UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CITY OF PALMETTO,

*Plaintiff,*

v.

PURDUE PHARMA L.P, CEPHALON,
INC., TEVA PHARMACEUTICALS
USA, INC., ENDO INTERNATIONAL
PLC, ENDO PHARMACEUTICALS,
INC., JANSSEN PHARMACEUTICALS,
INC., INSYS THERAPEUTICS, INC.,
MALLINCKRODT PLC,
MALLINCKRODT
PHARMACEUTICALS,
AMERISOURCEBERGEN
CORPORATION, CARDINAL
HEALTH, INC., and MCKESSON
CORPORTATION,

*Defendants.*

CASE NO: 8:18-cv-2036-T-36CPT

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, the City of Palmetto, by and through its undersigned counsel, hereby brings this

Complaint for Damages against Defendants, and in support thereof, alleges as follows:

## INTRODUCTION

1. Defendants manufacture, market and sell prescription opioids (hereinafter "opioids"),

including brand-name drugs like Oxycontin and Percocet, and generics like oxycodone and

hydrocodone, which are powerful narcotic painkillers. Historically, because they were

considered too additive and debilitating for the treatment of chronic pain (e.g., back pain,

migraine, and arthritis),[1] opioids were used only to treat short-term acute pain or for palliative (end-of-life) care.

2. However, by the late 1990s, and continuing through today, each Defendant began a marketing scheme designed to persuade a wide swath of health care provider and doctors, as well as patients, that opioids can and should be used for chronic pain. This broadened group of targeted health care providers and doctors made it much more likely that patients would become addicted and suffer other adverse effects from the long-term use of opioids. In connection with this scheme, each Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioid use while overstating the benefits of using them for chronic pain.

3. Defendant's efforts were and continue to be wildly successful. Opioids are now the most commonly prescribed class of drugs, generating $11 billion in revenue for drug companies in 2014 alone and resulting in a national health crisis of opioid addiction. In 2014, more than 47,000 people died in the United States from lethal drug overdoses. In 2015, that number exceeded 52,000,[2] a number representing far more deaths than caused by car crashes and gun homicides combined. In 2016, the number of drug-related deaths had grown to more than 64,000. Sadly, this trend shows no sign of slowing. Alarmingly, more than three out of five of these deaths involve opioids – a dangerous, highly addictive and often lethal class comprised of natural, synthetic, and semi-synthetic painkillers. Nearly half of those involved legal opioids prescribed by doctors to treat pain. These prescription

---

[1] In this Complaint, "chronic pain" means non-cancer pain lasting three months or longer.
[2] Rose A. Rudd, *et al.*, *Increases in Drug and Opioid-Involved Overdose Deaths – United States, 2010-2015*, 65 Morbidity & Mortality Weekly Report 1445-52 (2016), available at https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm (hereinafter "Rudd, *Increases in Drug and Opioid-Involved Overdose*").

opioids include branded medications (e.g.) OxyContin, Opana, Subsys, Fentora, and

Duragesic, as well as generics labeled as oxycodone, methadone, and fentanyl. In all, more

than 183,000 people died in the United States between 1999 and 2015 from overdoses

directly related to prescription opioids,[3] and current estimates suggest 145 people now die

every day in the United States from opioid overdoses.[4] Public health officials have called

the current epidemic the worst drug crisis in American history,[5] and on October 26, 2017,

President Donald Trump officially declared it a public health emergency. The following

charts[6] illustrate the rise of opioid-related deaths in the United States:

---

[3] That number does not take into account the staggering number of additional illicit opioid deaths that can be related back to doctor-prescribed opioids; indeed, four out of five new heroin users began first with prescription opioid misuse. Christopher M. Jones, *Heroin use and heroin use risk behaviors among nonmedical users of prescription opioid pain relievers – United States, 2002-2004 and 2008-2010*, 132 (1-2) Drug & Alcohol Dependence 95-100 (Sept. 1, 2013), available at http://www.drugandalcoholdependence.com/article/S0376-8716(13)00019-7/pdf. Still, most misused prescription drugs are obtained directly or indirectly from a doctor's prescription; only 4% of persons misusing or addiction to prescription drugs report getting them from a drug dealer or stranger. Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, And Why It's So Hard to Stop*, 18 (John Hopkins University Press 2016); "[U]nintentional poisoning deaths from prescription opioids quadrupled between 1999 and 2010, outnumbering deaths from heroin and cocaine combined." Kathleen Frydl, *Purdue Pharma: Corporate Fraud With a Body Count*, Alternet (May 18, 2016), available at https://www.alternet.org/drugs/purdue-pharma-corporate-fraud-body-count (hereafter "Frydl, *Purdue Pharma*").

[4] Patrick Keefe, *The Family that Built an Empire of Pain*, New Yorker (Oct. 30, 2017), available at https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain (hereafter "Keefe, *Empire of Pain*").

[5] Julie Borman, *Inside a Killer Drug Epidemic: A Look at America's Opioid Crises*, N.Y. Times (Jan. 6, 2017), available at https://www.nytimes.com/2017/01/06/us/opioid-crisis-epidemic.html.

[6] German Lopez & Sarah Frostenson, *How the Opioid Epidemic Became America's Worst Drug Crisis Ever, in 15 Maps and Charts*, Vox (Mar. 23, 2017), available at http://www.vox.com/science-and-health/2017/3/23/14987892/opioid-heroin-epidemic-charts (hereafter "Lopez, *How the Opioid Epidemic*"); National Institute on Drug Abuse, Overdose Death Rates, https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (last visited Mar. 6, 2017).



**Drug overdose deaths in America**

Note: Some deaths on this chart may overlap if they involve multiple drugs.

All drugs   Opioid painkillers (minus synthetic opioids)
Non-methadone synthetic opioids (particularly fentanyl)   Heroin

Source: National Institute on Drug Abuse



**Drugs Involved in U.S. Overdose Deaths, 2000 to 2016**

Synthetic Opioids other than Methadone, 20,145
Heroin, 15,446
Natural and semi-synthetic opioids, 14,427
Cocaine, 10,619
Methamphetamine, 7,663
Methadone, 3,314

4.   In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to

4

doctors...[m]any of [whom] were even taught – incorrectly- that opioids are not addictive when prescribed for legitimate pain"[7]

5.  Like many states across the country, Florida is suffering the effects of this unprecedented addiction epidemic. Florida healthcare providers wrote 67.1 prescriptions for opioid medications per 100 people in 2015 and 66.6 per 100 people in 2016. Of the 33,000 people who died nationwide of opioid overdoses in 2015, approximately 12% were Floridian. On May 4, 2017, Governor Rick Scott officially declared the opioid epidemic a public health emergency in Florida, stating, "The individuals struggling with drug use are sons, daughters, mothers, fathers, sisters, brothers, and friends, and each tragic case leaves loved ones searching for answers and praying for help. Families across our nation are fighting the opioid epidemic, and Florida is going to do everything possible to help our communities."[8]

6.  The region made up of Sarasota, Manatee and DeSoto counties has been hit hard by the opioid epidemic. The area has seen opioid usage and accidental overdose deaths rise to alarming levels – from 246 drug overdose deaths in 2015 to 263 in 2016.[9] Manatee County, known as the epicenter of the opioid epidemic in Florida[10], saw deaths rise from 153 in 2015 to 182 in 2016.[11] Manatee had the highest number of per capita deaths in 2016 from

---

[7] Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, available at http://turnthetiderx.org/.

[8] Michael Auslen, *Gov. Scott declares public health emergency over opioid crisis*, Miami Herald (May 3, 2017), available at http://www.miamiherald.com/news/health-care/article148355444.html.

[9] Zac Anderson, *Overdose Deaths keep climbing in Southwest Florida*, Sarasota Herald-Tribune (July 27, 2017), available at http://www.heraldtribune.com/news/20170727/overdose-deaths-keep-climbing-in-southwest-florida. (hereafter "Anderson, *Overdose Deaths*").

[10] Hannah Morse, *Manatee ready to sue opioid makers over epidemic's cost*, Bradenton Herald (Mar. 20, 2018), available at http://www.bradenton.com/news/local/article206076599.html (hereafter "Morse, *Manatee ready to sue*").

[11] Anderson, *Overdose Deaths, supra* n. 9.

derivatives of fentanyl, a powerful synthetic opioid.[12] The fentanyl derivative carfentanil alone killed 95 people in Manatee in 2016. In fact, the county's death rate is rising so rapidly, the county is being forced to building a new morgue because they are running out of space to store bodies.[13] At least thirty-nine of those deaths in 2016 were related to prescription opioid usage[14] with numbers likely to increase, as the Manatee County Sheriff's Office has already investigated 47 suspected overdoses in the first two months of 2018, at least 6 of which were fatal.[15]

7.  As such, located in Manatee County, the City of Palmetto ("City" or "Palmetto"), sits squarely in the crosshairs of the opioid-fueled-epidemic. Indeed, the City's residents have spent untold amounts on opioid medications they believe to be safe and effective, only to find themselves addicted, or worse. Upon information and belief, Palmetto spends millions of dollars each year to provide a wide range of opioid-and-addiction-related services for its residences and visitors – money that it would not have had to spend but for the extreme and continuing public nuisance caused by Defendants' actions – including, as just one example, law enforcement and emergency response services and treatment.

8.  In fact, the City has seen an unprecedented growth in the drug addiction treatment industry, which now helps people from across the country who are desperately seeking treatment for

---

[12] Zac Anderson, *Opioid abuse legislation facing resistance from Florida doctors*, Sarasota Herald Tribune (Jan. 10, 2018), available at http://www.heraldtribune.com/news/20180110/opioid-abuse-legislation-facing-resistance-from-florida-doctors.
[13] Dan Matica, *Manatee Co. to sue drug companies amid opioid crisis*, Fox 13 News (Dec. 5, 2017), available at http://www.fox13news.com/news/local-news/manatee-co-to-sue-drug-companies-amid-opiod-crisis.
[14] Anderson, *Overdose Deaths, supra* n.9.
[15] Jessica De Leon, *New Florida opioids law limits how many painkillers you can have*, Bradenton Herald (Mar. 19, 2018), available at http://www.bradenton.com/news/local/article205837024.html.

an opioid addiction that was caused by defendants' failure to report suspicious orders of opioid medication.

9. Drug manufacturers' deceptive marketing and sale of opioids to treat chronic pain is one of the main drivers[16] of this catastrophic epidemic. Prescription opioids have historically been used for short-term, post-surgical, and trauma-related pain, and for palliative end-of-life care primarily in cancer patients. Because opioids are, by their very nature, highly addictive and dangerous, the U.S. Food and Drug Administration ("FDA") regulates them as Schedule II Controlled Substances, *i.e.*, drugs that have a high potential for abuse and that may lead to severe psychological or physical dependence.

10. This demonstrated need for caution comports with the historical understanding of both the medical community and the American culture at large regarding the serious consequences of opioid use and misuse. Indeed, thousands of years of experience have taught that opium's ability to relieve pain comes at a steep price; it is a dangerously addictive and often lethal substance. For generations, physicians were taught that opioid painkillers were highly addictive and should be used sparingly and primarily for patients near death.[17] The medical community also understood that opioids were poorly suited for long-term use for two reasons: increasing patient drug tolerance would require escalating doses, and resulting dependence would make it extremely difficult to discontinue their use.

11. That prevailing and accurate understanding of the increased risks and decreasing benefits of long-term opioid use limited drug manufacturers' ability to drive sales. In order to

---

[16] The other main driver of this epidemic is both the drug manufacturers' and wholesalers' failure to report suspicious orders as required by state and federal law, discussed *infra*.

[17] Harriet Ryan, *et al.*, *OxyContin goes global* – *"We're only just getting started,"* L.A. Times (Dec. 18, 2016), available at http://www.latimes.com/projects/la-me-oxycontin-part3/ (hereinafter "Ryan, *OxyContin goes global*").

decrease reasonable concerns about opioids and to maximize profits, opioid manufacturers, including defendants Purdue, Janssen, Endo, Cephalon, Insys, and Mallinckrodt (individually defined in § II *infra*) (collectively, the "Manufacturing Defendants") engaged in a concerted, coordinated strategy to shift the way in which doctors and patients think about pain and, specifically, to encourage the use of opioids to treat not just the relative few who suffer from acute post-surgical pain and end-stage cancer pain, but the masses who suffer from a multitude of common chronic pain conditions.

12. Borrowing from the tobacco industry's playbook, the Manufacturing Defendants employed ingenious marketing strategies, as detailed further herein, designed to "reeducate" the public and prescribers. They deliberately conceived these strategies to create, and in fact did create, an entirely new "health care" narrative – one in which opioids are considered safe and effective for long-term use, and where pain is aggressively treated at all costs (with opioids). According to this newly fabricated narrative, pain was seriously under-treated throughout the United States because opioids were under-prescribed, and doctors were put under enormous pressure to treat all kinds of pain with opioids.

13. The Manufacturing Defendants' intention was to normalize aggressive prescribing of opioids for chronic pain by downplaying the very real risks of opioid usage, especially the risk of addiction, and by exaggerating the benefits of use for chronic pain. To accomplish this goal, they intentionally misled health care providers, including doctors, as well patients about the appropriate use, risks, safety, and efficacy of prescription opioids. They did so directly through sales representatives and marketing materials and indirectly through financial relationships with academic physicians, professional societies, hospitals, the trade association for state medical boards and seemingly neutral third-party foundations. False

8

and misleading messages about the safety, addictiveness, and efficacy were disseminated by infiltrating professional medical societies with shills, and crafting and influencing industry guidelines in order to disseminate false and deceptive pro-opioid communiqués under the guise of science and truth.

14. The Manufacturing Defendants assured the public and prescribers that the risk of becoming addicted to prescription opioids among patients being treated for pain was less than 1%. In reality, many people with no addiction history can become addicted after just days or weeks of use.[18] Estimates for the risk of addiction range up to 56% of patients receiving long-term prescription opioid painkillers.[19] Indeed, almost one in five people who take an opioid for only ten days will still be taking opioids one year later.[20] The following chart[21] illustrates the degree to which the risk of dependency exists even after just several day of opioid therapy:

---

[18] Lembke (2016), *supra* n.3, at 22.
[19] Bridget A. Martell, *et al.*, *Systemic Review: Opioid treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-27 (2007), available at http://annals.org/aim/article/732048/systematic-review-opioid-treatment-chronic-back-pain-prevalence-efficacy-association.
[20] Sarah Frostenson, *The Risk of a Single 5-Day Opioid Prescription, in One Chart*, Vox (Mar. 18, 2017), available at http://www.vox.com/2017/3/18/14954626/one-simple-way-to-curb-opioid-overuse-prescribe-them-for-3-days-or-less.
[21] Lopez, *How the Opioid Epidemic, supra* n.6.



**Risk of continued opioid use increases at 4-5 days**

Likeliness of continuing to use opioids

Source: Centers for Disease Control and Prevention
Credit: Sarah Frostenson

15. By 2012, Florida doctors were writing 73 opioid prescriptions for every 100 Florida state residents.[22] In essence, the Manufacturing Defendants manipulated and misrepresented medical science to serve their own agenda at great human cost:

---

[22] *Opioid Painkiller Prescribing Infographic*, Centers for Disease Control and Prevention: Vital Signs (July 2014), available at https://www.cdc.gov/vitalsigns/opioid-prescribing/infographic.html#map.



*Annual Review of Public Health*

16. Defendants McKesson Corporation ("McKesson"), Cardinal Health, Inc. ("Cardinal Health"), and AmerisourceBergen Corporation ("AmerisourceBergen") (collectively, the "Wholesaler Defendants") are major distributors of controlled substances that act as middlemen between drug companies and pharmacies. The Wholesaler Defendants (in addition to the manufacturing Defendants) were also aware of the growing epidemic from the addiction to, and abuse of, prescription opioids supplied by them. The Manufacturing Defendants and the Wholesaler Defendants were accordingly both well aware of the quantities and frequency with which those drugs were distributed to entities in Palmetto. However, both the Manufacturing Defendants and the Wholesaler Defendants persisted in failing to report suspicious sales as required by state and federal law. Their failure to follow the law significantly contributed to soaring addiction and overdose rates in Palmetto.

17. Defendants wholly failed to meet their obligations to timely report and put a halt to these and other suspicious sales, fueling the epidemic in Palmetto.

11

18. The Wholesaler Defendants' violations have already led to fines elsewhere. McKesson, the largest prescription wholesaler company in the United States, agreed on January 17, 2017, to pay a $150 million fine to the federal government for such misconduct. In December 2016, Cardinal Health reached a $44 million settlement with the federal government. One month later, Cardinal Health reached a $20 million settlement with the State of West Virginia, which has been among the states hardest hit by opioid abuse. AmerisourceBergen also recently agreed to pay West Virginia $16 million for similar violations.[23]

19. If profit be the measure, Defendants' scheme has been met with tremendous success. According to *Fortune* magazine, McKesson, AmerisourceBergen, and Cardinal Health are each among the top 15 companies in the Fortune 500. The Sackler family, which owns Purdue – a privately held company – is listed on *Fortune*'s list of America's wealthiest families. "The Sackler dynasty's ruthless marketing of painkillers has generated billions of dollars – and millions of addicts."[24] However, the impact of opioid addiction has devastated the nation, emerging as one of the country's, Florida's, and Palmetto's major health threats. As reported by *National Public Radio*, opioid addiction is thought to be among factors contributing to the United States' increase in overall rate for mortality from 2014 to 2015, the first time in a decade that the mortality rate increased. Former FDA Commissioner David A. Kessler has called the failure to recognize the dangers of painkillers "one of the greatest mistakes of modern medicine." As alleged herein, that "mistake" resulted in large part from defendants' intentionally false and misleading messaging, which was carefully

---

[23] Charles Ornstein, *Drug Distributors Penalized For Turning Blind Eyes in Opioid Epidemic*, National Public Radio (Jan. 27, 2017), available at http://www.npr.org/sections/health-shots/2017/01/27/511858862/drug-distributors-penalized-for-turning-blind-eye-in-opioid-epidemic.
[24] Keefe, *Empire of Pain, supra* n.4.

12

calculated to reach as many prescribers as possible, as well as Defendants' willingness to turn a blind eye to suspicious orders.

20. Even where some defendants have previously been forced to admit the unlawful marketing and sale of opioids and/or the failure to report suspicious orders, the conduct has not abated because profits realized by the aggressive marketing and prescribing of opioids continue to dwarf the penalties imposed as a result of violations found. Thus, the incentive to push opioids remains. The scheme has been so financially successful, in fact, that despite the clear and obvious devastation it caused at home, Purdue's owners, the Sackler family, are now pursuing the same strategy abroad. As reported by the *Los Angeles Times*, Purdue states "[w]e're only just getting started," and intends to "[p]ut the painkiller that set off the United States opioid crisis into medicine cabinets worldwide. A network of international companies owned by the family is moving rapidly into Latin America, Asia, the Middle East, Africa and other regions, and is pushing for broadened use of painkillers in places ill-prepared to deal with the ravages of opioid use and addiction."[25]

## PARTIES, JURISDICTION, AND VENUE

21. Plaintiff Palmetto is a municipal corporation organized under the laws of the State of Florida. Palmetto is responsible for the public health, safety, and welfare of its residents, is a citizen of the State of Florida for diversity purposes and has the capacity to sue and be sued. The City has been authorized by the City Commission to bring this suit.

22. Defendant Purdue Pharma L.P. is a Delaware limited partnership formed in 1991 with headquarters located in Stamford, Connecticut. The company maintains four operational

---

[25] Ryan, *OxyContin Goes Global*, *supra* n.17.

branches: Purdue Pharma L.P., the Purdue Frederick Company, Purdue Pharmaceutical Products L.P., and Purdue Products L.P. (referred to collectively herein as "Purdue").

23. Defendant Cephalon, Inc. is a Delaware corporation with its headquarters and principal place of business located in Frazer, Pennsylvania. Cephalon, Inc. was acquired by Teva Pharmaceutical Industries Ltd. ("Teva Ltd") in October 2011. Teva Ltd. Is incorporated under the laws of Israel with its principal place of business in Petah Tikva, Israel. Since Teva Ltd. Acquired with Cephalon, Inc., its U.S. sales and marketing activities have been conducted by Teva Pharmaceuticals USA, Inc. ("Teva USA" and, together with Teva Ltd., "Teva"), a wholly-owned operating subsidiary of Teva Ltd. Teva USA's headquarters and principal place of business are in North Wales, Pennsylvania. Cephalon, Inc. and Teva are collectively referred to herein as "Cephalon."

24. Defendant Endo International plc is an Irish public limited company with its headquarters in Dublin, Ireland. Endo Pharmaceuticals Inc. (together with Endo International plc, "Endo") is a Delaware corporation with its headquarters and principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is an indirectly wholly-owned subsidiary of Endo International plc.

25. Defendant Janssen Pharmaceuticals, Inc. ("Janssen") (formerly known as Ortho-McNeil-Janssen-Pharmaceuticals, Inc. and Janssen Pharmaceutica) is headquartered in Titusville, New Jersey and Raritan, New Jersey. Janssen is a wholly-owned subsidiary of Johnson & Johnson, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

26. Defendant Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.

27. Defendant Mallinckrodt plc is an Irish public limited company with its headquarters in Staines-Upon-Thames, Surrey, United Kingdom. Defendant Mallinckrodt Pharmaceuticals (together with Mallinckrodt plc, "Mallinckrodt") is a Delaware corporation with its headquarters in Hazelwood, Missouri.

28. Defendant AmerisourceBergen is a Delaware corporation with its headquarters and principal place of business in Chesterbrook, Pennsylvania.

29. Defendant Cardinal Health is a Delaware corporation with its headquarters and principal place of business located in Dublin, Ohio.

30. Defendant McKesson is a Delaware corporation with its headquarters and principal place of business located in San Francisco, California.

31. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

32. Venue is proper pursuant to 28 U.S.C. § 1391. This Court has personal jurisdiction over each defendant as each purposefully availed itself of the privilege of exploiting forum-based business opportunities, and the exercise of personal jurisdiction is accordingly proper pursuant to Fla. Stat. § 48.193.

## FACTUAL ALLEGATIONS

I.    **Over the Couse of More than Two Decades, the Manufacturing Defendants Misled the Public Regarding the Dangers of Opioid Addiction and the Efficacy of Opioids for Long-Term Use, Causing Sales and Overdose Rates to Soar**

33. From the mid-90s to the present, the Manufacturing Defendants aggressively marketed and falsely promoted liberal opioid prescribing as presenting little to no risk of addiction, even when used long term for the treatment of chronic pain. Upon information and belief, they infiltrated academic medicine and regulatory agencies with sham evidence to convince doctors that treating chronic pain with long-term opioids was evidence-based medicine

when, in fact, it was not. Huge profits resulted from these efforts, as did the present addiction and overdose crisis.

A.    Background on Opioid Prescribing

34. The Manufacturing Defendants' scheme to drive their rapid and dramatic expansion of prescription opioids was rooted in two pieces of so-called evidence. The first purported "evidence" was the publication of a 100-word letter to the editor published in 1980 in the *New England Journal of Medicine* ("1980 Letter to the Editor").[26] A recent article about the letter, titled "A 5-sentence letter helped trigger America's deadliest drug overdose crisis ever," quoted a 2017 study in the *New England Journal of Medicine*, in which researchers concluded:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was a heavily and uncritically cited as evidence that addiction was rare in long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy.[27]

---

[26] The 1980 Letter to the Editor, by Jane Porter ("Porter") and Dr. Hershel Jick ("Jick"), reported that less than 1% of patients at Boston University Medical Center who received narcotics while hospitalized became addicted. Jane Porter & Hershel Jick, *Addiction Rates in Patients Treated with Narcotics*, 302(2)New Eng. J. Med. 123 (Jan. 10, 1980). However, the letter did not support the conclusion for which it was often cited by the industry. Harrison Jacobs, *This One-Paragraph letter May Have Launched the Opioid Epidemic,* Bus. Insider (May 26, 2016), available at http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5 (hereinafter "Jacobs, *One-Paragraph Letter*"). As discussed in a 2009 article in the American Journal of Public Health, the 1980 Letter to the Editor "shed[] some light on the risk of addiction for acute pain, [but did] not help establish the risk of iatrogenic addiction when opioids are used daily for a prolonged time in treating chronic pain. [Indeed, t]here are a number of studies . . . that demonstrate that in the treatment of chronic non-cancer-related pain with opioids, there is a high incidence of prescription drug abuse." Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am. J. Pub. Health 221-27 (Feb. 2009) (hereinafter, "Van Zee, Promotion and Marketing").

[27] German Lopez, *A 5-Sentence Letter helped Trigger America's Deadliest Overdose Crisis Ever,* Vox (June 1, 2017), available at https://www.vox.com/science-and-health/2017/6/1/15723034/opioid-epidemic-letter-1980-study.

35. The second piece of purported evidence was comprised of a single medical study published by Drs. Russell Portenoy ("Portenoy") and Kathleen Foley ("Foley") ("Portenoy Publication").[28] Portenoy emerged as one of the industry's most vocal proponents of long-term opioid use, and essentially made it his life's work to campaign for the movement to increase the use of prescription opioids. Portenoy was one of Big Pharma's[29] "thought leaders" (in effect, one of Big Pharma's aforementioned shills) and was paid to travel the country to promote more liberal prescribing for many types of pain. His talks were sponsored by the Manufacturing Defendants and organization paid by them as continuing medical education ("CME") programs for doctors. Portenoy also had financial relationships with at least a dozen pharmaceutical companies, most of which produced prescription opioids.[30]

36. Portenoy has not admitted that he minimized the risk of opioids.[31] In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his earlier work purposefully relied on evidence that was not "Real" and left real evidence behind:

---

[28] In 1986, the medical journal Pain, which would eventually become the official journal of the American Pain Society ("APS"), published an article by Portenoy and Foley summarizing the results of a "study" of 38 chronic non-cancer pain patients who had been treated with opioid painkillers. Portenoy and Foley concluded that, for non-cancer pain, opioids "can be safely and effectively prescribed to selected patients with relatively little risk of producing the maladaptive behaviors which define opioid abuse." However, their study was neither scientific nor did it meet the rigorous standards commonly used to evaluate the validity and strength of such studies in the medical community. For instance, there was no placebo control group, and the results were retroactive (asking patients to describe prior experiences with opioid treatment rather than less biased, in-the-moment reports). The authors themselves advised caution, stating that the drugs should be used as an "alternative therapy" and recognizing that longer term studies of patients on opioids would have to be performed. None were. See Russell K. Portenoy & Kathleen M. Foley, *Chronic use of opioid analgesics in non-malignant pain: report of 38 cases*, 25(2) Pain 171-86 (May 1986).
[29] "Big Pharma" is used herein to refer to large pharmaceutical companies considered especially as a politically influential group.
[30] Lembke (2016), *supra* n.4, at 59 (citing Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (St. Martin's Press, 1st ed. 2003)).
[31] Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, New Yorker (Nov. 8, 2013), available at http://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic (hereinafter "Gounder, *Who Is Responsible*").

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of though or avenues of evidence, *none of which represented real evidence*, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way that they hadn't before. *In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.*[32]

37. The damage, however, was already done. The Manufacturing Defendants used these two publications, the 1980 Letter to the Editor and the Portenoy Publication, and the foundation for a massive, far-reaching campaign to dramatically shift the thinking of healthcare providers, patients, policymakers, and the public on the risk of addiction presented by opioid therapy. By 1997, the APS and the American Academy of Pain Medicine ("AAPM") (both funded by the Manufacturing Defendants) issued a "landmark consensus," co-authored by Portenoy, stating there is little risk of action or overdose in pain patients.[33]

38. In the years following publication of the 1980 Letter to the Editor and the Portenoy Publication, the Manufacturing Defendants introduced powerful prescription opioids into the market. Purdue introduced MS Contin in 1987 and OxyContin in 1995; Janssen introduced Duragesic in 1990; and Cephalon's Actiq was first approved by the FDA in 1998. More recently, Endo's Opana and Opana ER were approved by the FDA in 2006; Janssen's Nucynta, approvied in 2008 and Nucynta ER, approved in 2011; Cephalon's Fentora, approved in 2006; and Insys's Subsys. approved in 2012.

39. These branded prescription opioids and their generic counterparts are highly addictive. Between doses, patients are likely to experience symptoms of withdrawal that include, but

---

[32] Jacobs, *One-Paragraph Letter, supra* n.23; Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011), available at https://www.youtube.com/watch?v=DgyuBWN9D4w&feature=youtu.be.

[33] Jacobs, *One-Paragraph Letter, supra* n.23.

are in no way limited to: suffering from body aches; nausea; sweats; racing heart; hypertension; insomnia; anxiety; agitation; opioid cravings; and opioid induced hyperalgesia (heightened sensitivity to pain). When the agony is relieved by the next dose, it creates a cycle of dysphoria and euphoria that fosters addiction and dependence.

40. Despite the prescription opioids' highly addictive qualities, the Manufacturing Defendants launched aggressive pro-opioid marketing efforts that effected a dramatic shift in the public's and prescribers' perception of the safety and efficacy of opioids for chronic long-term pain and everyday use. In direct contravention to what doctors had previously understood about opioid risk and benefits, and for the past two decades, doctors and other health care providers have been encouraged by the Manufacturing Defendants to prescribe opioids aggressively and were assured, based on false evidence provided directly by the Manufacturing Defendants and numerous medical entities funded by the Manufacturing Defendants and others with a financial stake in generating more opioid prescriptions, that (i) the risk of becoming addicted was less than 1%; and (ii) great harm was caused by "under-treated" pain." These two foundational falsehoods has led directly to the current opioid crisis.

41. The Defendants' strategy was a brilliant marketing success. It was designed to recategorize back pain, neck pain, headaches, fibromyalgia, and other common condition suffered by most of the population at some point in their lives as a distinct malady – chronic pain – that doctors and patients should take seriously and for which opioids were an appropriate, successful, and low-risk treatment. Indeed, studies not show that more than 85% of patients taking OxyContin at common doses are doing so for chronic non-cancer pain.[34]

---

[34] Ryan, *OxyContin goes global, supra* n.17.

42. This false and misleading marketing strategy continued despite studies revealing that up to 56% of patients receiving long-term prescription opioid painkillers for chronic back pain progress to addictive opioid use, including patients with no prior history of addiction.[35]

43. Thus, based on false and incomplete evidence, the Manufacturing Defendants exponentially expanded their market from patients with end-stage cancer and acute pain, an obviously limited customer base, to anyone suffering from chronic pain, which by at least one account includes approximately 100 million Americans – nearly one-third of the country's population.[36] The treatment of chronic pain now includes patients whose general health is otherwise good enough to refill prescriptions month after month and year after year. This has significantly increased and the manufacture, promotion, and distribution (all without reporting either suspicious sales and aberrantly high sales volume of opioids) for such treatment has made defendants billions of dollars. It has also led to the opioid addiction and overdose crisis in the City of Palmetto.

B.    The Fraudulent Sales Practices

44. As set forth below, the Manufacturing Defendants employed a variety of strategies to normalize the use of opioids for chronic long-term pain without disclosing to or otherwise informing the public and prescribers about the very significant risk of addiction, overdose, and death.

---

[35] Lembke (2016), *supra* n.4, at 22 (citing Martell, *et al., Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy and Association with Addiction*, 146(2) Ann. Intern. Med. 116-27 (2007)).
[36] AAPM Facts and Figures on Pain, The American Academy of Pain Medicine, http://www.painmed.org/patientcenter/facts_on_pain.aspx#refer (last visited Mar. 07, 2018).

*1.      The Manufacturing Defendants Funded Front Organizations that Published
and Disseminated False and Misleading Marketing Materials.*

45. Defendants sponsored purportedly neutral medical boards and foundations that educated
doctors and set guidelines for the use of opioids in medical treatment in order to influence
and promote the liberal prescribing of opioids for chronic pain. The following
organizations, funded by the Manufacturing Defendants, advised doctors that liberal
prescribing of opioids was both safe and effective. In truth, it was neither.

46. **Federation of State Medical Boards:** The Federation of State Medical Boards ("FSMB")
is a national organization that functions as a trade group representing the 70 medical and
osteopathic boards in the United States. The FSMB routinely develops guidelines that serve
for model policies with the stated goal of improving medical practice. Defendants Purdue,
Cephalon, and Endo have provided substantial funding to the FSMB. Among its members
are the Florida Board of Medicine and the Florida Board of Osteopathic Medicine.

47. In 2007, the FSMB published and distributed a physician's guide on the use of opioids to
treat chronic pain entitled "Responsible Opioid Prescribing: A Physician's Guide" and
authored by Dr. Scott M. Fishman ("Fishman"). After the Fishman guide was adopted as a
model policy, the FSMB reported asked Purdue for $100,00 to help pay for printing and
distribution. Ultimately, the 2007 Fishman guide was disseminated by the FSMB to
approximately 700,000 practicing doctors.

48. The Fishman guide's clear purpose is to focus prescribers on the purported under-treatment
of pain and falsely assure them that opioid therapy is an appropriate treatment for chronic,
non-cancer related pain:

   - Pain management is integral to good medical practice and for all
     patients;

- ***Opioids therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins;***

- ***Patients should not be denied opioid medication except in light of clear evidence that such medications are harmful to the patient.***

\* \* \*

***Four key factors contribute to the ongoing problem of under treated pain:***

1. Lack of knowledge of medical standards, current research, and clinical guidelines for appropriate pain treatment;

2. The perception that prescribing adequate amounts of opioids will result in unnecessary scrutiny by regulatory authorities;

3. ***Misunderstanding of addiction and dependence; and***

4. Lack of understanding of regulatory practices and processes.[37]

49. While it acknowledges the risk of "abuse and diversion" (with scant attention paid to addiction), the Fishman guide purports to offer "professional guidelines" that will "easily and efficiently" allow physicians to manage that risk and "minimize the potential for [such] abuse."[38] Indeed, it states that even for those patients assessed to have risk of substance of abuse, "it does not mean that opioid use will become problematic or that opioids are contraindicated, "just that physicians should use additional care in prescribing."

50. The Fishman guide further warns physicians to "[b]e aware of the distinction between pseudoaddiction and addiction" and teaches that behaviors such as "[r]requesting [drug] by names," "[d]demanding or manipulative behavior," "[obtaining opioid drugs from more than one physician" and "[h]oarding opioids," which are, in fact, signs of genuine addiction, are all really just signs of "pseudoaddiction." [39] It defines "Physical

---

[37] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide,* 8-9 (Waterford Life Sciences 2007).
[38] *Id.* at 9.
[39] *Id.* at 62.

22

Dependence" as an acceptable result of opioid therapy not to be equated with addiction and states that while "[i]t may be tempting to assume that patients with chronic pain and a history of recreational drug use who are not adherent to a treatment regimen are abusing medication," there could be other acceptable reason[s] for non-adherence.[40] The Fishman guide published in 2007, sponsored by the Manufacturing Defendants and their pain foundation, dramatically overstated the safety and efficacy of opioids and understated the risk of opioid addiction, but has nonetheless seminal authority status on opioid prescribing for the medical profession.

51. In 2012, Fishman Guide was updated ("Updated Fishman Guide) but again emphasizes the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, *it's critical to remember that the problem of unrelieved pain remains as urgent as ever.*[41]

52. The 2012 Updated Fishman Guide still assures the healthcare profession that "*[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins.*"[42]

53. In another guide authored by Fishman (Second Fishman Guide), he continues to downplay the risk of addiction: "*I believe clinicians must be very careful with the label 'addict'. I draw a distinction between a 'chemical coper' and an addict.*"[43] The 2012 Second

---

[40] *Id.*
[41] Scott M. Fishman, *Responsible Opioid Prescribing: A Clinician's Guide*, 10-11 (2d ed. 2012).
[42] *Id.* at 11.
[43] Scott M. Fishman, *Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication* 45 (Oxford University Press 2012).

Fishman Guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."

54. The heightened focus on the under-treatment of pain was a concept devised by Big Pharma and intended to sell opioids. *The FSMB actually issued a report calling on medical boards to punish doctors for inadequately treating pain.*[44] Among the drafters of this policy was Dr. J. David Haddox ("Haddox"), who coined the phrase "pseudoaddiction," which wholly lacked any evidence-based science but nonetheless quickly became the de facto term of choice for the Manufacturing Defendants and their allies to promote the use of opioids, even to patients displaying addiction symptoms. Later joining Purdue as vice president,[45] Haddox likened OxyContin to a harmless vegetable, stating at a 2003 conference at Columbia University, "If I gave you a stalk of celery and you ate that, it would be healthy. But if you put in the a blender and tried to shoot it into your veins, it would not be good."[46]

55. As noted in ¶¶ 92-103 *infra*, in 2012 and again in 2017, these various guides and the sources of their funding became the subject of a Senate investigation.

56. On June 8, 2012, the FSMB submitted a letter to the U.S. Senate Committee on Finance "Senate Finance Committee") concerning its investigation into the abuse and misuse of opioids.[47] While the letter acknowledged the escalation of drug abuse and related deaths resulting from prescription painkillers, the FSMB continued to focus on the "serious and related problem" that "[m]illions of Americans suffer from debilitating pain – a condition that, for some, can be relieved through the use of opioids." Among other things, the letter

---

[44] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec 17. 2012, at A1.

[45] Gounder, *Who is Responsible*, *supra* n.31.

[46] Keefe, *Empire of Pain*, *supra* n.4.

[47] June 8, 2012 Letter from Federation of State Medical Boards to U.S. Senators Max Baucus and Charles Grassley.

stated, "Studies have concluded that both acute pain and chronic pain are often under-treated in the United States, creating some serious repercussions that include the loss of productivity and quality of life." The letter cited no such studies. The letter also confirmed that the FSMB's "Responsible Opioid prescribing: A Physician's Guide" has been distributed in each of the 50 states and the District of Columbia.

57. In addition, the FSMB letter disclosed payments the FSMB received from organizations that develop, manufacture, produce, market, or promote the use of opioid-based drugs from 1997 through the present. Included in the payments received are the following payments from defendants:

| Company | Fiscal Year | Amount |
|---------|-------------|--------|
| Purdue | 2001 | $38,324.56 |
| | 2002 | $10,000.00 |
| | 2003 | $85,180.50 |
| | 2004 | $87,895.00 |
| | 2005 | $244,000.00 |
| | 2006 | $207,000.00 |
| | 2007 | $50,000.00 |
| | 2008 | $100,000.00 |
| | Total Purdue Payments | $822,400.06 |
| Endo | 2007 | $40,000.00 |
| | 2008 | $100,000.00 |
| | 2009 | $100,000.00 |
| | 2011 | $125,000.00 |
| | 2012 | $46,620.00 |
| | Total Endo Payments | $371,620.00 |
| Cephalon | 2007 | $30,000.00 |
| | 2008 | $100,000.00 |
| | 2011 | $50,000.00 |
| | Total Cephalon Payments | $180,000.00 |
| Mallinckrodt | 2011 | $100,000.00 |
| | Total Mallinckrodt Payments | $100,000.00 |

58. The letter also disclosed payments of $40,000 by Endo and $50,000 by Purdue to directly fund the production of "Responsible Opioid Prescribing" and disclosed that 42,366 copies of "Responsible Opioid Prescribing" were distributed in Florida alone.

59. **The Joint Commission:** The Joint Commission is an organization that established standards for treatment and accredits healthcare organizations in the United States. The Manufacturing Defendants, including Purdue, contributed misleading and groundless teaching materials and videos to the Joint Commission. Not surprisingly, these materials emphasized what Pharma coined the "under-treatment of pain"; referenced pain as the "fifth vital sign" (the first and only unmeasurable/subjective vital sign) that must be monitored and treated; and encouraged the use of prescription opioids for chronic pain while minimizing the danger of addiction. It also deprecated doctors' concerns about addiction as "inaccurate and exaggerated."

60. In 2000, the Joint Commission printed a book for purchase by doctors as part of required continuing education seminars that cited studies claiming "*there is no evidence that addiction is a significant issue when persons are given opioids for pain control.*" The book was sponsored by Purdue.

61. In 2001, the Joint Commission and the National Pharmaceutical Council (founded in 1953 and supported by the nation's major research-based biopharmaceutical companies[48]) collaborated to issue a 101-page monograph titled "Pain: Current Understanding of Assessment, Management, and Treatments." The monograph states falsely that beliefs about opioids being addictive are "erroneous":

> *Societal issues that contribute to the undertreatment of pain include drug abuse programs and erroneous beliefs about tolerance, physical dependence, and addiction (see I.E.5). For example, some clinicians*

---

[48] Currently funded by Johnson & Johnson, Purdue, and Teva, among others.

*incorrectly assume that exposure to an addictive drug usually results in addiction.*

\*     \*     \*

**b. Etiology, issue, and concerns**

Many medications produce tolerance and physical dependence, and some (*e.g.* opioids, sedatives, stimulants, anxiolytics, some muscle relaxants) may cause addiction in vulnerable individuals. Most experts agree that *patients who undergo prolonged opioid therapy usually develop physical dependence but do not develop addictive disorders. In general, patients in pain do no become addicted to opioids. Although the actual risk of addiction is unknown, it is thought to be quite low.* A recent study of opioid analgesic use revealed "low and stable" abuse of opioids between 1990 and 1996 despite significant increases in opioids prescribed...

*Fear of causing addiction (i.e. iatrogenic addiction), particularly with opioid use, is a major barrier to appropriate pain management. This fear sometimes reflects a lack of understanding of the risk of addiction with therapeutic drug use. Although studies suggest that the risk of iatrogenic addiction is low* (e.g., Perry and Heidrich, Zenz et al.), *surveys indicate that clinicians often overestimate this risk.*[49]

62. Additionally, the monograph recommends that "[p]ain...is assessed in all patients" and suggests that long-acting (*i.e.* extended release) pain medications are superior and should be used whenever possible:

*Long-acting and sustained-release opioids are useful for patients with continuous pain, as they lessen the severity of end-of-dose pain* and often allow the patient to sleep through the night.

\*     \*     \*

- Administer opioids primarily via oral or transdermal routes, using long-acting medications when possible.[50]

In truth, such medications often do not last as long as promised, and there is evidence to suggest that the use of long-acting drugs may actually create more addicts.

---

[49] Pain: Current Understanding of Assessment, Management, and Treatments 16-17 (Dec. 2001), available at http://www.npcnow.org/system/files/research/download/Pain-Current-Understanding-of-Assessment-Management-and-Treatments.pdf (footnotes and citations omitted).

[50] *Id.* at 38, 68 (Table 38).

63. The Manufacturing Defendants' infiltration and influence over the Joint Commission's standards and literature exerted overwhelming pressure on doctors to treat and eliminate pain. As more and more doctors migrated from private practice to integrated healthcare systems in the 2000s, treatment options were dictated by, among other things, the Joint Commission's guidelines.[51] Consistent with guidelines, doctors who left pain untreated were viewed as demonstrating poor clinical skills and/or being morally compromised.[52]

64. The U.S. General Accounting Office's December 2003 Report to Congressional Requesters confirms that Purdue funded the "pain management educational courses" that taught the new standard of care for treating pain. It further revealed that Purdue disseminated educational materials on pain management, which "'facilitated [Purdue's] access to hospitals to promote OxyContin.'"[53]

65. **The American Pain Foundation**: The American Pain Foundation ("APF"), headquartered in Baltimore, Maryland, described itself as the nation's largest organization for pain patients.[54] While APF held itself out as an independent patient advocacy organization, in reality it received 90% of its funding in 2010 from the drug and medical-device industry, including from defendants Purdue, Endo, Janssen and Cephalon. It received more than $10 million in funding from opioid manufacturers between 2007 and 2012, when it shut down days after the Senate Finance Committee launched an investigation of APF's promotion of prescription opioids.

---

[51] Lembke (2016), *supra* n.4, at 119.
[52] *Id*. at 42.
[53] Gounder, *Who Is Responsible*, *supra* n.31; U.S. General Accounting Office, GAO-04-110, *Prescription Drugs, OxyContin Abuse and Diversion and Efforts to Address the Problem* (Dec. 2003), available at https://www.gao.gov/new.items/d04110.pdf.
[54] The APF was the focus of a December investigation by ProPublica in the *Washington Post* that detailed its close ties to drugmakers.

28

66. The APF's guides for patients, journalists and policymakers trivialized the risk of addiction, while at the same time greatly exaggerating the benefits associated with opioid painkillers.[55]

67. For example, in 2001, APF published "Treatment Options: A Guide for People Living with Pain."[56] The guide, which was produced through the support from companies including defendants Cephalon and Purdue, misrepresented the risks associated with opioid use. Among other things, the guide:

- lamented that opioids were sometimes called narcotics, because *"[c]alling opioid analgesics 'narcotics' reinforces myths and misunderstandings* as it places emphasis on their potential abuse rather than on the importance of their use as pain medicines";[57]

- stated that "[o]pioids are an essential option for treating moderate to severe pain associated with surgery or trauma;[58] and

- opined that "[r]estricted access to the most effective medications for treating pain [opioids] is not the solution to drug abuse or addiction."[59]

The guide included blurbs from Portenoy, who is quoted as saying "[t]his is a very good resource for the pain patient," and Fishman, who is quoted as saying, "[w]hat a great job! Finally, a pill consumer resource created for patients with pain. A 'must have' for every physician's waiting room."[60]

68. In 2003, APF published a newsletter titled "Best of . . . The Pain Community News" that purported to clarify any confusion over addiction and opioids and emphasized the "tragic

---

[55] Charles Ornstein & Tracy Weber, *American Pain Foundation Shut Down as Senators Launch Investigation of Prescription Narcotics*, ProPublica (May 8, 2012), available at https://www.propublica.org/article/senate-panel-investigates-drug-company-ties-to-pain-groups.
[56] *Treatment Options: A Guide for People Living with Pain*, American Pain Foundation, available at https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.
[57] *Id.* at 11.
[58] *Id.*
[59] *Id.* at 15.
[60] *Id.* at 76.

consequence of leaving many people with severe pain under-treated because they – or their doctors – fear that opioids will cause addiction."

69. In 2009, Endo sponsored APF's publication and distribution of "Exit Wounds: A Survival Guide to Pain Management for Returning Veterans & Their Families" ("Exit Wounds"), a book described as "the inspirational story of how one courageous veteran, with the aid of his family, recovered and thrived despite near death, traumatic brain injury, and the loss of a limb." It also purported to "offer[] veterans and their families comprehensive and authoritative information on . . . treatment options, and strategies for self-advocating for optimal pain care and medical resources inside and outside the VA system."

70. Among other false statements, Exit Wounds reported: "Long experience with opioids shows that *people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications*." Endo, through APF, thus distributed false information with the purpose of providing veterans false information they could use to "self-advocat[e]" for opioids while omitting a discussion of the risks associated with opioid use.

71. In 2009, APF played a central role in a first-of-its-kind web-based series called "Let's Talk Pain," hosted by veteran TV journalist Carol Martin. The series brought together healthcare providers and "people with pain to discuss a host of issues from managing health care for pain to exploring integrative treatment approaches to addressing the psychological aspects associated with pain." The "Let's Talk Pain" talk show is still available online. In the very first episode of this talk show, the following exchange took place:

> [**Teresa Shaffer (APF Action Network Leader)**]: As a person who has been living with pain for over 20 years, opioids are a big part of my pain treatment. And I have been hearing such negative things about opioids and the risk factors of opioids. Could you talk with me a little bit about that?
>
> [**Dr. Al Anderson (AAPM Board of Directors)**]: The general belief system in the public is that the opioids are a bad thing to be giving a

patient. Unfortunately, it's also prevalent in the medical profession, so patients have difficulty finding a doctor *when they are suffering from pain for a long period of time*, especially *moderate* to severe pain. And *that's the patients that we really need to sue the opioids* methods of treatment, because they are the one who need to have some help with the function and they're the ones that need o be controlled enough so that they can increase their quality of life.[61]

72. In reality, there is little scientific evidence to support the contention that opioids taken long-term improve function or quality of life for chronic pain patients.[62] To the contrary, there is ample evidence that opioids impose significant risks and adverse outcomes on long-term users and that they may actually reduce function.[63] As a recent article in the *New England Journal of Medicine* concluded: "Although opioid analgesics rapidly relieve many types of acute pain and improve function, the benefits of opioids when prescribed for chronic pain are much more questionable." The article continues, "opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national

---

[61] *Episode 1: Safe Use of Opioids (PainSAFE)*, Let's Talk Pain (Sept. 28, 2010), https://www.youtube.com/watch?v=zeAlVAMRgsk.

[62] Lembke (2016), *supra* n.4, at 59 (citing *Agency for Healthcare Research and Quality (US): The Effectiveness and Risks of Long-Term Opioid Treatment of Chronic Pain*, Evid. Rep./Tech Assess., No. 218 (2014), available at https://ahrq-ehc-application.s3.amazonaws.com/media/pdf/chronic-pain-opioid-treatment_executive.pdf.

[63] Discussing the "March 2016 Guideline for Prescribing Opioids for Chronic Pain" by the Centers for Disease Control ("CDC"), doctors wrote:

> Most placebo-controlled, randomized trials of opioids have lasted 6 weeks or less, and we are aware of no study that has compared opioid therapy with other treatments in terms of long-term (more than 1 year) outcomes related to pain, function, or quality of life. The few randomized trials to evaluate opioid efficacy for longer than 6 weeks had consistently poor results. In fact, several studies have showed that use of opioids for chronic pain may actually worsen pain and functioning, possibly by potentiating pain perception.

Thomas Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline*, 374 New Eng. J. Med. 1501-04 (Apr. 21, 2016), available at http://www.nejm.org/doi/full/10.1056/NEJMp1515917.

epidemic of opioid overdose deaths and addictions."[64]

73. The APF also developed the National Initiative on Pain Control ("NIPC"), which ran a facially unaffiliated website called www.painknowledge.org. The NIPC promoted itself as a n education initiative and promoted its expert leadership team, including purported experts in the pain management field. The website painknowledge.org promised that, while using opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. In a brochure available on painknowledge.org titled "Pain: Opioid Facts," the NIPC misleadingly stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted," and even refused to rule out the use of opioid pain relievers for patients who have a history of addiction to opioids.[65]

74. In or around 2011, the APF published the "Policymaker's Guide," sponsored by Purdue, which dispells the notion that "strong pain medication leads to addiction" by characterizing it as a *"common misconception*[]":

> *Many people living with pain, and even some health care practitioners, falsely believe that opioid pain medicines are universally addictive.* As with any medication, there are risks, but these risks can be managed when these medicines are properly prescribed and taken as directed. For more information about safety issues related to opioids and other pain therapies, visit http://www.painsafe.org.[66]

---

[64] Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain – Misconceptions and Mitigation Strategies*, 374 New Eng. J. Med. 1253-63 (Mar. 31, 2016), http://www.nejm.org/doi/full/10.1056/NEJMra1507771#t=article.
[65] Pain: Opioid Facts, Pain Knowledge, available at https://web.archive.org/web/20101007102042/http://painknowledge.org/patiented/pdf/Patient%20Education%20b380_b385%20%20pf%20opiod.pdf (last visited Mar. 14, 2018).
[66] *A Policymaker's Guide to Understanding Pain & Its Management*, American Pain Foundation at 5,

75. The guide describes "pain in America" as "an evolving public health crisis" and characterizes concerns about opioid addiction as misconceptions: "Unfortunately, too many Americans are not getting the pain care they need and deserve. Some common reasons for difficulty in obtaining adequate care include: . . . *Misconceptions about opioid addiction*."[67] It even characterizes as a "*myth*" that "*[c]hildren can easily become addicted to pain medications*."[68] The guide further asserts that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health and health-related quality of life for chronic pain patients, which was not the case.[69]

76. In December 2011, the *Washington Post* reported on ProPublica's investigation of the APF, which detailed APF's close ties to drugmakers:

> *[T]he pills continue to have an influential champion in the American Pain Foundation*, which describes itself as the nation's largest advocacy group for pain patients. *Its message: The risk of addiction is overblown, and the drugs are underused.*
>
> What the nonprofit organization doesn't highlight is the money behind that message.
>
> *The foundation collected nearly 90 percent of its $5 million in funding last year from the drug and medical-device industry – and closely mirrors its positions*, an examination by ProPublica found.[70]

---

http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last visited Mar. 08, 2018).
[67] *Id.* at 6.
[68] *Id.* at 40.
[69] The "Policymaker's Guide" cites for support "Opioids for chronic noncancer pain: a meta- analysis of effectiveness and side effects," a review published in 2006 in the *Canadian Medical Association Journal*. *Id.* at 34. However, the review concludes: "For functional outcomes, *the other analgesics were significantly more effective than were opioids*." Andrea D. Furlan, *et al.*, *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, 174(11) Canadian Med. Assoc. J. 1589-94 (May 23, 2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1459894/. The Purdue-sponsored guide failed to disclose both this conclusion and the fact that the review analyzed studies that lasted, on average, five weeks and therefore could not support the long-term use of opioids.
[70] Charles Ornstein & Tracy Weber, *Patient advocacy group funded by success of painkiller drugs, probe finds*, Wash. Post (Dec. 23, 2011), available at https://www.washingtonpost.com/national/healthscience/patient-advocacy-group-funded-by-success-of-painkiller-drugs-probefinds/2011/12/20/glQAgvczDP_story.html?utm_term. 22049984c606.

77. **American Academy of Pain Medicine and American Pain Society**: The Manufacturing Defendants, including at minimum Endo, Janssen and Purdue, have for decades contributed funding to the AAPM and the APS.

78. In 1997, the AAPM issued a "consensus" statement that endorsed the use of opioids for the treatment of chronic pain and claimed further that the risk of patient addiction to opioids was low. The chairman of the committee that issued the statement, Haddox, was at the time a paid speaker for Purdue. Haddox was later hired as Purdue's vice president for health policy. The consensus statement, which also formed the foundation of the 1998 guidelines, was published on the AAPM's website. AAPM's corporate council includes Purdue, Depomed, Teva and other pharmaceutical companies. AAPM's past presidents include Haddox (1998), Fishman (2005), Dr. Perry G. Fine ("Fine") (2011) and Lynn R. Webster ("Webster") (2013), all of whom have connections to the opioid manufacturers as well documented below.

79. At or about the same time, the APS introduced the "pain as the 5th vital sign" campaign, followed soon thereafter by the U.S. Department of Veterans Affairs adopting that campaign as part of their national pain management strategy.

80. AAPM and APS issued guidelines in 2009 ("2009 Guidelines") that continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the 2009 Guidelines received funding from defendants Janssen, Cephalon, Endo or Purdue.

81. The 2009 Guidelines falsely promoted opioids as safe and effective for treating chronic pain and concluded that the risk of addiction was manageable for patients regardless of past

abuse histories.[71] The 2009 Guidelines have proved to be a particularly effective channel of deception, and have influenced not only treating physicians but also the body of scientific evidence on opioids. They were reprinted in the journal *Pain*, have been cited hundreds of times in academic literature, and remain available online. The Manufacturing Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions.

82. The Alliance for Patient Access ("APA"): Founded in 2006, APA is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[72] It is run by Woodberry Associates, a lobbying firm that was also established in 2006.[73] As of June 2017, the APA listed 30 "Associate Members and Financial Supporters." The list includes Johnson & Johnson, Endo, Mallinckrodt, Purdue and Cephalon.

83. APA's board members have also received substantial funding directly from pharmaceutical companies.[74] For instance, board vice president Srinivas Nalamachu, M.D., who practices in Kansas, received more than $800,000 from 2013 through 2015 from pharmaceutical companies – nearly all of it from manufacturers of opioids or drugs that treat opioids' side-

---

[71] Roger Chou, *et al.*, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non- Cancer Pain*, 10(2) J. Pain 113 (Feb. 2009), available at http://www.jpain.org/article/S1526-5900(08)00831-6/pdf (hereinafter "Chou, *Clinical Guidelines*").

[72] The Alliance for Patient Access, *About AfPA*, http://allianceforpatientaccess.org/about-afpa/ (last visited Mar. 08, 2018). References herein to APA include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.

[73] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access Uses Journalists and Politicians to Push Big Pharma's Agenda*, Health News Review (Oct. 2, 2017), available at https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ (hereinafter "Jaklevic, *Non-profit Alliance for Patient Access*").

[74] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, available at https://projects.propublica.org/docdollars/.

effects, including from defendants Endo, Insys, Purdue and Cephalon. In 2017, Dr. Nalamachu's clinic was raided by FBI agents in connection with an investigation of Insys and its payment of kickbacks to physicians who prescribed Subsys.[75] Other board members include Dr. Robert A. Yapundich from North Carolina, who, between 2013 and 2015, received $215,000 from 2013 from pharmaceutical companies including defendants Cephalon and Mallinckrodt; Dr. Jack D. Schim from California, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies including defendants Endo, Mallinckrodt and Cephalon; Dr. Howard Hoffberg, a Maryland doctor who received $153,000 between 2013 and 2015 from pharmaceutical companies including defendants Endo, Purdue, Insys, Mallinckrodt and Cephalon; and Dr. Robin K. Dore, a California physician who received $700,000 between 2013 and 2015 from various pharmaceutical companies.

84. Among its other activities, APA issued a white paper titled "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse."[76] The white paper, *inter alia*, criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.

<p style="text-align:center">*    *    *</p>

> In some states, physicians who fail to consult prescription monitoring

---

[75] Andy Marso, *FBI seizes records of Overland Park pain doctor tied to Insys, Kansas City Star* (July 20, 2017), http://www.kansascity.com/news/business/health-care/article162569383.html.

[76] *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse, Institute for Patient Access* (Oct. 2013), available at http://1yh21u3cjptv3xjder1dco9mx5s.wpengine.netdna-cdn.com/wp-content/uploads/2013/12/PT_White-Paper_Finala.pdf.

> databases before prescribing pain medications for their patients are subject
> to fines; those who repeatedly fail to consult the databases face loss of their
> professional licensure. Such penalties seem excessive and may inadvertently
> target older physicians in rural areas who may not be facile with computers
> and may not have the requisite office staff. Moreover, threatening and fining
> physicians in an attempt to induce compliance with prescription monitoring
> programs represents a system based on punishment as opposed to
> incentives.
>
> <div align="center">*     *     *</div>
>
> We cannot merely assume that these programs will reduce prescription pain
> medication use and abuse.

85. The white paper also purports to express concern about policies that have been enacted in

response to the prevalence of pill mills:

> Although well intentioned, many of the policies designed to address this
> problem have made it difficult for legitimate pain management centers to
> operate. For instance, in some states, [pain management centers] must be
> owned by physicians or professional corporations, must have a Board
> certified medical director, may need to pay for annual inspections, and are
> subject to increased record keeping and reporting requirements. . . . [I]t is not
> even certain that the regulations are helping prevent abuses.

86. In addition, in an echo of earlier industry efforts to push back against what they termed

"opiophobia," the white paper laments the stigma associated with prescribing and taking pain

medication:

> Both pain patients and physicians can face negative perceptions and outright
> stigma. When patients with chronic pain can't get their prescriptions for
> pain medication filled at a pharmacy, they may feel like they are doing
> something wrong – or even criminal. . . . Physicians can face similar stigma
> from peers. Physicians in non-pain specialty areas often look down on those
> who specialize in pain management – a situation fueled by the numerous
> regulations and fines that surround prescription pain medications.

87. In conclusion, the white paper states that "Prescription pain medications, and specifically

the opioids, can provide substantial relief for people who are recovering from surgery,

afflicted by chronic painful diseases, or experiencing pain associated with other conditions

that does not adequately respond to over-the-counter drugs."

88. The APA also issues "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015. The awards were funded by a $7.8 million donation from unnamed donors. While the awards are ostensibly given for protecting patients' access to Medicare, and are thus touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they appear to be given to provide cover to and reward members of Congress who have supported the APA's agenda.[77]

89. The APA also lobbies Congress directly. In 2015, the APA signed onto a letter supporting legislation proposed to limit the ability of the U.S. Drug Enforcement Administration ("DEA") to police pill mills by enforcing the "suspicious orders" provision of the CSA.[78] The AAPM is also a signatory to this letter. An internal Department of Justice ("DOJ") memo stated that the proposed bill "could actually result in increased diversion, abuse, and public health and safety consequences"[79] and, according to DEA chief administrative law judge John J. Mulrooney, the law would make it "all but logically impossible" to defend prosecutions of manufacturers and distributors, like the defendants here, in the federal courts.[80] The law passed both houses of Congress and was signed into law in 2016.

---

[77] Jaklevic, *Non-profit Alliance for Patient Access*, *supra* n.73.

[78] Letter from Alliance for Patient Access, *et al.*, to Congressmen Tom Marino, Marsha Blackburn, Peter Welch, and Judy Chu (Jan. 26, 2015), http://webcache.googleusercontent.com/search?q=cache:-poWY1gKeEgJ:allianceforpatientaccess.org/wp-content/uploads/2013/12/FINAL-Patient-Access-Letter-of-Support-House-Bill.pdf+&cd=1&hl=en&ct=clnk&gl=us. (last available source).

[79] Bill Whitaker, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress*, CBS News (Oct. 17, 2017),https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-congress/.

[80] John J. Mulrooney, II & Katherine E. Legel, *Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters*, 101 MARQ. L. REV. 333 (2017), available at http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=5348&context=mulr.

2.   *The Manufacturing Defendants Paid Key opinion Leaders and Sponsored Speakers' Bureaus to Disseminate False and Misleading Messaging*

90. The Manufacturing Defendants have paid millions of dollars to physicians to promote aggressive prescribing of opioids for chronic pain. Recently released federal data shows that the Manufacturing Defendants increased such payments to physicians who treat chronic pain even while the opioid crisis accelerated and overdose deaths from prescription opioids and related illicit drugs, such as heroin, soared to record rates.[81] These payments come in the form of consulting and speaking fees, free food and beverages, discount coupons for drugs and other freebies. The total payments from the Manufacturing Defendants to doctors related to opioids doubled from 2014 to 2015. Moreover, according to experts, research shows even small amounts of money can have large effects on doctors' prescribing practices.[82] Physicians who are high prescribers are more likely to be invited to participate in defendants' speakers' bureaus. According to a study published by the U.S. National Institutes of Health, "[i]n the speakers' bureau system, physicians are recruited and trained by pharmaceutical, biotechnology, and medical device companies to deliver information about products to other physicians, in exchange for a fee."[83]

91. The use of speaker's bureaus has led to substantial ethical concerns within the medical field. According to a 2013 publication by the Institute on Medicine as a Profession, speakers' bureaus are ethically compromised because they often present information as objective when it is heavily biased toward the interests of the industry sponsor and, in fact,

---

[81] Joe Lawlor, *Even amid crisis, opioid makers plied doctors with perks*, Portland Press Herald (Dec. 25, 2016), available at https://www.pressherald.com/2016/12/25/even-amid-crisis-opioid-makers-plied-doctors-with-perks/.

[82] *Id.*

[83] Lynette Reid & Matthew Herder, *The Speakers' bureau system: a form of peer selling*, 7(2) Open Med. e31-e39 (Apr. 2, 2013), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3863750/.

may lead to the dissemination of false or biased information. These findings are substantiated by citations to research in the *Journal of the American Medical Association*, *The Journal of Law, Medicine & Ethics,* and *Academic Psychiatry.*

> **The Problem:**
>
> **Pharmaceutical companies often recruit physicians to perform speeches or presentations for the purpose of marketing a specific drug. In 2010, 8.6% of physicians reported having received payments for participating in speakers' bureaus.** *These speakers' bureaus leverage the credibility of physicians in order to promote the use of pharmaceutical products.* **The physicians are generally trained to present a certain message, or are provided with pre-produced slides. The audience may assume that these presentations are objective, when in fact they are heavily biased towards the interests of the industry sponsor.**
>
> ***Speakers' bureaus may lead to the dissemination of false or biased information.*** Exposure to industry-sponsored speaking events is associated with decreased quality of prescribing. Additionally, the compensation provided for these engagements may influence the attitudes or judgment of the presenter.[84]

92. For example, Fishman is a physician whose ties to the opioid drug industry are legion. He has served as an APF board member, president of the AAPM, and has participated yearly in numerous CME activities for which he received "market rate honoraria." As discussed above, Fishman has authored publications, including the seminal guides on opioid prescribing, that were funded by the Manufacturing Defendants. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. Fishman himself has acknowledged his failure to disclose all of his potential conflicts of interest in a letter in the *Journal of the American Medical Association* titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid

---

[84] *Speakers' Bureaus: Best Practices for Academic Medical Centers*, IMAP (Oct. 10, 2013), available at http://imapny.org/wp-content/themes/imapny/File%20Library/Best%20Practice%20toolkits/Best-Practices_Speakers--bureaus.pdf.

Abuse and Diversion."[85]

93. Similarly, Fine's ties to the Manufacturing Defendants are well documented.[86] He has authored articles and testified in court cases and before state and federal committees, and like Fishman, has served as president of the AAPM and argued against legislation restricting high-dose opioid prescription for non-cancer patients. Multiple videos also feature Fine delivering educational talks about prescription opioids; he even testified at trial that the 1,500 pills per month prescribed for pain to celebrity Anna Nicole Smith did not make her an addict before her death from an overdose.[87] Fine has also acknowledged failing to disclose numerous conflicts of interest.

94. Fishman and Fine are just two of the many physicians whom the Manufacturing Defendants paid to present false or biased information on the use of opioids for chronic pain.

    3.    *Senate Investigations of Manufacturing Defendants*

95. In May 2012, the Chair and Ranking Members of the Senate Finance Committee, Max Baucus (D-MT) and Chuck E. Grassley (R-IA), launched an investigation into makers of narcotic painkillers and the groups that champion them. The investigation was triggered by "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers," including popular brand names like OxyContin, Vicodin and Opana.

96. The Senate Finance Committee sent letters to Purdue, Endo and Johnson & Johnson, as well

---

[85] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13) JAMA 1445 (2011); Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011), available at https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry (hereinafter "Weber, *Two Leaders in Pain*").
[86] Weber, *Two Leaders in Pain*, *supra* n.85.
[87] Linda Deutsch, *Doctor: 1,500 pills don't prove Smith was addicted*, Seattle Times (Sept. 22, 2010, 5:16 PM), available at https://www.seattletimes.com/entertainment/doctor-1500-pills-dont-prove-smith-was-addicted/.

as to five groups that support pain patients, physicians or research, including the APF, AAPM, APS, the University of Wisconsin Pain & Policy Studies Group and the Center for Practical Bioethics. Letters also went to the FSMB and the Joint Commission.

97. As shown below in an excerpt from the Senators' letter to APF, the Senators addressed the magnitude of the epidemic and asserted that mounting evidence supports that the pharmaceutical companies may be responsible:

> *It is clear that the United States is suffering from an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers such as Oxycontin (oxycodone), Vicodin (hydrocodone), Opana (oxymorphone).* According to CDC data, "more than 40% (14,800)" of the "36,500 drug poisoning deaths in 2008" were related to opioid-based prescription painkillers. Deaths from these drugs rose more rapidly, "from about 4,000 to 14,800" between 1999 and 2008, than any other class of drugs, [killing] more people than heroin and cocaine combined. *More people in the United States now die from drugs than car accidents as a result of this new epidemic. Additionally, the CDC reports that improper "use of prescription painkillers costs health insurers up to $72.5 billion annually in direct health care costs."*

> \*    \*    \*

> Concurrent with the growing epidemic, the New York Times reports that, based on federal data, *"over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks" while "[d]ata suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses."*

> *There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness.* Recent investigative reporting from the Milwaukee Journal Sentinel/MedPage Today and ProPublica revealed extensive ties between companies that manufacture and market opioids and non-profit organizations such as the American Pain Foundation, the American Academy of Pain Medicine, the Federation of State Medical Boards, and University of Wisconsin Pain and Policy Study Group, and the Joint Commission.

> In a ProPublica story published in the Washington Post, the watchdog organization examined the *American Pain Foundation, a*

*"health advocacy" organization that received "nearly 90 percent of its $5 million funding from the drug and medical device industry."* ProPublica wrote that its review of the American Pain Foundation's "guides for patients, journalists, and policymakers *play down the risks associated with opioids and exaggerate their benefits.* Some of the foundation's materials on the drugs include statements that are misleading or based on scant or disputed research."

According to the Milwaukee Journal Sentinel/MedPage Today, a *"network of national organizations and researchers with financial connections to the makers of narcotic painkillers . . . helped create a body of dubious information" favoring opioids "that can be found in prescribing guidelines, patient literature, position statements, books and doctor education courses."*[88]

Although it is critical that patients continue to have access to opioids to treat serious pain, *pharmaceutical companies and health care organizations must distribute accurate and unbiased information about these drugs in order to prevent improper use and diversion to drug abusers.*[89]

98. The Senators demanded substantial discovery, including payment information from the companies to various groups, including the front organizations identified above, and to physicians, including Portenoy, Fishman and Fine, among others. The letter asked, *inter alia*, about any influence the companies exerted on the creation of a 2004 pain guide for physicians distributed by the FSMB, on the APS's guidelines, and on the APF's Military/Veterans Pain Initiative. Almost immediately upon the launch of the Senate investigation, the APF shut down "due to irreparable economic circumstances." The opioid

---

[88] For example, the *Sentinel* reported that the FSMB, with financial support from opioid manufacturers, distributed "[m]ore than 160,000 copies" of a model policy book that drew criticism from doctors because "it failed to point out the lack of science supporting the use of opioids for chronic, non cancer pain." John Fauber, *Follow the Money: Pain, Policy, and Profit*, MedPage Today (Feb. 19, 2012), available at http://www.medpagetoday.com/Neurology/PainManagement/31256.

[89] Letter from U.S. Senators Charles E. Grassley and Max Baucus to Catherine Underwood, Executive Director (May 8, 2012), American Pain Society, available at https://www.finance.senate.gov/imo/media/doc/05092012%20Baucus%20Grassley%20Opioid%20Investigation%20Letter%20to%20American%20Pain%20Society.pdf (footnote added).

report resulting from this investigation has not been released to the public.[90]

99. On March 29, 2017, it was widely reported[91] that yet another Senate investigation had been launched:

> Missouri Senator Claire McCaskill has launched an investigation into some of the country's leading prescription drug manufacturers, demanding documents and records dating back the past five years which indicate just what the companies knew of the drugs' risk for abuse as well as documents detailing marketing practices and sales presentations. Her office has sent letters to the heads of Purdue, Janssen/Johnson & Johnson, Insys, Mylan, and Depomed.

The above-referenced companies were reported targeted based on the role in manufacturing some of the opioid painkillers with the highest sales in 2015.

100. On September 6, 2017, Senator McCaskill's report, "Fueling an Epidemic: Insys Therapeutics and the Systemic Manipulation of Prior Authorization," was published. The report found that Insys manipulated the prior authorization process by misleading pharmacy benefit managers about the role of Insys in the prior authorization process and the presence of breakthrough cancer pain in potential Subsys patients.[92]

101. On September 12, 2017, Senator McCaskill convened a Roundtable Discussion on Opioid Marketing. During the hearing, Senator McCaskill stated:

> The opioid epidemic is the direct result of a calculated marketing and sales strategy developed in the 90's, which delivered three simple messages to physicians. First, that chronic pain was severely undertreated in the United States. Second, that opioids were the best tool to address that pain. And third, that opioids could treat pain without risk of serious

---

[90] Paul D. Thacker, *Senators Hatch and Wyden: Do your jobs and release the sealed opioids report*, Stat News (June 27, 2016), available at https://www.statnews.com/2016/06/27/opioid-addiction-orrin-hatch-ron-wyden/; *see also* Ornstein, *American Pain Foundation*, *supra* n.55.

[91] Nadia Kounang, *Senator opens investigation into opioid manufacturers*, CNN (Mar. 29, 2017), available at http://www.cnn.com/2017/03/28/health/senate-opioid-manufacturer-investigation/index.html.

[92] HSGAC Minority Staff Report, Insys Therapeutics and the Systemic Manipulation of Prior Authorization (2017).

> addiction. As it turns out, these messages were exaggerations at best and outright lies at worst.

<div align="center">*      *      *</div>

> Our national opioid epidemic is complex, but one explanation for this crisis is simple, pure greed.

102. Professor Adriane Fugh-Berman ("Fugh-Berman"), Associate Professor at Georgetown University Medical Center and director of a program at Georgetown called Pharmed Out, which conducts research on and educates the public about inappropriate pharmaceutical company marketing, also testified during the hearing. She, too, placed the blame for the opioid crisis squarely at the feet of pharmaceutical companies:

> Since the 1990's, pharmaceutical companies have stealthily distorted the perceptions of consumers and healthcare providers about pain and opioids. Opioid manufacturers use drug reps, physicians, consumer groups, medical groups, accreditation and licensing bodies, legislators, medical boards and the federal government to advance marketing goals to sell more opioids. This aggressive marketing pushes resulted in hundreds of thousands of deaths from the overprescribing of opioids. The U.S. is about – comprises about five percent of the world population, but we use about two-thirds of the world supply of opioids.

103. Fugh-Berman also answered why doctors were able to be convinced by pharmaceutical companies' marketing efforts:

> Why did the physicians fall for this? Well, physicians are overworked, overwhelmed, buried in paperwork and they feel unappreciated. Drug reps are cheerful. They're charming. They provide both appreciation and information. Unfortunately, the information they provide is innately unreliable.

> Pharmaceutical companies influence healthcare providers' attitudes and their therapeutic choices through financial incentives that include research grants, educational grants, consulting fees, speaking fees, gifts and meals.

104. Fugh-Berman further described the false information provided by pharmaceutical companies and the industry creation of front organizations, including the APF, to pass

<div align="center">45</div>

industry- influenced regulations and policies:

> Pharmaceutical companies convinced healthcare providers that they were opiophobic and that they were causing suffering to their patients by denying opioids to patients with back pain or arthritis. They persuaded prescribers that patients with pain were somehow immune to addiction. Even when addiction was suspected, physicians were taught that it might not really be addiction, it might be pseudo- addiction, an invented (ph) condition that's treated by increasing opioid dosages.

> Industry created the American Pain Foundation co-opted other groups including medical organizations, and they change state laws to eliminate curbs on opioid prescribing. Between 2006 and 2015, pharmaceutical companies and the advocacy groups they control employ 1,350 lobbyists a year in legislative hubs. Industry-influenced regulations and policies ensure that hospitalized patients were and are berated paraded constantly about their level of pain and overmedicated with opioids for that pain. Even a week of opioids can lead a patient into addiction so many patients are discharged from hospitals already dependent on opioids.

105. In addition, Fugh-Berman pointed out that promotion of opioids remains ongoing despite increasing public concern about their use:

> Promotion of opioids is not in the past. Between 2013 and 2015, one in 12 physicians took out money from opioid manufacturers, a total of more than $46 million. Industry-friendly messages that pharmaceutical companies are currently perpetuating reassure physicians that prescribing opioids is safe as long as patients do not have a history of substance abuse or mental illness.

106. Fugh-Berman concluded by stating: "It is a misperception to think that most opioid deaths are caused by misuse of opioids or overdoses. In fact, many deaths occur when people are using opioids in exactly the way they were prescribed. Misuse isn't the problem; use is the problem."

C. The Devastating Impact

107. The impact of the Manufacturing Defendants' false messaging has been profound. The drug companies profited handsomely as more and more people became addicted to opioids

and died of overdoses.[93]

108. For Purdue, sales grew from $48 million per year in 1996, to over $1 billion per year in 2000, to $3.1 billion per year ten years later. In 2011, pharmaceutical companies generated revenues of $11 billion from opioid sales alone.

109. The United States, including specifically Palmetto, is experiencing an unprecedented opioid addiction and overdose epidemic, costing millions of dollars for, *inter alia*, treatment, services and public safety as well as lost productivity in the workforce, economic opportunity and tax revenue.

110. By 2002, "[l]ifetime *nonmedical* use of OxyContin increased from 1.9 million to 3.1 million people between 2002 and 2004, and in 2004 there were 615,000 new nonmedical users of OxyContin."[94]

111. By 2004, OxyContin had "become the most prevalent prescription opioid abused in the United States."[95] The severity of the problem was first felt in states including Maine, West Virginia, eastern Kentucky, southwestern Virginia and Alabama, where, from 1998 through 2000, hydrocodone and oxycodone were being prescribed 2.5-5 times more often than the national average. By 2000, these same areas had a prescription rate up to 5-6 times higher than the national average. These areas were also the first to suffer increased abuse and diversion, which became apparent by 1999 and 2000. Manufacturers then expanded the geographic market by investing hundreds of millions of dollars in marketing, and the once-regional problem began to spread nationally. "[B]y 2004 OxyContin had become a leading

---

[93] German Lopez, *How big pharma got people hooked on dangerous opioids – and made tons of money off it*, Vox (Sept. 22, 2016), available at http://www.vox.com/2016/2/5/10919360/opioid-epidemic-chart.
[94] Van Zee, *Promotion and Marketing, supra* n.26.
[95] *Id.*

drug of abuse in the United States."[96]

112. As OxyContin sales grew between 1999 and 2002, so did sales of other opioids, including fentanyl (226%), morphine (73%) and oxycodone (402%). And, as prescriptions surged between 1999 and 2010, so did deaths from opioid overdoses (from about 4,000 to almost 17,000).[97]

113. In 2012 alone, an estimated 259 million opioid prescriptions were filled, enough to medicate every adult in the United States for a month on a round-the-clock basis.[98] In 2014, there were more than 47,000 drug overdose deaths nationwide, 61% involving a prescription or illicit opioid.[99] The use of prescription painkillers cost health insurers up to $72.5 billion annually in direct healthcare costs.[100]

114. According to the CDC, drug overdose deaths in Florida increased by 4.8% from 2013 to 2014, and by 22.7% from 2014 to 2015, with deaths increasing from 2,474, to 2,634, to 3,228 over the three-year period, with opioids being the main driver of those deaths. During that timeframe, drug overdose deaths in Florida increased from approximately 12 per 100,000 to 16 per 100,000. Further, the Florida Medical Examiners Commission's 2016 Interim Report indicates that between January and June 2016, 33.8% of decedents examined had opioids in their system at the time of death.

115. Palmetto has seen a corresponding rise in area opioid usage and accidental deaths. Manatee Memorial Hospital saw 1,096 drug overdoses in 2015 grow to 1,396 overdoses in 2016,

---

[96] *Id.*

[97] Gounder, *Who Is Responsible, supra* n.31.

[98] *Opioid Painkiller Prescribing*, Centers for Disease Control and Prevention: Vital Signs (July 2014), available at https://www.cdc.gov/vitalsigns/opioid-prescribing/.

[99] Rudd, *Increases in Drug and Opioid-Involved Overdose, supra* n.2.

[100] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune Magazine (Nov. 9, 2011), available at http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/ (hereinafter "Eban, *Painful Medicine*").

and through October 2017, that figure was 1,093.[101] The Manatee County Sheriff's Office

has already investigated 47 suspected overdoses in the first two months of 2018, at least 6

of which were fatal.[102] As such, Manatee County has equipped not only its EMS personnel,

fire department, and Sheriff's department with Naloxone, an epipen-like injector which is

intended to keep people from overdosing as a result of opioid usage,[103] but also its segment

of the Florida Highway Patrol.[104] Manatee County officials have reported that from January

to May 2017, their paramedics spent $110,000 for 596 Naloxone treatments[105]

116. Additionally, the effects of the opioid epidemic spread beyond overdose-related deaths. As

law enforcement officials must arrest those who commit crimes to support their addiction,

Manatee county jail not has two pods and staff dedicated to getting addicts treatment during

and after their incarceration.[106]

117. Palmetto continues to suffer significant damage as a result of opioid over- prescription and

addiction, including, but not limited to, increased law enforcement and public works

expenditures, increased expenditures for overtime, the hiring of additional City employees,

mental health treatment and workers' compensation for its employees, increased emergency

and treatment services, damage to emergency equipment and vehicles, and lost productivity,

---

[101] Hannah Morse, *Narcotics will be tougher to get in these Manatee emergency rooms*, Bradenton Herald (Feb. 15, 2018), available at
http://www.bradenton.com/news/local/article200129874.html.
[102] Jessica De Leon, *New Florida opioids law limits how many painkillers you can have*, Bradenton Herald (Mar. 19, 2018), available at http://www.bradenton.com/news/local/article205837024.html.
[103] Topher Forhecz, *Sarasota Sheriff's Office First Law Enforcement Agency in Florida to Give Deputies Naloxone*, WGCU News (Oct. 9, 2015), available at http://news.wgcu.org/post/sarasota-sheriffs-office-first-law-enforcement-agency-florida-give-deputies-naloxone.
[104] Morse, *Manatee ready to sue, supra* n.10.
[105] Dale White, *Opioid addiction forum draws standing-room-only crowd*, The Daytona Beach News-Journal (May 2, 2017), available at http://www.news-journalonline.com/news/20170502/opioid-addiction-forum-draws-standing-room-only-crowd.
[106] *Id.*

economic opportunity, and tax revenue. In order to properly address this unprecedented epidemic and protect the safety and welfare of its residents, the City has had to significantly modify its emergency response plan, requiring the hiring of additional permanent emergency response personnel, overtime pay, and the purchase and maintenance of additional emergency vehicles and supplies, such as Naloxone[107] – none of which would otherwise have been necessary. Additionally, Palmetto must now pay to provide mental health services to its employees, who are on the front lines of assisting residents and visitors, and otherwise re-allocate City funds to cope with the opioid epidemic.

## II.     The Manufacturing Defendants' Specific Unlawful Practices that Targeted Palmetto Prescribers

   A.     Purdue

118. Purdue, which is privately held by the Sackler family – one of America's richest families with a collective net worth of $13 billion, manufactures, markets, sells and distributes opioids in Palmetto and nationwide, including the following:

| OxyContin (oxycodone hydrochloride extended release) | Opioid agonist[108] indicated for pain severe enough to require daily, around-the-clock, long-term opioid treatment; not indicated as an as-needed (p.r.n.) analgesic. It was first approved by the FDA in December 1995. | Schedule II |
|---|---|---|
| MS Contin (morphine sulfate extended release) | Opioid agonist; controlled-release tablet form of morphine sulfate indicated for the management of severe pain; not intended for use as a p.r.n. analgesic; first approved in May 1987 as the first formulation of an opioid pain medicine that allowed dosing every 12 | Schedule II |

---

[107] Topher Forhecz, *Sarasota Sheriff's Office First Law Enforcement Agency in Florida to Give Deputies Naloxone*, WGCU News (Oct. 9, 2015), available at http://news.wgcu.org/post/sarasota-sheriffs-office-first-law-enforcement-agency-florida-give-deputies-naloxone.

[108] An "agonist" medication is one that binds to and fully activates targeted receptors in the brain. They activate these neurotransmitter receptors to illicit a certain response. An "antagonist" medication, on the other hand, works to prevent the binding of other chemicals to neurotransmitters in order to block a certain response. Both may be used to offer pain relief. *Health Q&A*, Reference*, https://www.reference.com/health/difference-between-agonist-antagonist-drugs-838e9e0994a788eb (last visited Mar. 08, 2018).

| | hours. | |
|---|---|---|
| Dilaudid (hydromorphone hydrochloride) | Opioid analgesic; injectable and oral formulation; eight times more potent than morphine.[109] | Schedule II |
| Dilaudid-HP (hydromorphone hydrochloride) | Opioid analgesic; injectable and oral high-potency and highly concentrated formulation indicated for relief of moderate-to-severe pain in opioid-tolerant patients. | Schedule II |
| Hysingla ER (hydrocodone bitrate) | Brand-name extended-release form of hydrocodone bitrate that is indicated for the management of severe pain. | Schedule II |
| Targiniq ER (oxycodone hydrochloride and naloxone hydrochloride) | Brand-name extended-release opioid analgesic made of a combination of oxycodone hydrochloride and naloxone hydrochloride. It was approved by the FDA on July 23, 2013. | Schedule II |

*1.    Purdue Falsely Marketed Extended-Release Drugs as Safer and More Effective than Regular-Release Drugs*

119.   Purdue launched OxyContin 20 years ago with a bold marketing claim: "One dose relieves pain for 12 hours, more than twice as long as generic medications."[110] Prior to launching OxyContin, Purdue conducted focus groups with doctors and "learned that the 'biggest negative' that might prevent widespread use of the drug was ingrained concern regarding the 'abuse potential' of opioids."[111] In its initial press release launching the drug, Purdue told doctors that one OxyContin tablet would provide "smooth and sustained pain control all day and all night." Based in large part on that promise, and Purdue's repeated assurances that opioids were both effective and non-addictive, OxyContin became America's bestselling

---

[109] *Dilaudid Addiction*, Suboxone California, https://www.suboxonecalifornia.com/suboxone-treatment/dilaudid-addiction/ (last visited Mar. 08, 2018).
[110] Harriet Ryan, *et al.*, *"You Want A Description of Hell?" OxyContin's 12-Hour Problem*, L.A. Times (May 5, 2016), available at http://www.latimes.com/projects/oxycontin-part1/ (hereinafter "Ryan, *Description of Hell*").
[111] Keefe, *Empire of Pain*, *supra* n.4.

painkiller.[112] But, Purdue had no evidentiary basis for those claims.[113]

120. In truth, Purdue's nationwide marketing claims were false and highly deceptive. OxyContin was not superior to immediate-release opioids. And not only does OxyContin wear off early, as Purdue's own early studies showed, it is highly addictive:

> OxyContin's stunning success masked a fundamental problem: The drug wears off hours early in many people, a Los Angeles Times investigation found. *OxyContin is a chemical cousin of heroin, and when it doesn't last, patients can experience excruciating symptoms of withdrawal, including an intense craving for the drug.*[114]

121. Furthermore, experts call the 12-hour dosing "'an addiction producing machine.'"[115] Purdue had reportedly known for decades that it falsely promised 12-hour relief and nevertheless mobilized hundreds of sales representatives to "refocus" physicians on 12-hour dosing:

- ...Even before OxyContin went on the market, *clinical trials showed many patients weren't getting 12 hours of relief.* Since the drug's debut in 1996, the company has been confronted with additional evidence, including complaints from doctors, reports from its own sales reps and independent research.

- The company has held fast to the claim of 12-hour relief, in part to protect its revenue. OxyContin's market dominance and its high price – up to hundreds of dollars per bottle – hinge on its 12-hour duration. Without that, it offers little advantage over less expensive painkillers.

---

[112] Press Release, Purdue Pharma L.P., New Hope for Millions of Americans Suffering from Persistent Pain: Long-Acting OxyContin Tablets Now Available to Relieve Pain (May 31, 1996), available at http://documents.latimes.com/oxycontin-press-release-1996/.

[113] Though the FDA's 1995 approval allowed Purdue to include a package insert for OxyContin declaring the drug to be safer than its competitors due to its delayed release design, Purdue had in fact "conducted no clinical studies on how addictive or prone to abuse the drug might be. . . . The F.D.A. examiner who oversaw the process, Dr. Curtis Wright, left the agency shortly afterward. Within two years, he had taken a job at Purdue." Keefe, *Empire of Pain, supra* n.4.

[114] The *Los Angeles Times* investigation, reported in three parts on May 5, July 10 and December 18, 2016, included the review of thousands of pages of confidential Purdue documents and court and other records. They span three decades, from the conception of OxyContin in the mid-1980s to 2011, and include e-mails, memoranda, meeting minutes and sales reports, as well as sworn testimony by executives, sales representatives and other employees. Ryan, *Description of Hell, supra* n.110. The *Los Angeles Times* reporters also examined FDA records, Patent Office files and medical journal articles, and interviewed experts in pain treatment, addiction medicine and pharmacology. *Id.*

[115] Frydl, *Purdue Pharma, supra* n.3.

- When many doctors began prescribing OxyContin at shorter intervals in the late 1990s, Purdue executives mobilized hundreds of sales reps to "refocus" physicians on 12-hour dosing. Anything shorter "needs to be nipped in the bud. NOW!!" one manager wrote to her staff.

- Purdue tells doctors to prescribe stronger doses, not more frequent ones, when patients complain that OxyContin doesn't last 12 hours. That approach creates risks of its own. Research shows that the more potent the dose of an opioid such as OxyContin, the greater the possibility of overdose and death.

- More than half of long-term OxyContin users are on doses that public health officials consider dangerously high, according to an analysis of nationwide prescription data conducted for The Times.[116]

122. As reported by *The New York Times*, "internal Purdue Pharma documents show that company officials recognized even before the drug was marketed that they would face stiff resistance from doctors who were concerned about the potential of a high-powered narcotic like OxyContin to be abused by patients or cause addiction." To combat this resistance, Purdue falsely promised the long-acting, extended-release formulation was safer and "less prone to such problems."[117]

    2.    *Purdue Falsely Marketed Low Addiction Risk to Wide Swaths of Physicians*

123. In addition to pushing OxyContin as safe and non-addictive by equating extended- release with a lower risk, Purdue also promoted the use of prescription opioids for use in non-cancer patients, who make up 86% of the total opioid market today.[118]

124. Rather than targeting merely those physicians treating acute severe short-term (like post-operative) pain or oncologists treating end-stage cancer pain, reports indicate that Purdue heavily promoted OxyContin nationwide to doctors including general practitioners, who

---

[116] Ryan, *Description of Hell, supra* n.110.

[117] Barry Meier, *In Guilty Plea, OxyContin Maker to Pay $600 Million*, N.Y. Times (May 10, 2007), available at http://www.nytimes.com/2007/05/10/business/11drug-web.html (hereinafter "Meier, *Guilty Plea*").

[118] Ornstein, *American Pain Foundation, supra* n.55.

often had little training in the treatment of serious pain or in recognizing signs of drug abuse in patients.[119] According to a report in *The New Yorker*, "[a] major thrust of the sales campaign was that OxyContin should be prescribed not merely for the kind of severe short-term pain associated with surgery or cancer but also for less acute, longer-lasting pain: arthritis, back pain, sports injuries, fibromyalgia" and "[t]he number of conditions that OxyContin could treat seemed almost unlimited."[120]

125. Sales representatives plied these and other physicians with coupons that were redeemable for a 7- to 30-day supply of free OxyContin, a Schedule II narcotic that by definition cannot be prescribed for more than one month at a time, with the promise that OxyContin was a safe opioid. Purdue "trained its sales representatives to carry the message that the risk of addiction was 'less than one percent,'" and "[a] consistent feature in the promotion and marketing of OxyContin was a systematic effort to minimize the risk of addiction in the use of opioids for the treatment of chronic non-cancer-related pain."[121]

126. Sales representatives marketed OxyContin as a product "'to start with and to stay with,'" and Purdue deliberately exploited a misconception it knew many doctors held that oxycodone was less potent than morphine.[122] They also received training in overcoming doctors' concerns about addiction with talking points they knew to be untrue about the drug's abuse potential. *The New Yorker* reported that "[i]n 2002, a sales manager from the company, William Gergely, told a state investigator in Florida that Purdue executives 'told us to say things like it is "virtually" non-addicting.'"[123]

---

[119] Meier, *Guilty Plea, supra* n.117.
[120] Keefe, *Empire of Pain, supra* n.4.
[121] Van Zee, *Promotion and Marketing, supra* n.26.
[122] Keefe, *Empire of Pain, supra* n.4.
[123] *Id.*

127. Further, "[a]ccording to training materials, Purdue instructed sales representatives to assure doctors – repeatedly and without evidence – that 'fewer than one per cent' of patients who took OxyContin became addicted. (In 1999, a Purdue-funded study of patients who used OxyContin for headaches found that the addiction rate was thirteen per cent.)"[124]

128. Even as late as 2015, and perhaps even later, Purdue sales representatives were telling physicians OxyContin was addiction resistant and had "'abuse-deterrent' properties."[125]

129. And the marketing worked. Keith Humphreys, Professor of Psychiatry at Stanford and drug-policy adviser to the Obama Administration, said

> "That's the real Greek tragedy of this – that so many well-meaning doctors got co-opted. The level of influence is just mind-boggling. Purdue gave money to continuing medical education, to state medical boards, to faux grassroots organizations."[126]

130. Additionally, Purdue tracked physicians' prescribing practices by reviewing pharmacy prescription data it obtained from I.M.S. Health, a company that buys bulk prescription data from pharmacies and resells it to drug makers for marketing purposes (and which, notably, Arthur Sackler is a co-founder). Rather than reporting highly suspicious prescribing practices, Purdue used the data to track physicians who prescribed opioids and might be persuaded to increase their opioid prescription volume. Purdue also could identify physicians writing large numbers of prescriptions, and particularly for high-dose 80 mg pills – potential signs of diversion and drug dealing.[127] Purdue called those high- prescribing doctors

---

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] An 80 mg tablet is equivalent in strength to 16 Vicodin tablets and was generally reserved by doctors for patients with severe, chronic pain who had built up a tolerance over months or years. In the illegal drug trade, however, "80s" were the most in demand. For those attempting to detect how OxyContin was getting onto the black market, a physician writing a high volume of 80s was a red flag. Harriet Ryan, *et al., More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew,*

"whales."[128]

131. Purdue was aware of suspicious doctors and pharmacies from the information contained in prescribing records, pharmacy orders, field reports from sales representatives and, in some instances, its own surveillance operations.[129] Since 2002, Purdue maintained a confidential roster of suspected reckless prescribers known as "Region Zero." By 2013, there were more than 1,800 doctors in Region Zero, but Purdue had reported only 8% of them to authorities. The *Los Angeles Times* reported that "[a] former Purdue executive, who monitored pharmacies for criminal activity, acknowledged that even when the company had evidence pharmacies were colluding with drug dealers, it did not stop supplying distributors selling to those stores."[130]

> 3. *Purdue Funded Publications and Presentations with False and Misleading Messaging*

132. As explained above, Purdue's false and deceptive marketing scheme did not end with its own sales representatives and branded marketing materials. Extending far beyond the margin of legitimate and truthful marketing, Purdue engaged third parties including doctors and front groups to spread the false message of prescription opioids' safety and efficacy.

133. Purdue caused the publication and distribution of false and deceptive guidelines on opioid

---

L.A. Times (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/ (hereinafter "Ryan, *More than 1 million*").

[128] Keefe, *Empire of Pain*, *supra* n.4.

[129] Purdue's "Abuse and Diversion Detection" program requires its sales representatives to report to the company any facts that suggest a healthcare provider to whom it markets opioids may be involved in the abuse or illegal diversion of opioid products. When a provider is reported under the program, Purdue purportedly conducts an internal inquiry regarding the provider to determine whether he or she should be placed on a "no-call" list. If a provider is placed on this list, Purdue sales representatives may no longer contact the provider to promote the company's opioid products. Bill Fallon, *Purdue Pharma agrees to restrict marketing of opioids*, Stamford Advocate (Aug. 25, 2015), available at https://www.stamfordadvocate.com/business/article/Purdue-Pharma-agrees-to-restrict-marketing-of-6464800.php (hereinafter "Fallon, *Purdue Pharma agrees*").

[130] Ryan, *More than 1 Million*, *supra* n.127.

56

prescribing. For example, as set forth above, Purdue paid $100,000 to the FSMB to help print and distribute its guidelines on the use of opioids to treat chronic pain to *700,000* practicing doctors; among them FSMB's members Florida Board of Medicine and the Florida Board of Osteopathic Medicine.

134. One of the advisors for Fishman's 2007 publication "Responsible Opioid Prescribing: A Physician's Guide" and its 2012 update was Haddox, a longtime member of Purdue's speakers' bureau who later became a Purdue vice president.

135. Similarly, multiple videos feature Fine delivering educational talks about the drugs.[131] In one video from 2011, titled "Optimizing Opioid Therapy," he sets forth a "Guideline for Chronic Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) not only for cancer patients, but for non-cancer patients, and suggests it may take four or five switches over a person's "lifetime" to manage pain.[132] He states the "goal is to improve effectiveness which is different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events *over the course of years*." The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids can be used to treat *sleep apnea*. He further states that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture."[133]

136. Purdue provided many "teaching" materials free of charge to the Joint Commission.

137. Purdue also deceptively marketed the use of opioids for chronic pain through the APF,

---

[131] Weber, *Two Leaders in Pain*, *supra* n.85.
[132] Perry A. Fine, *Safe and Effective Opioid Rotation*, YouTube (Nov. 8, 2012), available at https://www.youtube.com/watch?v=_G3Il9yqgXI.
[133] *Id.*

which was shut down after the launch of the Senate investigation in 2012. In 2010 alone, the APF received 90% of its funding from drug and medical device companies, including from Purdue. Purdue paid APF unspecified amounts in 2008 and 2009 and between $100,000 and $499,999 in 2010.[134]

### 4.    *The Guilty Pleas*

138. In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction. Purdue was ordered to pay $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science. Additionally, Michael Friedman ("Friedman"), the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell ("Udell"), Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim ("Goldenheim"), its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

139. In a statement announcing the guilty plea, John Brownlee ("Brownlee"), the U.S. Attorney for the Western District of Virginia, stated:

> Purdue claimed it had created the miracle drug – a low risk drug that could provide long acting pain relief but was less addictive and less subject to abuse. *Purdue's marketing campaign worked, and sales for OxyContin skyrocketed – making billions for Purdue and millions for its top executives.*
>
> But OxyContin offered no miracles to those suffering in pain. Purdue's claims that OxyContin was less addictive and less subject to abuse and diversion were false – and Purdue knew its claims were false. The

---

[134] American    Pain    Foundation    Partner Report, GuideStar, available at http://www.guidestar.org/PartnerReport.aspx?ein=52-2002328&Partner=Demo (last visited Mar. 09, 2018) (links to annual reports at bottom of page).

result of their *misrepresentations and crimes sparked one of our nation's greatest prescription drug failures . . .*OxyContin was the child of marketers and bottom line financial decision-making.[135]

140. Brownlee characterized Purdue's criminal activity as follows:

First, *Purdue trained its sales representatives to falsely inform health care providers that it was more difficult to extract the oxycodone from an OxyContin tablet for the purpose of intravenous abuse.* Purdue ordered this training even though its own study showed that a drug abuser could extract approximately 68% of the oxycodone from a single 10 mg OxyContin tablet by simply crushing the tablet, stirring it in water, and drawing the solution through cotton into a syringe.

Second, *Purdue falsely instructed its sales representatives to inform health care providers that OxyContin could create fewer chances for addiction* than immediate-release opioids.

*Third,* Purdue sponsored training that falsely taught Purdue sales supervisors that OxyContin had fewer "peak and trough" blood level effects than immediate-release opioids resulting in less euphoria and less potential for abuse *than short-acting opioids.*

Fourth, *Purdue falsely told certain health care providers that patients could stop therapy abruptly without experiencing withdrawal symptoms and that patients who took OxyContin would not develop tolerance* to the drug.

And fifth, *Purdue falsely told health care providers that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids*, and could be used to "weed out" addicts and drug seekers.[136]

141. Specifically, Purdue pled guilty to illegally misbranding OxyContin in an effort to mislead

and defraud physicians and consumers, while Friedman, Udell and Goldenheim pled guilty

to the misdemeanor charge of misbranding OxyContin for introducing misbranded drugs

into interstate commerce in violation of 21 U.S.C. §§331(a), 333(a)(1)-(2) and 352(a).

---

[135] Press Release, U.S. Attorney for the Western District of Virginia, Statement of United States Attorney John Brownlee on the Guilty Plea of the Purdue Frederick Company and Its Executives for Illegally Misbranding OxyContin (May 10, 2007), available at
https://assets.documentcloud.org/documents/279028/purdue-guilty-plea.pdf.
[136] *Id.*

142. Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were both effective and non-addictive. Purdue continues to aggressively market the liberal prescribing of opioids for chronic pain while diminishing the associated dangers of addiction. After Purdue made its guilty plea in 2007,

> it assembled an army of lobbyists to fight any legislative actions that might encroach on its business. Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly nine hundred million dollars on lobbying and political contributions – eight times what the gun lobby spent during that period.[137]

143. Purdue has earned more than $31 billion from OxyContin, the nation's bestselling painkiller, which constitutes approximately 30% of the U.S. market for painkillers. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up threefold from 2006 sales of $800 million.[138]

144. Purdue also made thousands of payments to physicians nationwide, including payments to Palmetto physicians, for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services.

145. OxyContin has been widely prescribed in Palmetto. According to data collected by ProPublica, during 2014 and 2015, Florida doctors' prescriptions of OxyContin to patients insured by the Medicare Part D program totaled more than $60 million and $62.3 million, respectively.

---

[137] Keefe, *Empire of Pain*, *supra* n.4.

[138] Eban, *Painful Medicine*, *supra* n.100.

5.    *Purdue Failed to Report Suspicious Sales as Required*

146. The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C §801, *et seq.* ("CSA" or "Controlled Substances Act"), and the regulations promulgated thereunder, 21 C.F.R. §1300 *et seq.*, which is incorporated into Florida law by Fla. Stat. §499.0121(10) and (15)(b), imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R.§1301.74(b).

147. Purdue is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

148. Purdue failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders. Purdue's failure to timely report suspicious sales violated the CSA.

B.    Janssen

149. Janssen manufactures, markets, sells, and distributes the following opioids in Palmetto and nationwide:

| | | |
|---|---|---|
| Duragesic (fentanyl) | Opioid analgesic delivered via skin patch; contains gel form of fentanyl, a synthetic opioid that is up to 100 times more potent than morphine; delivers fentanyl at regulated rate for up to 72 hours; first approved by the FDA in August 1990. | Schedule II |
| Nucynta    ER (tapentadol hydrochloride) | Opioid agonist; extended-release formulation indicated for severe pain. | Schedule II |

61

| Nucynta (tapentadol hydrochloride) | Immediate-release version of tapentadol hydrochloride for the management of moderate to severe acute pain. | Schedule II |
| --- | --- | --- |

150. Janssen introduced Duragesic in 1990. It is indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Janssen also markets Nucynta, which was first approved by the FDA in 2008, formulated in tablet form and in an oral solution and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older." Additionally, Janssen markets Nucynta ER, which was first approved by the FDA in 2011 in tablet form. Initially, it was indicated for the "management of . . . pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." This pain indication was later altered to "management of moderate to severe chronic pain in adults" and "neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults." Janssen sold Nucynta and Nucynta ER to Depomed in 2015 for $1.05 billion.

*1.     The FDA Warned Janssen Regarding Its False Messaging*

151. On February 15, 2000, the FDA sent Janssen a letter concerning the alleged dissemination of "homemade" promotional pieces that promoted Duragesic in violation of the Federal Food, Drug, and Cosmetic Act. In a subsequent letter, dated March 30, 2000, the FDA explained that the "homemade" promotional pieces were "false or misleading because they contain misrepresentations of safety information, broaden Duragesic's indication, contain unsubstantiated claims, and lack fair balance."

152. The March 30, 2000 letter identified specific violations, including misrepresentations that Duragesic had a low potential for abuse:

- You present the claim, "Low abuse potential!" This claim suggests that Duragesic has less potential for abuse than other currently available opioids. However, this claim has not been demonstrated by substantial evidence. Furthermore, this claim is contradictory to information in the approved product labeling (PI) that states, "Fentanyl is a Schedule II controlled substance and can produce drug dependence similar to that produced by morphine." Therefore, this claim is false or misleading.[139]

153. The March 30, 2000 letter also stated that the promotional materials represented that Duragesic was "more useful in a broader range of conditions or patients than has been demonstrated by substantial evidence." Specifically, the FDA stated that Janssen was marketing Duragesic for indications other than the treatment of chronic pain that cannot otherwise be managed, for which it was approved:

- You present the claim, "It's not just for end stage cancer anymore!" This claim suggests that Duragesic can be used for any type of pain management. However, the PI for Duragesic states, "Duragesic (fentanyl transdermal system) is indicated in the management of chronic pain in patients who require continuous opioid analgesia for pain that cannot be managed by lesser means..." Therefore, the suggestion that Duragesic can be used for any type of pain management promotes Duragesic[] for a much broader use than is recommended in the PI, and thus, is misleading. In addition, the suggestion that Duragesic can be used to treat any kind of pain is contradictory to the boxed warning in the PI. Specifically, the PI states,

BECAUSE SERIOUS OR LIFE-THREATENING HYPOVENTILATION COULD OCCUR, DURAGESIC® (FENTANYL TRANSDERMAL SYSTEM) IS CONTRAINDICATED:

- In the management of acute or post-operative pain, including use in out-patient surgeries....[140]

154. The March 30, 2000 letter also stated Janssen failed to adequately present "contraindications, warnings, precautions, and side effects with a prominence and

---

[139] NDA 19-813 Letter from Spencer Salis, U.S. Food & Drug Administration, to Cynthia Chianese, Janssen Pharmaceutica (Mar. 30, 2000) at 2.
[140] Id. at 2-3.

readability reasonably comparable to the presentation of information relating to the effectiveness of the product":

> Although this piece contains numerous claims for the efficacy and safety of Duragesic, *you have not presented any risk information* concerning the boxed warnings, contraindications, warnings, precautions, or side effects associated with Duragesic's use…. Therefore, this promotional piece is lacking in fair balance, or otherwise misleading, because it fails to address important risks and restrictions associated with Duragesic therapy.[141]

155. On September 2, 2004, the U.S. Department of Health and Human Services ("HHS") sent Janssen a warning letter concerning Duragesic due to "false or misleading claims about the abuse potential and other risks of the drug, and…unsubstantiated effectiveness claims for Duragesic," including, specifically, "suggesting that Duragesic has a lower potential for abuse compared to other opioid products."

156. The September 2, 2004 letter warned Janssen regarding its claims that Duragesic had a low reported rate of mentions in the Drug Abuse Warning Network ("DAWN") as compared to other opioids. The letter stated that the claim was false or misleading because the claim was not based on substantial data and because the lower rate of mentions was likely attributable to Duragesic's lower frequency of use compared to other opioids listed in DAWN:

> The file card presents the prominent claim, "Low reported rate of mentions in DAWN data," along with Drug Abuse Warning Network (DAWN) data comparing the number of mentions for Fentanyl/combinations (710 mentions) to other listed opioid products, including Hydrocodone/combinations (21,567 mentions), Oxycodone/combinations (18,409 mentions), and Methadone (10,725 mentions). The file card thus suggests that Duragesic is less abused than other opioid drugs.
>
> This is false or misleading for two reasons. First, we are not aware of substantial evidence or substantial clinical experience to support this comparative claim. The DAWN data cannot provide the basis for a valid

---

[141] *Id.* at 3. (emphasis in original).

comparison among these products. As you know, DAWN is not a clinical trial database. Instead, it is a national public health surveillance system that monitors drug-related emergency department visits and deaths. If you have other data demonstrating that Duragesic is less abused, please submit them.

Second, Duragesic is not as widely prescribed as other opioid products. As a result, the relatively lower number of mentions could be attributed to the lower frequency of use, and not to a lower incidence of abuse. The file card fails to disclose this information.[142]

157. The September 2, 2004 letter also detailed a series of unsubstantiated false or misleading claims regarding Duragesic's effectiveness. The letter concluded that various claims made by Janssen were insufficiently supported, including that:

- "'Demonstrated effectiveness in chronic back pain with additional patient benefits, …86% of patients experienced overall benefit in a clinical study based on: pain control, disability in ADLs, quality of sleep.'"

- "'All patients who experienced overall benefit from DURAGESIC would recommend it to others which chronic low back pain.'"

- "'Significantly reduced nighttime awakenings.'"

- "'Significant improvement in disability scores as measured by the Oswestry Disability Questionnaire and Pain Disability Index.'"

- "'Significant improvement in physical functioning summary scores.'"

- "'Significant improvement in social functioning.'"[143]

158. In addition, the September 2, 2004 letter identified "outcome claims [that] are misleading because they imply that patients will experience improved social or physical functioning or improved work productivity when using Duragesic." The claims include "'1,360 loaves[ [sic]…and counting,' '[w]ork, uninterrupted,' '[l]ife, uninterrupted,' '[g]ame,

---

[142] Warning Letter from Thomas W. Abrams, U.S. Department of Health and Human Services, to Ajit Shetty, Janssen Pharmaceutica, Inc. (Sept. 2, 2004), available at http://www.johnsonandtoxin.com/040920_duragesic_letter.pdf, at 2.

[143] Id. at 2-3.

uninterrupted,' '[c]hronic pain relief that supports functionality,' '[h]elps patients think less about their pain,' and '[i]mprove[s]…physical and social functioning.'" The September 2, 2004 letter stated: "Janssen has not provided references to support these outcome claims. We are not aware of substantial evidence or substantial clinical experience to support these claims."[144]

159. On July 15, 2005, the FDA issued a public health advisory warning doctors of deaths resulting from the use of Duragesic and its generic competitor, manufactured by Mylan N.V. The advisory noted that the FDA had been "'examining the circumstances of product use to determine if the reported adverse events may be related to inappropriate use of the patch'" and noted the possibility "that patients and physicians might be unaware of the risks" of using the fentanyl transdermal patch, which is a potent opioid analgesic meant to treat chronic pain that does not respond to other painkillers.

### 2.   Janssen Funded False Publications and Presentations

160. Despite these repeated warnings, Janssen continued to falsely market the risks of opioids. In 2009, PriCara, a "Division of Ortho-McNeil-Janssen Pharmaceuticals, Inc.," sponsored a 2009 brochure, titled "Finding Relief: Pain Management for Older Adults," aimed at potential patients. The brochure included a free DVD featuring actress Kathy Baker, who played a doctor in the popular television series "Picket Fences."

161. The brochure represented that it was a source for older adults to gain accurate information about treatment options for effective pain relief:

> This program is aimed specifically at older adults and what they need to know to get effective pain relief. You will learn that there are many pathways to this relief.
>
> You will learn about your options for pain management and how to find the

---

[144] *Id.* at 3.

treatment that's right for you. By learning more about pain and the many ways it can be treated, you are taking solid steps toward reducing the pain you or a loved one may be feeling.[145]

162. Despite representing itself as a source of accurate information, the brochure included false and misleading information about opioids, including a section seeking to dispel purported "myths" about opioid usage:

> **Opioid Myths**
>
> **Myth:** Opioid medications are always addictive.
>
> **Fact:** Many studies show that opioids are *rarely* addictive when used properly for the management of chronic pain.
>
> **Myth:** Opioids make it harder to function normally.
>
> **Fact:** When used correctly for appropriate conditions, opioids may make it *easier* for people to live normally.
>
> **Myth:** Opioid doses have to get bigger over time because the body gets used to them.
>
> **Fact:** Unless the underlying cause of your pain gets worse (such as with cancer or arthritis), you will probably remain on the same dose or need only small increases over time.[146]

163. Among the "Partners" listed in "Finding Relief: Pain Management for Older Adults" are the AAPM, the American Geriatrics Society ("AGS") and the AGS Foundation for Health in Aging. Janssen (along with Purdue and Endo) funded the AAPM. The AGS and the AGS Foundation for Health in Aging published a pain guide titled "Finding Relief: Pain Management for Older Adults," which was funded by Janssen.[147]

164. In addition, Janssen disseminated false information about opioids on the website Prescribe Responsibly, which remains publicly accessible at www.prescriberesponsibly.com.

---

[145] *Finding Relief, Pain Management for Older Adults* (2009).
[146] *Id.* (emphasis in original).
[147] *Id.*

67

According to the website's legal notice, all content on the site "is owned or controlled by Janssen."[148] The website includes numerous false or misleading representations concerning the relative safety of opioids and omissions of the risks associated with taking them. For example, it states that while practitioners are often concerned about prescribing opioids due to "questions of addiction," such concerns "are often overestimated. According to clinical opinion polls, true addiction occurs only in a small percentage of patients with chronic pain who receive chronic opioid analgesic[]...therapy."[149]

165. Prescribe Responsibly also compared the risks of opioid use favorably to those associated with nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as aspirin and ibuprofen, and stated that many patients develop tolerance for opioid side effects:

> Opioid analgesics are often the first line of treatment for many painful conditions and may offer advantages over nonsteroidal anti-inflammatory drugs (NSAIDs). Opioid analgesics, for example, have no true 'ceiling dose' for analgesia and do not cause direct organ damage; however, they do have several possible side effects, including constipation, nausea, vomiting, a decrease in sexual interest, drowsiness, and respiratory depression. With the exception of constipation, many patients often develop tolerance to most of the opioid analgesic-related side effects.[150]

166. Further, Prescribe Responsibly repeats the scientifically unsupported discussion of "pseudoaddiction" as "a syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically when the pain is treated appropriately, the inappropriate behavior ceases."[151] Thus, pseudoaddiction is defined as a condition requiring the prescription of more or stronger opioids.

---

[148] *Legal Notice*, Prescribe Responsibly, http://www.prescriberesponsibly.com/legal-notice (last visited Mar. 09, 2018).
[149] *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, available at http://www.prescriberesponsibly.com/articles/opioid-pain-management (last visited Mar. 09, 2018).
[150] *Id.*
[151] *What a Prescriber Should Know Before Writing the First Prescription*, Prescribe Responsibly, available at http://www.prescriberesponsibly.com/articles/before-prescribing-opioids (last visited Mar 14, 2018).

68

167. Janssen also made thousands of payments to physicians nationwide, including payments to Palmetto physicians, for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services.

168. According to data collected by ProPublica, in 2014, Florida doctors prescribed more than $2 million worth of Duragesic, nearly $2 million worth of Nucynta, and approximately $2.2 million worth of Nucynta ER to patients insured by Medicare Part D. In 2015, Medicare part D prescriptions totaled more than $2.1 million worth of Duragesic, almost $2.6 million worth of Nucynta and more than $3.5 million of Nucynta ER.

169. As people became increasingly hooked on prescription pain killers, they moved to heroin, and in turn increasingly to fentanyl, which is even more potent and cheaper than heroin, and which, as set forth above, was being deceptively marketed by Janssen, causing a dramatic spike in heroin and fentanyl overdose deaths:



**Heroin and fentanyl overdose deaths are on the rise**



■ Heroin   ■ Non-methadone synthetic opioids (particularly fentanyl)

Source: National Institute on Drug Abuse

### 3.    *Janssen Failed to Report Suspicious Sales as Required*

170. The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

171. Janssen is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

172. Janssen failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders.

Janssen's failure to timely report suspicious sales violated the CSA.

C.      Endo

173. Endo manufactures, markets, sells and distributes the following opioids in Palmetto and

nationwide:

| Opana ER (oxymorphone hydrochloride) | Opioid agonist; extended-release tablet formulation; first drug in which oxymorphone is available in an oral, extended-release formulation; first approved in 2006. | Schedule II |
|---|---|---|
| Opana (oxymorphone hydrochloride) | Opioid agonist; first approved in 2006. | Schedule II |
| Percodan (oxymorphone hydrochloride and aspirin) | Branded tablet combining oxymorphone hydrochloride and aspirin; first approved in 1950; first marketed by Endo in 2004. | Schedule II |
| Percocet (oxymorphone hydrochloride and acetaminophen) | Branded tablet that combines oxymorphone hydrochloride and acetaminophen; first approved in 1999; first marketed by Endo in 2006. | Schedule II |
| Oxycodone | Generic product. | Schedule II |
| Oxymorphone | Generic product. | Schedule II |
| Hydromorphone | Generic product. | Schedule II |
| Hydrocodone | Generic product. | Schedule II |

174. The FDA first approved an injectable form of Opana in 1959. The injectable form of Opana

was indicated "for the relief of moderate to severe pain" and "for preoperative medication, for

support of anesthesia, for obstetrical analgesia, and for relief of anxiety in patients with

dyspnea associated with pulmonary edema secondary to acute left ventricular

dysfunction." However, oxymorphone drugs were removed from the market in the 1970s

due to widespread abuse.[152]

---

[152] John Fauber & Kristina Fiore, *Opana gets FDA approval despite history of abuse, limited effectiveness in trials*, Milwaukee Journal Sentinel (May 9, 2015), available at http://archive.jsonline.com/watchdog/watchdogreports/opana-gets-fda-approval-despite-history-of-%20abuse-limited-effectiveness-in-trials-b99494132z1-303198321.html/.

175. In 2006, the FDA approved a tablet form of Opana in 5 mg and 10 mg strengths. The tablet form was "indicated for the relief of moderate to severe acute pain where the use of an opioid is appropriate." Also in 2006, the FDA approved Opana ER, an extended-release tablet version of Opana available in 5 mg, 10 mg, 20 mg and 40 mg tablet strengths. Opana ER was indicated "for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time." Endo's goal was to use Opana ER to take market share away from OxyContin; it was thus marketed as being safer, and with less abuse potential than OxyContin because of its crush-resistance.

176. According to Endo's annual reports, sales of Opana and Opana ER regularly generate several hundred million dollars in annual revenue for the company, growing from $107 million in 2007 to as high as $384 million in 2011. Over the last ten years, Percocet has generated an average of well over $100 million in annual revenue for the company.

       *1.    Endo Falsely Marketed Opana ER as Crush Resistant*

177. In December 2011, the FDA approved a reformulated version of Opana ER, which Endo claimed offered "safety advantages" over the original formulation because the latter "'is resistant to crushing by common methods and tools employed by abusers of prescription opioids . . . [and] is less likely to be chewed or crushed even in situations where there is no intent for abuse, such as where patients inadvertently chew the tablets, or where caregivers attempt to crush the tablets for easier administration with food or by gastric tubes, or where children accidentally gain access to the tablets.'"[153]

---

[153] FDA-2012-P-0895 Letter from Janet Woodcock, M.D., Center for Drug Evaluation and Research, to Richard Barto, Endo Pharmaceuticals, available at
https://www.pharmamedtechbi.com/~/media/Supporting%20Documents/The%20Pink%20Sheet%20DAI
LY/2013/May/FDA_CDER_Final_RespEndo_Pharmaceuticals_Inc_Petition_Denial.pdf at 4. (hereafter "Letter from Janet Woodcock").

178. Endo publicized the reformulated version of Opana ER as "crush-resistant." To combat the fear of opioids, sales representatives touted it to doctors as a safer option owing to its crush-resistance and extended release. In a December 12, 2011 press release announcing FDA approval of the reformulated Opana ER, Endo's executive vice president for research and development and chief scientific officer highlighted the reformulated version's safety characteristics:

> "FDA's approval of this new formulation of Opana ER is an important milestone for both the Long Acting Opioid category as well as Endo's branded pharmaceutical portfolio. . . . Patient safety is our top concern and addressing appropriate use of opioids is a responsibility that we take very seriously. We firmly believe this new formulation of Opana ER, coupled with our long-term commitment to awareness and education around appropriate use of opioids will benefit patients, physicians and payers."[154]

179. However, in October 2012, the CDC issued a health alert noting that 15 people in Tennessee had contracted thrombotic thrombocytopenic purpura, a rare blood-clotting disorder, after injecting reformulated Opana ER. In response, Endo's chief scientific officer stated that, while Endo was looking into the data, he was not especially concerned: "'Clearly, we are looking into this data, . . .but it's in a very, very distinct area of the country.'"[155]

180. Shortly thereafter, the FDA determined that Endo's conclusions about the purported safety advantages of the reformulated Opana ER were unfounded. In a May 10, 2013 letter to Endo, the FDA found that the tablet was still vulnerable to "'cutting, grinding, or chewing,'" "'can be prepared for insufflation (snorting) using commonly available tools and methods,'" and "'can [be readily] prepared for injection.'" It also warned that preliminary

---

[154] Press Release, Endo Announces FDA Approval of New Formulation of Opana ER Designed to be Crush-Resistant (Dec. 12, 2011), available at https://www.prnewswire.com/news-releases/endo-announces-fda-approval-of-a-new-formulation-of-opana-er-designed-to-be-crush-resistant-135431073.html.
[155] Jake Harper & Kelly McEvers, *How A Painkiller Designed To Deter Abuse Helped Spark An HIV Outbreak*, National Public Radio (Apr. 1, 2016), available at https://www.npr.org/sections/health-shots/2016/04/01/472538272/how-a-painkiller-designed-to-deter-abuse-helped-spark-an-hiv-outbreak.

data suggested "the troubling possibility that a higher percentage of reformulated Opana ER abuse is via injection than was the case with the original formulation."[156]

181. A 2014 study co-authored by an Endo medical director corroborated the FDA's warning. This 2014 study found that while overall abuse of Opana had fallen following Opana ER's reformulation, it also found that injection had become the preferred way of abusing the drug.[157] However, the study reassured that it was not possible to draw a causal link between the reformulation and injection abuse.

182. The study's failure to adequately warn healthcare providers and the public was catastrophic. On April 24, 2015, the CDC issued a health advisory concerning its investigation of "a large outbreak of recent human immunodeficiency virus (HIV) infections among persons who inject drugs."[158] The CDC specifically attributed the outbreak to the injection of Opana ER. As the advisory explained:

> From November 2014 to January 2015, ISDH identified 11 new HIV infections in a rural southeastern county where fewer than 5 infections have been identified annually in the past. As of April 21, 2015, an on-going investigation by ISDH with assistance from CDC has identified 135 persons with newly diagnosed HIV infections in a community of 4,200 people; 84% were also HCV infected. Among 112 persons interviewed thus far, 108 (96%) injected drugs; all reported dissolving and injecting tablets of the prescription-type opioid oxymorphone (OPANA® ER) using shared drug preparation and injection equipment.[159]

    2.    *New York's Investigation Found Endo Falsely Marketed Opana ER*

183. On February 18, 2017, the State of New York announced a settlement with Endo requiring it "to cease all misrepresentations regarding the properties of Opana ER [and] to describe

---

[156] Letter from Janet Woodcock, *supra* n. 153 at 2 n.5.
[157] Harper, *supra* n. 155.
[158] *Outbreak of Recent HIV and HCV Infections Among Persons Who Inject Drugs*, Centers for Disease Control and Prevention, https://stacks.cdc.gov/view/cdc/30591 (last visited Mar. 14, 2018).
[159] *Id.*

accurately the risk of addiction to Opana ER."[160] In the Assurance of Discontinuance that

effectuated the settlement, the State of New York revealed evidence showing that Endo had

known about the risks arising from the reformulated Opana ER even before it received

FDA approval.

184. Among other things, the investigation concluded that:

- *Endo improperly marketed Opana ER as designed to be crush resistant, when Endo's own studies dating from 2009 and 2010 showed that the pill could be crushed and ground;*

- *Endo improperly instructed its sales representatives to diminish and distort the risks associated with Opana ER, including the serious danger of addiction; and*

- *Endo made unsupported claims comparing Opana ER to other opioids and failed to disclose accurate information regarding studies addressing the negative effects of Opana ER.*

185. In October 2011, Endo's director of project management e-mailed the company that had

developed the formulation technology for reformulated Opana ER to say there was little or

no difference between the new formulation and the earlier formulation, which Endo

withdrew due to risks associated with grinding and chewing:

> "*We already demonstrated that there was little difference between [the original and new formulations of Opana] in Study 108 when both products were ground. FDA deemed that there was no difference* and this contributed to their statement that we had not shown an incremental benefit. *The chewing study (109) showed the same thing no real difference* which the FDA used to claim no incremental benefit."[161]

186. Endo conducted two additional studies to test the reformulated Opana ER's crush

---

[160] Press Release, Attorney General Eric T. Schneiderman, A.G. Schneiderman Announces Settlement With Endo Health Solutions Inc. & Endo Pharmaceuticals Inc. Over Marketing Of Prescription Opioid Drugs (Mar. 3, 2016), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-endo-health-solutions-inc-endo-pharmaceuticals.
[161] *In the Matter of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.*, Assurance No. 15-228, Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 at 5 (Mar. 1, 2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

resistance. Study 901 tested whether it was more difficult to extract reformulated Opana ER than the original version, and whether it would take longer to extract from reformulated Opana ER than from the original version. The test revealed that both formulations behaved similarly with respect to manipulation time and produced equivalent opioid yields.

187. The settlement also identified and discussed a February 2013 communication from a consultant hired by Endo to the company, in which the consultant concluded that "'[t]he initial data presented do not necessarily establish that the reformulated Opana ER is tamper resistant.'" The same consultant also reported that the distribution of the reformulated Opana ER had already led to higher levels of abuse of the drug via injection.[162]

188. Regardless, pamphlets produced by Endo and distributed to physicians misleadingly marketed the reformulated Opana ER as "'designed to be' crush resistant," and Endo's sales representative training identified Opana ER as "CR," short for crush resistant.[163]

189. The Office of the Attorney General of New York also revealed that the "managed care dossier" Endo provided to formulary committees of healthcare plans and pharmacy benefit managers misrepresented the studies that had been conducted on Opana ER. The dossier was distributed in order to assure the inclusion of reformulated Opana ER in their formularies.

190. According to Endo's vice president for pharmacovigilance and risk management, the dossier was presented as a complete compendium of all research on the drug. However, it omitted certain studies: Study 108 (completed in 2009) and Study 109 (completed in 2010), which showed that reformulated Opana ER could be ground and chewed.

191. The settlement also detailed Endo's false and misleading representations about the non-

---

[162] *Id.* at 6.
[163] *Id.*

addictiveness of opioids and Opana. Until April 2012, Endo's website for the drug, www.opana.com, contained the following representation: "'Most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted.'" [164] However, Endo neither conducted nor possessed a survey demonstrating that most healthcare providers who treat patients with pain agree with that representation.

192. The Office of the Attorney General of New York also disclosed that training materials provided by Endo to sales representatives stated: "'Symptoms of withdrawal do not indicate addiction.'" [165] This representation is inconsistent with the diagnosis of opioid-use disorder as provided in the Diagnostic and Statistical Manual of Mental Disorders by the American Psychiatric Association (Fifth Edition).

193. The Office of the Attorney General of New York also found that Endo trained its sales representatives to falsely distinguish addiction from "pseudoaddiction," which it defined as a condition in which patients exhibit drug-seeking behavior that resembles but is not the same as addiction. However, Endo's vice president for pharmacovigilance and risk management testified that he was not aware of any research validating the concept of pseudoaddiction.

194. On June 9, 2017, the FDA asked Endo to voluntarily cease sales of Opana ER after determining that the risks associated with its abuse outweighed the benefits. According to Dr. Janet Woodcock, director of the FDA's Center for Drug Evaluation and Research, the risks include "several serious problems," including "outbreaks of HIV and Hepatitis C from sharing the drug after it was extracted by abusers" and "a[n] outbreak of serious blood

---

[164] *Id.*
[165] *Id.* at 7.

disorder." If Endo does not comply with the request, Dr. Woodcock stated that the FDA would issue notice of a hearing and commence proceedings to compel its removal.

### 3. Endo Funded False Publications and Presentations

195. Like several of the other Manufacturing Defendants, Endo provided substantial funding to purportedly neutral medical organizations, including the APF.

196. For example, in April 2007, Endo sponsored an article aimed at prescribers, written by Dr. Charles E. Argoff in *Pain Medicine News*, titled "Case Challenges in Pain Management: Opioid Therapy for Chronic Pain."[166]

197. The article commenced with the observation that "[a]n estimated 50 to 60 million people . . . suffer from chronic pain." It continued:

> Opioids represent a highly effective but controversial and often
> misunderstood class of analgesic medications for controlling both chronic
> and acute pain. The phenomenon of tolerance to opioids – the gradual
> waning of relief at a given dose – and fears of abuse, diversion, and misuse
> of these medications by patients have led many clinicians to be wary of
> prescribing these drugs, and/or to restrict dosages to levels that may be
> insufficient to provide meaningful relief.[167]

198. The article included a case study that focused on the danger of extended use of NSAIDs, including that the subject was hospitalized with a massive upper gastrointestinal bleed believed to have resulted from his protracted NSAID use. In contrast, the article did not provide the same detail concerning the serious side effects associated with opioids. It concluded by saying that the "use of opioids may be effective in the management of chronic pain."

199. Later, in 2014, Endo issued a patient brochure titled "Understanding Your Pain: Taking

---

[166] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News, https://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf.
[167] *Id.*

Oral Opioid Analgesics." It was written by nurses Margo McCaffery and Chris Pasero and
edited by APF board member Portenoy.

200. The brochure included numerous false and misleading statements minimizing the dangers
associated with prescription opioid use. Among other things, the brochure falsely and
misleadingly represented that:

> Addiction **IS NOT** when a person develops "withdrawal" (such as abdominal
> cramping or sweating) after the medicine is stopped quickly or the dose is
> reduced by a large amount. Your doctor will avoid stopping your medication
> suddenly by slowly reducing the amount of opioid you take before the
> medicine is completely stopped. Addiction also **IS NOT** what happens
> when some people taking opioids need to take a higher dose after a period
> of time in order for it to continue to relieve their pain. This normal
> "tolerance" to opioid medications doesn't affect everyone who takes them
> and does not, by itself, imply addiction. If tolerance does occur, it does not
> mean you will "run out" of pain relief. Your dose can be adjusted or another
> medicine can be prescribed.

> *        *        *

> *How can I be sure I'm not addicted?*

> □□  Addiction to an opioid would mean that your pain has gone away but you
> still take the medicine regularly when you don't need it for pain, maybe just
> to escape from your problems.

> •     Ask yourself: Would I want to take this medicine if my pain went
> away? If you answer no, you are taking opioids for the right reasons – to
> relieve your pain and improve your function.  You are not addicted.

> *        *        *

> Your doctor or nurse may instruct you to do some of the following:

> •     Take the next dose before the last dose wears off. If pain is present
> most of the day and night, the pain medicine may be taken at regularly
> scheduled times. If you are taking a short-acting opioid, this usually means
> taking it every 4 hours. You may need to set your alarm, especially at night,
> to be sure you take your dose before the pain returns and wakes you up.

> •     If your pain comes and goes, take your pain medicine when pain first
> begins, before it becomes severe.

> •     If you are taking a long-acting opioid, you may only need to take it every

8 to 12 hours, but you may also need to take a short-acting opioid in between for any increase in pain.[168]

201. In 2008, Endo also provided an "educational grant" to PainEDU.org, which produced a document titled "Screener and Opioid Assessment for Patients with Pain (SOAPP) Version 1.0-14Q." Endo and King Pharmaceuticals sponsor PainEDU.org.[169] SOAPP describes itself "as a tool for clinicians to help determine how much monitoring a patient on long-term opioid therapy might require." It falsely highlights purportedly "recent findings suggesting that most patients are able to successfully remain on long-term opioid therapy without significant problems."

202. Endo also sponsored the now-defunct website painknowledge.com, which was created by the APF and stated it was "a one-stop repository for print materials, educational resources, and physician tools across the broad spectrum of pain assessment, treatment, and management approaches."[170] Among other featured content, painknowledge.com included a flyer titled "Pain: Opioid Therapy," which failed to warn of significant adverse effects that could arise from opioid use, including hyperalgesia, immune and hormone dysfunction, cognitive impairment, decreased tolerance, dependence and addiction.

203. Endo, along with Janssen and Purdue, also provided grants to APF to distribute Exit Wounds, discussed above. *See supra* ¶69.[171]

---

[168] Margo McCaffery & Chris Pasero, *Understanding Your Pain: Taking Oral Opioid Analgesics*, Endo Pharmaceuticals (2004), http://www.thblack.com/links/RSD/Understand_Pain_Opioid_Analgesics.pdf (emphasis in original).

[169] B. Eliot Cole, *Resources for Education on Pain and Its Management: A Practitioner's Compendium* 2 (Am. Society of Pain Educators 2009), https://www.paineducators.org/wp-content/uploads/2012/12/ASPE-ResForEducationOnPainAn.pdf.

[170] *AboutPainKnowledge.org*, PainKnowledge, available at http://web.archive.org/web/20120120094923/http://www.painknowledge.org/aboutpaink.aspx (last visited Mar. 14, 2018).

[171] *Iraq War Veteran Amputee, Pain Advocate and New Author Release Exit Wounds: A Survival Guide to Pain Management for Returning Veterans and Their Families*, Coalition for Iraq + Afghanistan Veterans, available at https://web.archive.org/web/20160804131030/http://coalitionforveterans.org/2009/10/iraq-war-

204. Endo also made thousands of payments to physicians nationwide, including payments to Palmetto physicians, for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services.

### 4. The FDA Requested Endo Withdraw Opana ER Due to the Public Health Consequences of Abuse

205. On June 8, 2017, the FDA requested that Endo remove reformulated Opana ER from the market "based on its concern that the benefits of the drug may no longer outweigh its risks."[172] According to the FDA's press release, it sought removal "due to the public health consequences of abuse." The decision to seek Opana ER's removal from sale followed a March 2017 FDA advisory committee meeting, during which a group of independent experts voted 18-8 that the drug's benefits no longer outweigh the risks associated with its use. Should Endo choose not to remove Opana ER due to the FDA's request, the agency stated that it will take steps to formally require its removal by withdrawing approval.

206. Opana ER has been widely prescribed in Palmetto. According to data collected by ProPublica, during 2014 and 2015, Florida doctors' prescriptions of Opana ER to patients insured by the Medicare Part D program totaled approximately $12.8 million and more than $14.8 million, respectively.

### 5. Endo Failed to Report Suspicious Sales as Required

207. The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders.

---

veteran-amputee-pain-advocate-and-new-author-releases-exit-wounds-a-survival-guide-to-pain-management-for-returning-veterans-and-their-families/ (last visited Mar. 14, 2018).
[172] Press Release, U.S. Food & Drug Administration, FDA requests removal of Opana ER for risks related to abuse (June 8, 2017), available at
https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm562401.htm.

"Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

208. Endo is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

209. Endo failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders. Endo's failure to timely report suspicious sales violated the CSA.

D.   Cephalon

210. Cephalon manufactures, markets, sells and distributes the following opioids in Palmetto and nationwide:

| Actiq (fentanyl citrate) | Opioid analgesic; oral transmucosal lozenge; indicated only for the management of breakthrough pain (or "BTP") in cancer patients – pain that for a short time "breaks through" medication that otherwise effectively controls a patient's persistent pain – in patients 16 and older with malignancies; commonly referred to as a lollipop because designed to look and perform like one; approved in 1998 with restricted distribution program. | Schedule II |
|---|---|---|
| Fentora (fentanyl buccal) | Rapid-release tablet for BTP in cancer patients who are already receiving and tolerant of around-the-clock opioid therapy; approved 2006. | Schedule II |
| Generic of OxyContin (oxycodone hydrochloride) | Opiate agonist. | Schedule II |

211. Actiq is designed to resemble a lollipop and is meant to be sucked on at the onset of intense BTP in cancer patients. It delivers fentanyl citrate, a powerful opioid agonist that is 80 times

stronger than morphine, [173] rapidly into a patient's bloodstream through the oral membranes. [174] Because it is absorbed through those membranes, it passes directly into circulation without having to go through the liver or stomach, thereby providing faster relief.[175]

212. In November 1998, the FDA approved Actiq for only a very narrow group of people cancer patients "with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[176]

213. Understanding the risks of introducing such an intense opioid analgesic to the market, the FDA provided approval of Actiq *"ONLY* for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[177] Further, the FDA explicitly stated that Actiq *"must not* be used in opioid non-tolerant patients," was contraindicated for the management of acute or postoperative pain, could be deadly to children, and was "intended to be used only in the care of opioid-tolerant cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain."

214. The FDA also required that Actiq be provided only in compliance with a strict risk-

---

[173] *See* John Carreyrou, *Narcotic "Lollipop" Becomes Big Seller Despite FDA Curbs*, Wall St. J. (Nov. 3, 2006), available at https://www.opiates.com/narcotic-lollipop-becomes-big-seller-despite-fda-curbs/ (hereinafter "Carreyrou, *Narcotic Lollipop*").

[174] Actiq would later become part of a category of opioids now known as transmucosal immediate- release fentanyl ("TIRF") products. "Transmucosal" refers to the means through which the opioid is delivered into a patient's bloodstream, across mucous membranes, such as inside the cheek, under the tongue or in the nose.

[175] *Cephalon, Inc.*, Company-Histories.com, available at http://www.company-histories.com/Cephalon-Inc-Company-History.html (last visited Mar. 14, 2018).

[176] 1998 FDA Label.

[177] NDA 20-747 Letter from Cynthia McCormick, Center for Drug Evaluation and Research, to Patricia J. Richards, Anesta Corporation, available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/1998/20747ltr.pdf.

management program that explicitly limited the drug's direct marketing to the approved target audiences, defined as oncologists, pain specialists, their nurses and office staff.[178]

215. In October 2000, Cephalon acquired the worldwide product rights to Actiq and began marketing and selling Actiq in the United States.

216. Cephalon purchased the rights to Fentora, an even faster-acting tablet formulation of fentanyl, from Cima Labs, and submitted a new drug application to the FDA in August 2005. In September 2006, Cephalon received FDA approval to sell this faster-acting version of Actiq; but once again, concerned about the power and risks inherent to fentanyl, the FDA limited Fentora's approval to the treatment of BTP in cancer patients who were already tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Cephalon began marketing and selling Fentora in October 2006.

   *1.  Cephalon Falsely and Aggressively Marketed Cancer Drug Actiq to Non-Cancer Treating Physicians*

217. Due to the FDA's restrictions, Actiq's consumer base was limited, as was its potential for growing revenue. In order to increase its revenue and market share, Cephalon needed to find a broader audience and thus began marketing its lollipop to treat headaches, back pain, sports injuries and other chronic non-cancer pain, targeting non-oncology practices, including, but not limited to, pain doctors, general practitioners, migraine clinics, anesthesiologists and sports clinics. It did so in violation of applicable regulations prohibiting the marketing of medications for off-label use and in direct contravention of the FDA's strict instructions that Actiq be prescribed only to terminal cancer patients and by oncologists and pain management doctors experienced in treating cancer pain.

218. According to "data gathered from a network of doctors by research firm ImpactRx between

---

[178] Carreyrou, *Narcotic Lollipop, supra* n.173.

June 2005 and October 2006" ("ImpactRx Survey"), Cephalon sales representatives' visits to non-oncologists to pitch Actiq increased sixfold between 2002 and 2005. Cephalon representatives would reportedly visit non-oncologists monthly, providing up to 60 or 70 coupons (each coupon was good for six free Actiq lozenges) and encouraging prescribers to try Actiq on their non-cancer patients.[179]

219. Cephalon's efforts paid off. In 2000, Actiq generated $15 million in sales.[180] By 2002, it attributed a 92% increase in Actiq sales to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[181] By 2005, Actiq's sales total had jumped to $412 million, making it (a drug approved for only a narrow customer base) Cephalon's second-best selling drug. By the end of 2006, Actiq's sales had exceeded $500 million.[182]

220. Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. Results of the ImpactRx Survey suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[183]

      2.    *Governmental Investigations Found Cephalon Falsely Marketed Actiq for Off-Label Uses.*

221. Beginning in or about 2003, former Cephalon employees filed four whistleblower lawsuits claiming the company had wrongfully marketed Actiq for unapproved off-label uses. On September 29, 2008, Cephalon finalized and entered into a corporate integrity agreement

---

[179] *Id.*

[180] *Id.*

[181] Cephalon, Inc. Annual Report (Form 10-K)    (Mar.    31,    2003),    available    at https://www.sec.gov/Archives/edgar/data/873364/000104746903011137/a2105971z10-k.htm at 28.

[182] Carreyrou, *Narcotic Lollipop, supra* n.173.

[183] *Id.*

with the Office of the Inspector General of HHS and agreed to pay $425 million in civil and criminal penalties for its off-label marketing of Actiq and two other drugs (Gabitril and Provigil). According to a DOJ press release, Cephalon trained sales representatives to disregard restrictions of the FDA- approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of the three drugs, and funded CME to promote off-label uses. Specifically, the DOJ stated:

> From 2001 through at least 2006, *Cephalon was allegedly promoting [Actiq] for non-cancer patients to use for such maladies as migraines, sickle-cell pain crises, injuries, and in anticipation of changing wound dressings or radiation therapy. Cephalon also promoted Actiq for use in patients who were not yet opioid-tolerant, and for whom it could have life-threatening results.*[184]

222. Then-acting U.S. Attorney Laurie Magid commented on the dangers of Cephalon's unlawful practices:

> "*This company subverted the very process put in place to protect the public from harm, and put patients' health at risk for nothing more than boosting its bottom line.* People have an absolute right to their doctors' best medical judgment. They need to know the recommendations a doctor makes are not influenced by sales tactics designed to convince the doctor that the drug being prescribed is safe for uses beyond what the FDA has approved."[185]

223. Upon information and belief, documents uncovered in the government's investigations confirm that Cephalon directly targeted non-oncology practices and pushed its sales representatives to market Actiq for off-label use. For instance, the government's investigations confirmed:

- Cephalon instructed its sales representatives to ask non-cancer doctors whether they have the potential to treat cancer pain. Even if the doctor answered "no," a decision tree provided by Cephalon instructed the sales representatives to give

---

[184] Press Release, U.S. Department of Justice, Pharmaceutical Company Cephalon To Pay $425 Million For Off-Label Drug Marketing (Sept. 29, 2008), available at https://www.justice.gov/archive/usao/pae/News/2008/sep/cephalonrelease.pdf.
[185] *Id.*

these physicians free Actiq coupons;

- Cephalon targeted neurologists in order to encourage them to prescribe Actiq to patients with migraine headaches;

- Cephalon sales representatives utilized the assistance of outside pain management specialists when visiting non-cancer physicians to pitch Actiq. The pain management specialist would falsely inform the physician that Actiq does not cause patients to experience a "high" and carries a low risk of diversion toward recreational use;

- Cephalon set sales quotas for its sales and marketing representatives that could not possibly have been met solely by promoting Actiq for its FDA-approved indication;

- Cephalon promoted the use of higher doses of Actiq than patients required by encouraging prescriptions of the drug to include larger-than-necessary numbers of lozenges with unnecessarily high doses of fentanyl; and

- Cephalon promoted Actiq for off-label use by funding and controlling CME seminars that promoted and misrepresented the efficacy of the drug for off-label uses such as treating migraine headaches and for patients not already opioid-tolerant.[186]

224. Still, the letters, the FDA's safety alert, the DOJ and state investigations and the massive settlement seemed to have had little impact on Cephalon as it continued its deceptive marketing strategy for both Actiq and Fentora.

   3.   *Cephalon Falsely and Aggressively Marketed Cancer Drug Fentora to Non-Cancer Treating Physicians*

225. From the time it first introduced Fentora to the market in October 2006, Cephalon targeted non-cancer doctors, falsely represented Fentora as a safe, effective off-label treatment for non-cancer pain and continued its disinformation campaign about the safety and non-addictiveness of Fentora specifically and opioids generally. In fact, Cephalon targeted the same pain specialists and non-oncologists that it had targeted with its off-label marketing

---

[186] John Carreyrou, *Cephalon Used Improper Tactics to Sell Drug, Probe Finds*, Wall St. J., Nov. 21, 2006, https://www.wsj.com/articles/SB116407880059829145, at B1 (hereinafter "Carreyrou, *Cephalon Used Improper Tactics*").

of Actiq, simply substituting Fentora.

226. During an investor earnings call shortly after Fentora's launch, Cephalon's chief executive

officer described the "opportunity" presented by the use of Fentora for non-cancer pain:

> ***The other opportunity of course is the prospect for FENTORA outside of cancer pain, in indications such as breakthrough lower back pain and breakthrough neuropathic pain.***
>
> \*       \*       \*
>
> Of all the patients taking chronic opioids, 32% of them take that medication to treat back pain, and 30% of them are taking their opioids to treat neuropathic pain. In contrast only 12% are taking them to treat cancer pain, 12%.
>
> We know from our own studies that breakthrough pain episodes experienced by these non-cancer sufferers respond very well to FENTORA. And for all these reasons, we are tremendously excited about the significant impact FENTORA can have on patient health and well being and the exciting growth potential that it has for Cephalon.
>
> In summary, we have had a strong launch of FENTORA and continue to grow the product aggressively. Today, that growth is coming from the physicians and patient types that we have identified through our efforts in the field over the last seven years. In the future, with new and broader indications and a much bigger field force presence, the opportunity that FENTORA represents is enormous.[187]

### 4.    The FDA Warned Cephalon Regarding its False and Off-Label Marketing of Fentora

227. On September 27, 2007, the FDA issued a public health advisory to address numerous

reports that patients who did not have cancer or were not opioid tolerant had been

prescribed Fentora, and death or life-threatening side effects had resulted. The FDA

warned: "Fentora should not be used to treat any type of short-term pain."[188]

---

[187] Seeking Alpha, Transcript of Q1 2007 Cephalon, Inc. Earnings Conference Call, May 1, 2007, https://seekingalpha.com/article/34163-cephalon-q1-2007-earnings-call-transcript at 6-7.

[188] Press Release, U.S. Food & Drug Administration, Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets) (Sept. 26, 2007), available at https://wayback.archive-it.org/7993/20170112032918/http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationfo rPatientsandProviders/ucm051273.htm.

228. Nevertheless, in 2008, Cephalon pushed forward to expand the target base for Fentora and filed a supplemental drug application requesting FDA approval of Fentora for the treatment of non-cancer BTP. In the application and supporting presentations to the FDA, Cephalon admitted both that it knew the drug was heavily prescribed for off-label use and that the drug's safety for such use had never been clinically evaluated.[189] An FDA advisory committee lamented that Fentora's existing risk management program was ineffective and stated that Cephalon would have to institute a risk evaluation and mitigation strategy for the drug before the FDA would consider broader label indications. In response, Cephalon revised Fentora's label and medication guide to add strengthened warnings.

229. But in 2009, the FDA once again informed Cephalon that the risk management program was not sufficient to ensure the safe use of Fentora for already approved indications.

230. On March 26, 2009, the FDA warned Cephalon against its misleading advertising of Fentora ("Warning Letter"). The Warning Letter described a Fentora Internet advertisement as misleading because it purported to broaden "the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora . . . when this is not the case." Rather, Fentora was only indicated for those who were already opioid tolerant. It further criticized Cephalon's other direct Fentora advertisements because they did not disclose the risks associated with the drug.

231. Flagrantly disregarding the FDA's refusal to approve Fentora for non-cancer BTP and its warning against marketing the drug for the same, Cephalon continued to use the same sales

---

[189] *FENTORA (fentanyl buccal tablet) CII, Joint Meeting of Anesthetic and Life Support Drugs and Drug Safety and Risk Management Advisory Committee*, U.S. Food & Drug Administration (May 6, https://wayback.archive-it.org/7993/20170405034239/https://www.fda.gov/ohrms/dockets/ac/08/slides/2008-4356s2-02-FDA-corepresentations_files/frame.htm.

tactics to push Fentora as it did with Actiq.

232. For example, on January 13, 2012, Cephalon published an insert in *Pharmacy Times* titled

"An Integrated Risk Evaluation and Mitigation Strategy (REMS) for FENTORA (Fentanyl

Buccal Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)." Despite the repeated

warnings of the dangers associated with the use of the drugs beyond their limited indication,

as detailed above, the first sentence of the insert states: "It is well recognized that the

judicious use of opioids can facilitate effective and safe management of chronic pain."[190]

5.    *Cephalon Funded False Publications and Presentations*

233. In addition to its direct marketing, Cephalon indirectly marketed through third parties to

change the way doctors viewed and prescribed opioids – disseminating the unproven and

deceptive messages that opioids were safe for the treatment of chronic long-term pain, that

they were non-addictive and that they were woefully under-prescribed to the detriment of

patients who were needlessly suffering. It did so by sponsoring pro-opioid front groups,

misleading prescription guidelines, articles and CME programs, and it paid physicians

thousands of dollars every year to publicly opine that opioids were safe, effective and non-

addictive for a wide variety of uses.

234. Cephalon sponsored numerous CME programs, which were made widely available through

organizations like Medscape, LLC ("Medscape"), and which disseminated false and

misleading information to physicians in Palmetto and across the country.

235. For example, a 2003 Cephalon-sponsored CME presentation titled "Pharmacologic

Management of Breakthrough or Incident Pain," posted on Medscape in February 2003,

---

[190] *An Integrated Risk Evaluation and Mitigation Strategy (REMS) for FENTORA (Fentanyl Buccal Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)*, Pharmacy Times (Jan. 13, 2012), http://www.pharmacytimes.com/publications/issue/2012/january2012/r514-jan-12-rems.

teaches:

> *C]hronic pain is often undertreated, particularly in the noncancer patient population. . . . The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.[191]*

236.   Another Cephalon-sponsored CME presentation, titled "Breakthrough Pain: Treatment Rationale with Opioids," was available on Medscape starting September 16, 2003 and was given by a self-professed pain management doctor who "previously operated back, complex pain syndromes, the neuropathies, and interstitial cystitis." He describes the pain process as a non- time-dependent continuum that requires a balanced analgesia approach using "targeted pharmacotherapeutics to affect multiple points in the pain-signaling pathway."[192] The doctor lists fentanyl as one of the most effective opioids available for treating BTP, describing its use as an expected and normal part of the pain management process. Nowhere in the CME presentation is cancer or cancer pain mentioned.

---

[191] Michael J. Brennan, *et al.*, *Pharmacologic Management of Breakthrough or Incident Pain*, Medscape, https://www.medscape.org/viewarticle/449803 (last visited Mar. 14, 2018).

[192] Daniel S. Bennett, *Breakthrough Pain: Treatment Rationale With Opioids*, Medscape, https://www.medscape.org/viewarticle/461612 (last visited Mar. 14, 2018).



237. Dr. Stephen H. Landy ("Landy") authored a 2004 CME manuscript available on Medscape titled "Oral Transmucosal Fentanyl Citrate for the Treatment of Migraine Headache Pain In Outpatients: A Case Series." The manuscript preparation was supported by Cephalon. Landy describes the findings of a study of fentanyl citrate for the use of migraine headache pain and concluded that "OTFC rapidly and significantly relieved acute, refractory migraine pain in outpatients . . . and was associated with high patient satisfaction ratings."[193] Based on an analysis of publicly available data, Cephalon paid Landy approximately $190,000 in 2009-2010 alone, and in 2015-2016, Cephalon paid Landy another $75,000.

238. In 2006, Cephalon sponsored a review of scientific literature to create additional fentanyl-specific dosing guidelines titled "Evidence-Based Oral Transmucosal Fentanyl Citrate

---

[193] Stephen H. Landy, *Oral Transmucosal Fentanyl Citrate for the Treatment of Migraine Headache Pain In Outpatients: A Case Series*, 44(8) Headache (2004), https://www.medscape.com/viewarticle/488337_2.

(OTFC®) Dosing Guidelines."[194] The article purports to review the evidence for dosing and efficacy of oral transmucosal fentanyl citrate in the management of pain and produce dosing guidelines in both cancer and non-cancer patients. In pertinent part, it states:

> Oral transmucosal fentanyl citrate has a proven benefit in treating cancer-associated breakthrough pain in opioid-tolerant patients with cancer, which is the Food and Drug Administration (FDA)-approved indication for Actiq. *Pain medicine physicians have also used OTFC successfully to provide rapid pain relief in moderate to severe noncancer pain in both opioid-tolerant and opioid-nontolerant patients.*[195]

239. Deeper into the article, the authors attempt to assuage doctors' concerns regarding possible overdose and respiratory distress in non-cancer patients by arguing "*[t]here is no evidence that opioid safety and efficacy differs in opioid-tolerant patients with chronic noncancer pain.*" Regarding the use of fentanyl to treat non-opioid-tolerant patients, the article's authors stated:

> Alternatively, *OTFC might also be used cautiously and safely for acute pain experienced by patients who are not opioid tolerant. Parenteral opioids are routinely used for acute pain in patients who are not opioid tolerant.* Examples include episodic pain (i.e., refractory migraine pain, recurrent renal calculi, etc.) and acute pain that follows surgery, trauma, or painful procedures (burn dressing change, bone marrow aspiration, lumbar puncture). Assuming that clinical experience with IV morphine in patients who are not opioid tolerant can be extrapolated, OTFC should be safe and efficacious in such settings as well.[196]

240. Through its sponsorship of the FSMB's "Responsible Opioid Prescribing: A Physician's Guide" (*see supra* ¶¶44-49), Cephalon continued to encourage the prescribing of opioid medication to "reverse . . . and improve" patient function, attributing patients' displays of traditional drug-seeking behaviors as merely "pseudoaddiction."

---

[194] Gerald M. Aronoff, *et al.*, *Evidence-Based Oral Transmucosal Fentanyl Citrate (OTFC) Dosing Guidelines*, 6(4) Pain Med. 305-14 (Aug. 2005).
[195] *Id.*
[196] *Id.*

241. Cephalon also disseminated its false messaging through speakers' bureaus and publications. For example, at an AAPM annual meeting held February 22 through 25, 2006, Cephalon sponsored a presentation by Webster and others titled "Open-label study of fentanyl effervescent buccal tablets in patients with chronic pain and breakthrough pain: Interim safety results." The presentation's agenda description states: "Most patients with chronic pain experience episodes of breakthrough pain (BTP), yet no currently available pharmacologic agent is ideal for its treatment." The presentation purports to cover a study analyzing the safety of a new form of fentanyl buccal tablets in the chronic pain setting and promises to show the "[i]nterim results of this study suggest that FEBT is safe and well-tolerated in patients with chronic pain and BTP."

242. Cephalon sponsored another CME activity written by Webster and M. Beth Dove titled "Optimizing Opioid Treatment for Breakthrough Pain" and offered on Medscape from September 28, 2007 through December 15, 2008. The CME activity teaches that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating BTP than pure opioid analgesics because of dose limitations on the non-opioid component.[197]

243. Fine authored a Cephalon-sponsored CME article titled "Opioid-Based Management of Persistent and Breakthrough Pain" with Drs. Christine A. Miaskowski and Michael J. Brennan. Cephalon paid to have this CME article published in a "Special Report" supplement of the journal *Pain Medicine News* in 2009.[198] The CME article targeted a wide

---

[197] Lynn Webster, *Optimizing Opioid Treatment for       Breakthrough       Pain,*       Medscape, https://www.medscape.org/viewarticle/563417_6 (last visited Mar. 14, 2018).
[198] Perry G. Fine, *et al., Opioid-Based Management of Persistent and Breakthrough Pain,* Special Report (2009), https://www.yumpu.com/en/document/view/11409251/opioid-based-management-of-persistent-and-breakthrough-pain/9.

variety of non-oncologist healthcare providers who treat patients with chronic pain with the objective of educating "health care professionals about a semi-structured approach to the opioid-based management of persistent and breakthrough pain," including the use of fentanyl. The CME article purports to analyze the "combination of evidence- and case-based discussions" and ultimately concludes:

> Chronic pain is a debilitating biopsychosocial condition prevalent in both cancer and noncancer pain populations. . . .Opioids have an established role in pain related to cancer and other advanced medical illnesses, as well as an increasing contribution to the long-term treatment of carefully selected and monitored patients with certain [chronic noncancer pain] conditions. *All individuals with chronic, moderate to severe pain associated with functional impairment should be considered for a trial or opioid therapy, although not all of them will be selected.*[199]

244. Along with Purdue, Cephalon sponsored APF's guide (*see supra* ¶¶62, 64), which warned against the purported *under*-prescribing of opioids, taught that addiction is *rare* and suggested that opioids have "*no ceiling dose*" and are therefore the most appropriate treatment for severe pain.

245. A summary of the February 12-16, 2008 AAPM annual meeting reinforced the message, promoted both by the AAPM and the APS, that "the undertreatment of pain is unjustified." It continues:

> *Pain management is a fundamental human right* in all patients not only with acute postoperative pain but also *in patients suffering from chronic pain.* Treating the underlying cause of pain does not usually treat all of the ongoing pain. Minimal pathology with maximum dysfunction remains the enigma of chronic pain. Chronic pain is only recently being explored as a complex condition that requires individual treatment and a multidisciplinary approach. It is considered to be a disease entity.[200]

246. Cephalon was one of several opioid manufacturers who collectively paid 14 of the 21 panel

---

[199] *Id.*
[200] Mohamed A. Elkersh & Zahid H. Bajwa, *Highlights From the American Academy of Pain Medicine 24th Annual Meeting*, 2(1) Advances in Pain Management 50-52 (2008).

members who drafted the 2009 APS-AAPM opioid treatment guidelines.[201]

247. In the March 2007 article titled "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate,"[202] published in the nationally circulated journal *Pain Medicine*, physicians paid by Cephalon (including Webster) described the results of a Cephalon-sponsored study seeking to expand the definition of BTP to the chronic non-cancer setting. The authors stated that the "OTFC has been shown to relieve BTP more rapidly than conventional oral, normal-release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of noncancer pain patients."[203] The number-one-diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cites Portenoy and recommends fentanyl for non-cancer BTP patients:

> In summary, BTP appears to be a clinically important condition in patients with *chronic noncancer pain* and is associated with an adverse impact on QoL. This qualitative study on the negative impact of BTP *and the potential benefits of BTP- specific therapy* suggests several domains that may be helpful in developing BTP- specific, QoL assessment tools.[204]

248. Cephalon also sponsored, through an educational grant, the regularly published journal *Advances in Pain Management*. In a single 2008 issue of the journal, there are numerous articles from Portenoy, Dr. Steven Passik ("Passik"), Dr. Kenneth L. Kirsh ("Kirsh") and Webster, all advancing the safety and efficacy of opioids. In an article titled "Screening

---

[201] *See* Chou, *Clinical Guidelines*, *supra* n.71.
[202] Donald R. Taylor, *et al.*, *Impact of Breakthrough Pain on Quality of Life in Patients With Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment With Oral Transmucosal Fentanyl Citrate (OTFC, ACTIQ)*, 8(3) Pain Med. 281-88 (Mar. 2007).
[203] *Id.*
[204] *Id.*

and Stratification Methods to Minimize Opioid Abuse in Cancer Patients," Webster
expresses disdain for the prior 20 years of opioid phobia.

249. In another article from the same issue, "Appropriate Prescribing of Opioids and Associated
Risk Minimization," Passik and Kirsh state: "[c]hronic pain, currently experienced by
approximately 75 million Americans, is becoming one of the biggest public health problems
in the US." They assert that addiction is rare, that "[m]ost pain specialists have prescribed
opioids for long periods of time with success demonstrated by an improvement in
function," and that then-recent work had shown "that opioids do have efficacy for subsets
of patients who can remain on them long term and have very little risk of addiction."[205]

250. In November 2010, Fine and others published an article presenting the results of another
Cephalon-sponsored study titled "Long-Term Safety and Tolerability of Fentanyl Buccal
Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic
Pain: An 18-Month Study."[206] In that article, Fine explained that the 18-month "open-label"
study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment
of BTP in a large cohort...of opioid-tolerant patients receiving around-the-clock...opioids
for noncancer pain." The article acknowledged that: (a) "[t]here has been a steady increase
in the use of opioids for the management of chronic noncancer pain over the past two
decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines
"to provide evidence- and consensus-based recommendations for the optimal use of opioids
in the management of chronic pain"; and (c) those guidelines lacked "data assessing the

[205] Steven D. Passik & Kenneth L. Kirsh, *Appropriate Prescribing of Opioids and Associated Risk Minimization*, 2(1) Advances in Pain Management 9-16 (2008).
[206] Perry G. Fine, *et al.*, *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).

long-term benefits and harms of opioid therapy for chronic pain."[207]

251. They conclude: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in most cases, predictable, manageable, and tolerable." They also conclude that the number of abuse-related events was "small."[208]

252. From 2000 forward, Cephalon has paid doctors nationwide millions of dollars for programs relating to its opioids, many of whom were not oncologists and who did not treat cancer pain. These doctors included Portenoy, Webster, Fine, Passik, Kirsh, Landy and others.

253. Further, Fentora has been widely prescribed in Palmetto. According to data collected by ProPublica, during 2014 and 2015, Florida doctors' prescriptions of Fentora to patients insured by the Medicare Part D program totaled more than $2.3 million in 2014 and almost $3.6 million in 2015.

254. Cephalon's payments to doctors have resulted in studies that support its sales, but, on closer examination, are biased or irreparably flawed. For instance, and upon information and belief, the governmental whistleblower investigation into Actiq revealed that two studies touted by Cephalon had tested fewer than 28 patients and had no control group whatsoever.[209] A 2012 article evaluating the then-current status of transmucosal fentanyl tablet formulations for the treatment of BTP in cancer patients noted that clinical trials to date used varying criteria, that "the approaches taken . . . [did] not uniformly reflect clinical practice," and that "the studies ha[d] been sponsored by the manufacturer and so ha[d] potential for bias."[210]

[207] Id.
[208] Id.
[209] Carreyrou, *Cephalon Used Improper Tactics*, supra n.186.
[210] Eric Prommer & Brandy Fleck, *Fentanyl Transmucosal Tablets: Current Status in the Management of Cancer-Related Breakthrough Pain*, 2012(6) Patient Preference and Adherence 465-75 (June 25, 2012).

### 6.     Cephalon Failed to Report Suspicious Sales as Required

255. The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

256. Cephalon is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

257. Cephalon failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders. Cephalon's failure to timely report suspicious sales violated the CSA.

E.     Insys

258. Insys manufactures, markets, sells and distributes the following pharmaceutical drug in Palmetto and nationwide:

| Subsys (fentanyl) | Fentanyl sublingual spray; semi-synthetic opioid agonist, approved in 2012. | Schedule II |
|---|---|---|

259. Subsys is indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and are tolerant to opioid therapy for their underlying persistent cancer pain." [211] The indication also specifies that "SUBSYS is

---

[211] The indication provides that "[p]atients considered opioid tolerant are those who are taking around-the-clock medicine consisting of at least 60 mg of oral morphine daily, at least 25 mcg of transdermal fentanyl/hour, at least 30 mg of oral oxycodone daily, at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid daily for a week or longer."

intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain." In addition, the indication provides that "[p]atients must remain on around-the-clock opioids when taking SUBSYS." Subsys is contraindicated for, among other ailments, the "[m]anagement of acute or postoperative pain including headache/migraine and dental pain." It is available in 100 mcg, 200 mcg, 400 mcg, 600 mcg and 800 mcg dosage strengths.

260. Insys' revenue is derived almost entirely from Subsys. According to its Form 10-K for 2015, Insys reported revenues of $331 million. Of that total, $329.5 million was derived from sales of Subsys. Subsys has been widely prescribed in Palmetto. According to data collected by ProPublica, during 2014 Florida doctors' prescriptions of Subsys to patients insured by the Medicare Part D program totaled more than $15 million, and in 2015, Subsys Medicare Part D prescriptions totaled more than $28.1 million. The majority of Insys' sales of Subsys are through wholesalers, including defendants AmerisourceBergen, McKesson and Cardinal Health. In 2015, those wholesalers respectively comprised 20%, 17% and 14% of Insys' total gross sales of Subsys.

261. According to Dr. Andrew Kolodny, executive director of Physicians for Responsible Opioid Prescribing and chief medical officer of the Phoenix House Foundation, fentanyl products are "'the most potent and dangerous opioids on the market.'"[212]

262. The dangers associated with Subsys are reflected by its extremely limited and specific indication, as it is approved solely for BTP in cancer patients already receiving opioids for persistent cancer-related pain.

---

[212] Dina Gusovsky, *The pain killer: A drug company putting profits above patients*, CNBC (Nov. 5, 2015), available at https://www.cnbc.com/2015/11/04/the-deadly-drug-appeal-of-insys-pharmaceuticals.html.

263. Despite Subsys' limited indication and the potent danger associated with fentanyl, Insys falsely and misleadingly marketed Subsys to doctors as an effective treatment for back pain, neck pain and other off-label pain conditions.[213] Moreover, as of June 2012, Insys defined BTP in cancer patients to include mild pain: a "flare of *mild-to*-severe pain in patients with otherwise stable persistent pain," based on a misleading citation to a paper written by Portenoy.[214] Insys trained and instructed its sales representatives to use the false definition of breakthrough pain and specifically to use a core visual aid, which included the improper definition, whenever they detailed Subsys to a healthcare provider or provider's office.

264. According to a 2014 article in *The New York Times*, only 1% of prescriptions for Subsys were written by oncologists. Approximately half the prescriptions were written by pain specialists, with others written by other specialists including dentists and podiatrists.[215]

*1.     The Indictment of Insys Executives and Arrest of Its Founder*

265. On December 8, 2016, several former Insys executives were arrested and indicted for conspiring to bribe practitioners in numerous states, many of whom operated pain clinics, in order to get them to prescribe Subsys. In exchange for bribes and kickbacks, the practitioners wrote large numbers of prescriptions for patients, most of whom were not diagnosed with cancer.[216]

---

[213] *In the Matter of Insys Therapeutics, Inc.*, Notice of Unlawful Trade Practices and Proposed Resolution (July 10, 2015), available at https://www.documentcloud.org/documents/2195731-insysdoj.html.

[214] Portenoy's paper, "Breakthrough pain: definition, prevalence and characteristics," which was featured in the 1990 issue of *Pain*, actually defined breakthrough pain as "a transitory increase in pain to greater than moderate intensity (that is, to an intensity of 'severe' or 'excruciating') . . . on a baseline pain of moderate intensity or less." Russell K. Portenoy & Neil A. Hagen, *Breakthrough pain: Definition, prevalence and characteristics*, 41(3) Pain 273-81 (July 1990).

[215] Katie Thomas, *Doubts Raised About Off-Label Use of Subsys, a Strong Painkiller*, N.Y. Times (May 13, 2014), available at https://www.nytimes.com/2014/05/14/business/doubts-raised-about-off-label-use-of-subsys-a-strong-painkiller.html?action=click&contentCollection=Business%20Day&region=Footer&module=MoreInSection&pgtype=Blog%20s&_r=2.

[216] Press Release, U.S. Attorney's Office for the District of Massachusetts, Pharmaceutical Executives

266. The indictment alleged that the former executives conspired to mislead and defraud health insurance providers, who were reluctant to approve payment for Subsys when it was prescribed for patients without cancer. In response, the former executives established a "reimbursement unit" at Insys, which was dedicated to assisting physicians by obtaining prior authorization for prescribing Subsys directly from insurers and pharmacy benefit managers. Insys' reimbursement unit employees were told to inform agents of insurers and pharmacy benefit managers that they were calling "from" or that they were "with" the doctor's office, or that they were calling "on behalf of" the doctor.

267. The executive defendants in the indictment are Insys' former chief executive officer and president, former vice president of sales, former national director of sales, former vice president of managed markets and several former regional sales directors. On October 26, 2017, the billionaire founder, chief executive officer, and chairman of Insys, John Kapoor, who owns a 60% stake in the company, was also charged with fraud and racketeering and was accused of offering bribes to doctors to write large numbers of prescriptions for Subsys. Most of the patients who received the medication did not have cancer.[217]

268. The charges against all seven executives include alleged violations of the federal Anti-Kickback Law, the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute and conspiracy to commit wire and mail fraud, as well as allegations of bribery and defrauding insurers. If found guilty, the defendants face possible sentences of up to 20 years

Charged in Racketeering Scheme (Dec. 8, 2016), https://www.justice.gov/usao-ma/pr/pharmaceutical-executives-charged-racketeering-scheme (hereinafter "*Insys* Indictment Press Release"); *United States v. Babich, et al.*, No. 1:16-cr-10343-ADB, Dkt. No. 1 (D. Mass. Dec. 6, 2016), https://www.justice.gov/usao-ma/press-release/file/916681/download (hereinafter "*Insys* Indictment").
[217] Michela Tindera, *Opioid Billionaire Arrested on Racketeering Charges*, Forbes (Oct. 26, 2017), available at https://www.forbes.com/sites/michelatindera/2017/10/26/opioid-billionaire-arrested-on-racketeering-charges/#3ab43aad6a00 (hereinafter "Tindera, *Opioid Billionaire Arrested*").

for conspiracy to commit RICO and conspiracy to commit mail and wire fraud, as well as a fine of $250,000 or twice the amount of the pecuniary gain or loss. For the charge of conspiracy to violate the Anti-Kickback Law, the defendants face a sentence of up to five years in prison and a $25,000 fine.

269. The indictment details a coordinated, centralized scheme by Insys to illegally drive profits. The company defrauded insurers from a call center at corporate headquarters where Insys employees, acting at the direction of Insys' former chief executive officer and vice president of managed markets, disguised their identity and the location of their employer and lied about patient diagnoses, the type of pain being treated and the patients' course of treatment with other medication.

270. Harold Shaw, special agent in charge of the FBI Boston field division, said in a statement, "As alleged, these executives created a corporate culture at Insys that utilized deception and bribery as an acceptable business practice, deceiving patients, and conspiring with doctors and insurers."[218]

2. *Insys Targeted Non-Cancer Treating Physicians and Funded False Publications and Presentations*

271. As set forth in the above-referenced indictment, Insys targeted and bribed practitioners in a number of ways. Insys bribed Subsys prescribers through strategic hires and by employing sales representatives and other employees at practitioners' behest, with the expectation that such hires would provide inroads with key practitioners. Insys also bribed practitioners through a sham speakers' bureau that was purportedly intended to increase brand awareness using peer-to- peer educational lunches and dinners.

272. Specifically, in June 2012, former executives began using in-person meetings, telephone

---

[218] *Id.*

calls and texts to inform Insys sales representatives that the key to sales was using the speakers' bureau to pay practitioners to prescribe Subsys. As one of the company's vice presidents for sales texted one of his sales representatives about potential physicians for the speakers' bureau: "[t]hey do not need to be good speakers, they need to write a lot of [Subsys prescriptions]." The former Insys executives actively recruited physicians known to have questionable prescribing habits for these speakers' bureaus.[219]

273. The speakers' bureaus were often just social gatherings at high-priced restaurants involving neither education nor presentations. Frequently, they involved repeat attendees, including physicians not licensed to prescribe Subsys. Many of the speakers' bureaus had no attendees; sales representatives were instructed to falsely list names of attendees and their signatures on Insys' sign-in sheets.

274. Insys made thousands of payments to physicians nationwide, including to Palmetto physicians, for participating on these speakers' bureaus and for other services.

275. Moreover, the executives are charged with targeting practitioners who prescribed Subsys not only for cancer pain, but for all pain.

276. As set forth in the indictment, at one national speakers' bureau in or about 2014, Insys' then-vice president of sales stated:

> "These [doctors] will tell you all the time, well, I've only got like eight patients with cancer. Or, I only have, like, twelve patients that are on a rapid-onset opioids [sic]. Doc, I'm not talking about any of those patients. I don't want any of those patients. That's, that's small potatoes. That's nothing. That's not what I'm here doing. I'm here selling [unintelligible] for the breakthrough pain. If I can successfully sell you the [unintelligible] for the breakthrough pain, do you have a thousand people in your practice, a thousand patients, twelve of them are currently on a rapid-onset opioids [sic]. *That leaves me with at least five hundred patients that can go on this*

---

[219] *Insys* Indictment Press Release, *supra* n.216.

*drug.*"[220]

277. Moreover, when agents of insurers or pharmacy benefit managers asked if a patient was being treated for BTP in cancer patients, Insys' reimbursement unit employees were instructed to answer using a written script, sometimes called "the spiel": "'The physician is aware that the medication is intended for the management of breakthrough pain in cancer patients. The physician is treating the patient for their pain (or breakthrough pain, whichever is applicable).'"[221]

278. Insys' former executives also tracked and internally circulated the number of planned and completed speakers' bureau events for each speaker, as well as the number of Subsys prescriptions each speaker wrote, the percentage of such prescriptions compared to those written for Subsys' competitor drugs, the total amount of honoraria paid to each speaker and, for a period of time, an explicit calculation of the ratio of return on investment for each speaker. When a speaker did not write an appropriately large number of Subsys prescriptions, as determined by Insys, the number of future events for which that speaker would be paid would be reduced unless and until he or she wrote more Subsys prescriptions.

279. In a press release issued when the indictment was announced, the Massachusetts U.S. Attorney, Carmen M. Ortiz, stated: "'I hope that today's charges send a clear message that we will continue to attack the opioid epidemic from all angles, whether it is corporate greed or street level dealing.'"[222]

280. In the same press release, the FBI Special Agent in Charge of the Boston field division,

---

[220] *Insys* Indictment, *supra* n.216, at 15.
[221] *Id.* at 44.
[222] *Insys* Indictment Press Release, *supra* n.216.

Harold H. Shaw, linked the allegations to the national opioid epidemic:

> *"As alleged, top executives of Insys Therapeutics, Inc. paid kickbacks and committed fraud to sell a highly potent and addictive opioid that can lead to abuse and life threatening respiratory depression.... In doing so, they contributed to the growing opioid epidemic and placed profit before patient safety. These indictments reflect the steadfast commitment of the FBI and our law enforcement partners to confront the opioid epidemic impacting our communities, while bringing to justice those who seek to profit from fraud or other criminal acts."[223]*

281. The Special Agent in Charge at the Defense Criminal Investigative Service in the Northeast Field Office, Craig Rupert, commented specifically on the effect the criminal activities had on members of the military: "'Causing the unnecessary use of opioids by current and retired military service members shows disregard for their health and disrespect for their service to our country....'"[224]

3. *Insys Failed to Report Suspicious Sales as Required*

282. The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

283. Insys is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

284. Insys failed to design and operate a system to disclose suspicious orders of controlled substances and/or failed to notify the appropriate DEA field division of suspicious orders.

---

[223] *Id.*
[224] *Id.*

Insys' failure to timely report suspicious sales violated the CSA.

F.    Mallinckrodt

285. Mallinckrodt manufactures, markets, sells and distributes pharmaceutical drugs in
     Palmetto and nationwide.  Mallinckrodt is the largest U.S. supplier of opioid pain
     medications and among the top ten generic pharmaceutical manufacturers in the United
     States, based on prescriptions.

286. Among the drugs it distributes are the following:

| | | |
|---|---|---|
| Exalgo (hydromorphone hydrochloride extended release) | Opioid agonist indicated for opioid-tolerant patients for management of pain severe enough to require daily, around- the-clock, long-term opioid treatment and for which alternative treatment options (*e.g.*, non-opioid analgesics) are inadequate. The FDA approved the 8, 12, and 16 mg tablets of Exalgo in March 2010 and 32 mg tablet in August 2012. | Schedule II |
| Roxicodone (oxycodone hydrochloride) | Brand-name instant-release form of oxycodone hydrochloride. Indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate. Acquired from Xanodyne Pharmaceuticals in 2012. Strengths range up to 30 mg per pill. Nicknames include Roxies, blues, and stars. | Schedule II |
| Xartemis   XR (oxycodone hydrochloride and acetaminophen) | The FDA approved Xartemis XR in March 2014 for the management of acute pain severe enough to require opioid treatment and in patients for whom alternative treatment options are ineffective, not tolerated or would otherwise be inadequate. It was the first extended-release oral combination of oxycodone and acetaminophen. | Schedule II |
| Methadose (methadone hydrochloride) | Branded generic product. Opioid agonist indicated for treatment of opioid addiction. | Schedule II |
| Morphine sulfate extended release | Generic product. | Schedule II |
| Fentanyl extended release | Generic product. | Schedule II |
| Fentanyl citrate | Generic product. | Schedule II |
| Oxycodone   and acetaminophen | Generic product. | Schedule II |

| Hydrocodone bitartrate and acetaminophen | Generic product. | Schedule II |
| Hydromorphone hydrochloride | Generic product. | Schedule II |
| Hydromorphone hydrochloride extended release | Generic product. | Schedule II |
| Naltrexone hydrochloride | Generic product. | Schedule II |
| Oxymorphone hydrochloride | Generic product. | Schedule II |
| Methadone hydrochloride | Generic product. | Schedule II |
| Oxycodone hydrochloride | Generic product. | Schedule II |

287. Mallinckrodt purchased Roxicodone from Xanodyne Pharmaceuticals in 2012.[225]

288. Mallinckrodt debuted Xartemis (MNK-795) at the September 4-7, 2013 PAINWeek in Las Vegas.

### 1.    Mallinckrodt Funded False Publications and Presentations

289. Like several of the other Manufacturing Defendants, Mallinckrodt provided substantial funding to purportedly neutral organizations, which disseminated false messaging about opioids.

290. For example, until at least February 2009, Mallinckrodt provided an educational grant to Pain-Topics.org, a now-defunct website that touted itself as "a noncommercial resource for healthcare professionals, providing open access to clinical news, information, research, and education for a better understanding of evidence-based pain-management practices."[226]

---

[225] *Mallinckrodt Announces Agreement with Xanodyne to Purchase Roxicodone*, Bus. Wire (Aug. 23, 2012), available at https://www.businesswire.com/news/home/20120823005209/en/Mallinckrodt-Announces-Agreement-Xanodyne-Purchase-Roxicodone%C2%AE.

[226] *Pain Treatment Topics*, Pain-Topics.org, available at https://web.archive.org/web/20070104235709/http://www.pain-topics.org:80/ (last visited Mar. 14, 2018).

291. Among other content, the website included a handout titled "Oxycodone Safety Handout for Patients," which advised practitioners that: "Patients' fears of opioid addiction should be dispelled."[227] The handout included several false and misleading statements concerning the risk of addiction associated with prescription opioids:

Will you become dependent on or addicted to oxycodone?

- After a while, oxycodone causes physical dependence. That is, if you suddenly stop the medication you may experience uncomfortable withdrawal symptoms, such as diarrhea, body aches, weakness, restlessness, anxiety, loss of appetite, and other ill feelings. These may take several days to develop.

- This is not the same as addiction, a disease involving craving for the drug, loss of control over taking it or compulsive use, and using it despite harm. Addiction to oxycodone in persons without a recent history of alcohol or drug problems is rare.[228]

292. Additionally, the FAQ section of Pain-Topics.org contained the following false and misleading information downplaying the dangers of prescription opioid use:

Pseudoaddiction – has been used to describe aberrant patient behaviors that may occur when pain is undertreated (AAPM 2001). Although this diagnosis is not supported by rigorous investigation, it has been widely observed that patients with unrelieved pain may become very focused on obtaining opioid medications, and may be erroneously perceived as "drug seeking." Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated. Along with this, two related phenomena have been described in the literature (Alford et al. 2006):

Therapeutic dependence – sometimes patients exhibit what is considered drug-seeking because they fear the reemergence of pain and/or withdrawal symptoms from lack of adequate medication; their ongoing quest for more analgesics is in the hopes of insuring a tolerable level of comfort.

Pseudo-opioid-resistance – other patients, with adequate pain control, may continue to report pain or exaggerate its presence,

---

[227] Lee A. Kral & Stewart B. Leavitt, *Oxycodone Safety Handout for Patients*, Pain-Topics.Org (June 2007), available at http://paincommunity.org/blog/wp-content/uploads/OxycodoneHandout.pdf.
[228] *Id.*

as if their opioid analgesics are not working, to prevent reductions in their currently effective doses of medication.

Patient anxieties about receiving inadequate pain control can be profound, resulting in demanding or aggressive behaviors that are misunderstood by healthcare practitioners and ultimately detract from the provision of adequate pain relief.[229]

293. Another document available on the website, "Commonsense Oxycodone Prescribing & Safety," falsely suggests that generic oxycodone is less prone to abuse and diversion than branded oxycodone: "Anecdotally, it has been observed that generic versions of popularly abused opioids usually are less appealing; persons buying drugs for illicit purposes prefer brand names because they are more recognizable and the generics have a lower value 'on the street,' which also makes them less alluring for drug dealers."[230]

294. In November 2016, Mallinckrodt paid Dr. Scott Gottlieb ("Gottlieb"), the new commissioner of the FDA, $22,500 for a speech in London, shortly after the U.S. presidential election.[231] Gottlieb has also received money from the Healthcare Distribution Alliance ("HDA"), an industry-funded organization that pushes the agenda of large pharmaceutical wholesalers, and he has often criticized efforts aimed at regulating the pharmaceutical opioid market.[232]

295. Mallinckrodt also made thousands of payments to physicians nationwide, including payments to Palmetto physicians.

296. Exalgo, Roxicodone and Xartemis XR have been widely prescribed in Palmetto. According

---

[229] *FAQs*, Pain-Topics.org, available at, https://web.archive.org/web/20070709031530/http://www.pain-topics.org:80/faqs/index1.php#tolerance
[230] Lee A. Kral, *Commonsense Oxycodone Prescribing & Safety*, Pain-Topics.org (June 2007), available at http://paincommunity.org/blog/wp-content/uploads/OxycodoneRxSafety.pdf.
[231] Lee Fang, *Donald Trump's Pick to Oversee Big Pharma Is Addicted to Opioid-Industry Cash*, Intercept (Apr. 4, 2017), available at https://theintercept.com/2017/04/04/scott-gottlieb-opioid/.
[232] *Id.*

to data collected by ProPublica, in 2014, Florida doctors' prescriptions of Exalgo to patients insured by the Medicare Part D program totaled almost $3.8 million, prescriptions of Roxicodone totaled more than $265,000, and prescriptions of Xartemis XR totaled almost $9,000. In 2015, those numbers were more than $1.5 million for Exalgo, almost $292,000 for Roxicodone, and approximately $15,000 for Xartemis XR.

2. *The DEA Investigates Suspicious Orders*

297. In 2008, the DEA and federal prosecutors launched an investigation into Mallinckrodt, charging that the company ignored red flags and supplied – and failed to report – suspicious orders for its generic oxycodone between 2008 and 2012.[233] The U.S. Attorney's office in Detroit handled the case. The investigation uncovered that from 2008 to 2012, Mallinckrodt sent, for example, 500 million tablets of oxycodone into a single state, Florida – "66 percent of all oxycodone sold in the state."[234] According to the internal government documents obtained by the Washington Post, Mallinckrodt's failure to report could have resulted in "nearly 44,000 federal violations and exposed it to $2.3 billion in fines."[235]

298. Despite learning from the DEA that generic opioids seized in a Tennessee drug operation were traceable to one of its Florida distributors, Sunrise Wholesale ("Sunrise") of Broward County, Mallinckrodt in the following six weeks sent 2.1 million tablets of oxycodone to Sunrise. In turn, Sunrise sent at least 92,400 oxycodone tablets to a single doctor over an 11-month period, who, in one day, prescribed 1,000 to a single patient.[236]

299. According to documents obtained by the *Washington Post*, investigators also found "scores

---

[233] Lenny Bernstein & Scott Higham, *The government's struggle to hold opioid manufacturers accountable*, Wash. Post (Apr. 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.7ce8c975dd86.
[234] *Id.*
[235] *Id.*
[236] *Id.*

of alleged violations" at Mallinckrodt's plant in Hobart, New York. Those violations included the failure to keep accurate records, to document transfers of drugs and to secure narcotics.[237]

300. During the DEA's investigation, Mallinckrodt sponsored the HDA (known as the Healthcare Distribution Management Association until 2016), an industry-funded organization that represents pharmaceutical distributors.[238] The HDA initiated the Ensuring Patient Access and Effective Drug Enforcement Act of 2016 (enacted April 19, 2016), which requires the DEA to give notice of violation and an opportunity to comply, to pharmacies and distributors, before withdrawing licenses. This Act substantially lessened the DEA's ability to regulate manufacturers and wholesalers.[239]

301. In May 2014, Mallinckrodt posted a video titled "Red Flags: Pharmacists Anti-Abuse Video." The video is a thinly veiled attempt to divert responsibility for the opioid epidemic away from manufacturers and wholesalers, and toward individual pharmacists. The video was sponsored by the Anti-Diversion Industry Working Group, which is composed of Cardinal Health, Actavis, McKesson, Mallinckrodt, AmerisourceBergen, and Qualitest—all of whom are conveniently missing from the list of those responsible.[240]

302. In April 2017, Mallinckrodt reached an agreement with the DEA and the U.S. Attorneys for the Eastern District of Florida and Northern District of New York to pay $35 million to

---

[237] *Id.*

[238] *Sponsors:   HDA's   Annual   Circle   Sponsors*, Healthcare   Distribution   Alliance, https://www.healthcaredistribution.org/hda-sponsors (last visited Mar. 14, 2018).

[239] Chris McGreal, *Opioid epidemic: ex-DEA official says Congress is protecting drug makers*, Guardian (Oct.   31,   2016),   https://www.theguardian.com/us-news/2016/oct/31/opioid-epidemic-dea-official-congress-big-pharma.

[240] Mallinckrodt Pharmaceuticals, *Red Flags: Pharmacists Anti-Abuse Video*, YouTube (May 27, 2014), https://www.youtube.com/watch?v=fdv0B210bEk&amp=&t=1s. (last available source).

resolve a probe of its distribution of its opioid medications.[241] Mallinckrodt finalized the

settlement on July 11, 2017, agreeing to pay $35 million while admitting no wrongdoing.[242]

> 3.    *Mallinckrodt Failed to Report Suspicious Sales as Required*

303.  The federal CSA imposes on all "registrants" the obligation to design and operate a system

to disclose to the registrant suspicious orders of controlled substances and requires the

registrant to notify the DEA field division office in its area of any suspicious orders.

"Suspicious orders include orders of unusual size, orders deviating substantially from a

normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

304.  Mallinckrodt is a "registrant" under the federal CSA.  21 C.F.R. §1300.02(b) defines a

registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section

823, in turn, requires manufacturers of Schedule II controlled substances to register with

the DEA.

305.  Mallinckrodt failed to design and operate a system to disclose suspicious orders of

controlled substances and/or failed to notify the appropriate DEA field division of suspicious

orders. Mallinckrodt's failure to timely report suspicious sales violated the CSA.

III.  **The Wholesaler Defendants Failed to Track and Report Suspicious Sales as Required by Florida and Federal Law**

306.  Manufacturers rely upon distributors to distribute their drugs.  The distributors serve as

middlemen, sending billions of doses of opioid pain pills to pharmacists, hospitals, nursing

homes and pain clinics. According to the CDC, the increased distribution of opioids directly

---

[241] Linda A. Johnson, *Mallinckrodt to Pay $35M in Deal to End Feds' Opioid Probe*, U.S. News & World Report (Apr. 3, 2017), https://www.usnews.com/news/business/articles/2017-04-03/mallinckrodt-to-pay-35m-in-deal-to-end-feds-opioid-probe.

[242] Press Release, U.S. Department of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

correlates to increased overdose death rates:



# Opioid distribution and overdose death rates rise
**Both rates have more than doubled since 2000.**

**PRESCRIPTION OPIOID DISTRIBUTION RATE**
Grams per 100 people

14.7

10

6.2

5

0

2000     2014

**PRESCRIPTION OPIOID OVERDOSE DEATH RATE**
Deaths per 100,000 people

4

3

2

1

Death rate: 4.7
(Deaths: 14,838)

Death rate: 1.3
(Deaths: 3,785)

0

2000     2014

**Fentanyl overdose deaths are excluded. The CDC removed the drug from the totals because of its growing prevalence as a street drug.**

**Sources: DEA, Centers for Disease Control and Prevention**          **THE WASHINGTON POST**

307. On October 23, 2017, CBS aired an episode of *60 Minutes* featuring former DEA agent

Joe Rannazzisi, who blamed the Wholesaler Defendants for killing people by violating the

CSA requirement to report suspicious orders:

> **RANNAZZISI:** This is an industry that's out of control. What they wanna do, is do what they wanna do, and not worry about what the law is. And if they don't follow the law in drug supply, people die. That's just it. People die.
>
> This is an industry that allowed millions and millions of drugs to go into bad pharmacies and doctors' offices, that distributed them out to people who had no legitimate need for those drugs.
>
> [INTERVIEWER]: Who are these distributors?
>
> **RANNAZZISI:** The three largest distributors are Cardinal Health, McKesson, and AmerisourceBergen. They control probably 85 or 90 percent of the drugs going downstream.
>
> [INTERVIEWER]: You know the implication of what you're saying, that these big companies knew that they were pumping drugs into American

communities that were killing people.

> **RANNAZZISI:** That's not an implication, that's a fact. That's exactly what they did.

308. Jim Geldhof, a 40-year veteran of the DEA who ran investigations in the Detroit field office, corroborated Rannazzinsi's account, saying that the wholesalers are "absolutely" responsible for the opioids epidemic:

> **[INTERVIEWER]:** These companies are a big reason for this epidemic?
>
> **GELDHOF:** Yeah, absolutely they are. And I can tell you with 100 percent accuracy that we were in there on multiple occasions trying to get them to change their behavior. And they just flat out ignored us.

309. Indeed, according to Rannazzisi, the Wholesaler Defendants succeeded in lobbying Congress to strip the DEA of its most potent tool for fighting against diversion and abuse. In 2013, a bill was introduced in the House that "was promoted as a way to ensure that patients had access to the pain medication they needed." What it "really did," however, "was strip the [DEA] of its ability to immediately freeze suspicious shipments of prescription narcotics to keep drugs off U.S. streets." A 2015 DOJ memo confirmed that the bill "'could actually result in increased diversion, abuse, and public health and safety consequences.'"

310. During the two years the legislation was considered and amended, defendants and others in the industry spent $102 million lobbying Congress on the bill and other legislation, "claiming the DEA was out of control [and] making it harder for patients to get needed medication." The APA co-signed a letter in support of the legislation. As discussed, *supra* ¶¶82-83, the APA receives funding from numerous industry participants, including Johnson & Johnson, Endo, Mallinckrodt, Purdue and Cephalon. Metadata associated with the letter co-signed by the APA shows that it was created by Kristen L. Freitas, vice president for federal government affairs at the HDA – the trade group that represents

defendants McKesson, Cardinal Health, and AmerisourceBergen. Freitas is also a registered lobbyist who lobbied in support of the bill.

311. According to *60 Minutes*, the chief administrative law judge of the DEA, John J. Mulrooney, has written "that the new legislation 'would make it all but . . . impossible' to prosecute unscrupulous distributors." The proposed bill was signed into law in 2016. The primary author of the bill is former DEA associate chief counsel Linden Barber. He was recently hired by Cardinal Health as senior vice president.

A.    McKesson

312. McKesson is a wholesale pharmaceutical distributor of controlled and uncontrolled prescription medications, including opioids. It is the largest drug distributor, and the fifth largest company, in the United States. It distributes pharmaceuticals through a network of distribution centers across the country. McKesson ranked fifth on the 2017 Fortune 500 list, with over $192 billion in revenues.

313. McKesson is a significant distributor of opioids in the United States and supplies various U.S. pharmacies with an increasing amount of oxycodone and hydrocodone pills, products frequently misused that are part of the current opioid epidemic.

314. McKesson distribution centers are required to operate in accordance with the statutory provisions of the CSA. The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "[s]uspicious orders" for controlled substances, as that term is defined in the regulation. *See* 21 C.F.R. §1301.74(b). The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. §1301.74(b). *See* 21 U.S.C. §842(a)(5) & (c)(1)(B). The provision requiring the reporting of suspicious orders in the federal CSA has been incorporated into Florida law. Fla. Stat. §499.0121(10) and (15)(b).

315. In or about 2007, the DEA accused McKesson of failing to report suspicious orders and launched an investigation. In 2008, McKesson entered into a settlement agreement with the DOJ and a memorandum of agreement, agreeing to pay a $13.25 million fine for failure to report suspicious orders of pharmaceutical drugs and promising to set up a monitoring system.

316. As a result, McKesson developed a Controlled Substance Monitoring Program ("CSMP"), but nevertheless failed to design and implement an effective system to detect and report "suspicious orders" for controlled substances distributed to its independent and small-chain pharmacy customers – *i.e.*, orders that are unusual in their frequency, size or other patterns. McKesson continued to fail to detect and disclose suspicious orders of controlled substances. It failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers, and bypassed suspicious order reporting procedures set forth in the CSMP.

317. In 2013, the DEA again began investigating reports that McKesson was failing to maintain proper controls to prevent the diversion of opioids and accused McKesson of failing to design and use an effective system to detect "suspicious orders" from pharmacies for powerful painkillers such as oxycodone, as required by the CSA. Nine DEA field divisions and 12 U.S. Attorneys built a case against McKesson for the company's role in the opioid crisis, which David Schiller, Assistant Special Agent in Charge for the Denver Field Division and leader of the DEA team investigating McKesson, called "the best case we've ever had against a major distributor in the history of the Drug Enforcement

Administration."[243]

318. On December 17, 2017, CBS aired an episode of *60 Minutes* featuring Assistant Special

Agent Schiller, who described McKesson as a company that killed people for its own

financial gain and blatantly ignored the CSA requirement to report suspicious orders:

> [SCHILLER:] If they woulda stayed in compliance with their authority and
> held those that they're supplying the pills to, the epidemic would be nowhere
> near where it is right now. Nowhere near.
>
>                      \*       \*       \*
>
> [SCHILLER:] They had hundreds of thousands of suspicious orders they
> should have reported, and they didn't report any. There's not a day that goes
> by in the pharmaceutical world, in the McKesson world, in the distribution
> world, where there's not something suspicious. It happens every day.
>
> INTERVIEWER:] And they had none.
>
> [SCHILLER:] They weren't reporting any. I mean, you have to understand
> that, nothing was suspicious?[244]

319. On January 17, 2017, in one of the most severe sanctions ever agreed to by a distributor,

McKesson agreed to pay a record $150 million in fines and suspend sales of controlled

substances from distribution centers in four states (Colorado, Ohio, Michigan and Florida)

to settle allegations that the company violated federal law. According to the DOJ,

McKesson continued to fail to report suspicious orders between 2008 and 2012 and did not

fully implement or follow the monitoring program. As part of the agreement, McKesson

acknowledged that:

> at various times during the Covered Time Period, it did not identify or report
> to DEA certain orders placed by certain pharmacies, which should have
> been detected by McKesson as suspicious, in a manner fully consistent with
> the requirements set forth in the 2008 MOA.

---

[243] Bill Whitaker, *Whistleblowers: DEA attorneys went easy on McKesson, the country's largest drug distributor*, CBS News (Dec. 17, 2017), https://www.cbsnews.com/news/whistleblowers-dea-%20attorneys-went-easy-on-mckesson-the-countrys-largest-drug-distributor/.

[244] *Id.*

B. Cardinal Health

320. Cardinal Health describes itself as a global integrated healthcare services and products company. It generated $121.5 billion in total revenue during fiscal year 2016 (ended June 30, 2016). It is ranked 15th on the 2017 Fortune 500 list of top U.S. companies with revenues of over $121 billion.

321. Cardinal Health has two operating segments: pharmaceutical and medical. Its pharmaceutical segment, at issue in this action, distributes branded and generic pharmaceutical, special pharmaceutical, over-the-counter and consumer products in the United States. Of Cardinal Health's $121.5 billion in revenue during fiscal year 2016, $109.1 billion was derived from the pharmaceutical operating segment.

322. Cardinal Health is a significant distributor of opioids in the United States. Cardinal Health's largest customer is CVS Health ("CVS"), which accounted for 25% of Cardinal Health's fiscal year 2016 revenue. According to its website, CVS operates thirteen pharmacies in Palmetto, and many more in nearby cities. Additionally, Cardinal Health runs a distribution center in Lakeland, Florida.[245]

323. Cardinal Health distribution centers are required to operate in accordance with the statutory provisions of the CSA and the regulations promulgated thereunder, 21 C.F.R. §1300 *et seq.* The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "suspicious orders" for controlled substances as that term is defined in the regulation. *See* 21 C.F.R. §1301.74(b). The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. §1301.74(b). *See* 21 U.S.C. §842(a)(5) & (c)(1)(B). The provision requiring the reporting of suspicious orders in the

[245] DrugDistribution Locations – Mainland US, https://batchgeo.com/map/788de3747b01802c0171abfa8a4b5eca (last visited Mar. 14, 2018).

federal CSA has been incorporated into Florida law. Fla. Stat. §499.0121(10) and (15)(b).

324. On December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the CSA in Maryland, Florida and New York by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA.[246]

325. In the settlement agreement, Cardinal Health admitted, accepted and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to:

- "timely identify suspicious orders of controlled substances and inform the DEA of those orders, as required by 21 C.F.R. §1301.74(b)";

- "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. §1301.74, including the failure to make records and reports required by the CSA or DEA's regulations for which a penalty may be imposed under 21 U.S.C. § 842(a)(5)"; and

- "execute, fill, cancel, correct, file with the DEA, and otherwise handle DEA 'Form 222' order forms and their electronic equivalent for Schedule II controlled substances, as required by 21 U.S.C. §828 and 21 C.F.R. Part 1305."

326. The settlement agreement was announced by the U.S. Attorney for the District of Maryland, Rod J. Rosenstein ("Rosenstein"), and the DEA Special Agent in Charge – Washington Field Division, Karl C. Colder ("Colder").[247]

327. In the press release announcing the settlement agreement, Rosenstein stated:

"Pharmaceutical suppliers violate the law when they fill unusually large or

---

[246] Earlier in 2016, CVS also agreed to pay the United States $8 million to resolve violations of the CSA by its Maryland pharmacies. According to the settlement agreement, CVS admitted that between 2008 and 2012 certain of its Maryland pharmacies dispensed oxycodone, fentanyl, hydrocodone and other pharmaceuticals in violation of the CSA because the drugs were dispensed without ensuring that the prescriptions were issued for legitimate medical purposes.

[247] Press Release, U.S. Attorney's Office for the District of Maryland, Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act (Dec. 23, 2016), https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act.

> frequent orders for controlled substances without notifying the DEA....
> Abuse of pharmaceutical drugs is one of the top federal law enforcement
> priorities. Cases such as this one, as well as our $8 million settlement with
> CVS in February 2016, reflect the federal commitment to prevent the
> diversion of pharmaceutical drugs for illegal purposes."[248]

328. In the press release, Colder clarified that the settlement specifically concerned oxycodone:

> "DEA is responsible for ensuring that all controlled substance transactions
> take place within DEA's regulatory closed system. All legitimate handlers
> of controlled substances must maintain strict accounting for all distributions
> and Cardinal failed to adhere to this policy.... Oxycodone is a very addictive
> drug and failure to report suspicious orders of oxycodone is a serious matter.
> The civil penalty levied against Cardinal should send a strong message that
> all handlers of controlled substances must perform due diligence to ensure
> the public safety...."[249]

329. AmerisourceBergen is a wholesale distributor of pharmaceuticals, including controlled

substances and non-controlled prescription medications. AmerisourceBergen is a

significant distributor of opioids in the United States. It handles the distribution of

approximately 20% of all pharmaceuticals sold and distributed in the United States through

a network of 26 pharmaceutical distribution centers, including one in Orlando, Florida.[250]

It ranked 11th on the Fortune 500 list in 2017, with over $146 billion in annual revenue.

330. AmerisourceBergen distribution centers are required to operate in accordance with the

statutory provisions of the CSA and the regulations promulgated thereunder, 21 C.F.R.

§1300 et seq. The regulations promulgated under the CSA include a requirement to design

and operate a system to detect and report "suspicious orders" for controlled substances as

that term is defined in the regulation. See 21 C.F.R. §1301.74(b). The CSA authorizes the

imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. §1301.74(b).

---

[248] Id.

[249] Id.

[250] AmerisourceBergen, Wikipedia, https://en.wikipedia.org/wiki/AmerisourceBergen (hereinafter
"AmerisourceBergen") (last visited Mar. 13, 2018); Drug Distribution Locations, supra n.245.

*See* 21 U.S.C. §842(a)(5) & (c)(1)(B). The provision requiring the reporting of suspicious orders in the federal CSA has been incorporated into Florida law. Fla. Stat. §499.0121(10) and (15)(b).

331. In 2012, West Virginia sued AmerisourceBergen and Cardinal Health, as well as several smaller wholesalers, for numerous causes of action, including violations of the CSA, consumer credit and protection and antitrust laws, and the creation of a public nuisance. Unsealed court records from that case demonstrate that AmerisourceBergen, along with McKesson and Cardinal Health, together shipped 423 million pain pills to West Virginia between 2007 and 2012.[251] AmerisourceBergen itself shipped 80.3 million hydrocodone pills and 38.4 oxycodone pills during that time period.[252] Moreover, public documents also demonstrate that the average dose of each tablet distributed grew substantially during that time period. The Wholesaler Defendants, including AmerisourceBergen, shipped large quantities of oxycodone and hydrocodone tablets to the state. In 2016, AmerisourceBergen agreed to settle the West Virginia lawsuit by paying $16 million to the state, with the funds set aside to fund drug treatment programs in order to respond to the opioid addiction crisis.

## COUNT I – VIOLATION OF FDUPTA
### (Against all Defendants)

332. Plaintiff City of Palmetto realleges paragraphs 1 through 331 above as if fully set forth herein.

333. The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.021, *et seq.* ("FDUTPA") prohibits "[u]nfair methods of competition, or unconscionable acts or

---

[251] Eric Eyre, *Drug firms poured 780M painkillers into WV amid rise of overdoses*, Charleston Gazette-Mail (Dec. 17, 2016), https://www.wvgazettemail.com/news/cops_and_courts/drug-firms-poured-m-painkillers-into-wv-amid-rise-of/article_99026dad-8ed5-5075-90fa-adb906a36214.html.
[252] *AmerisourceBergen, supra* n.250.

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204

334. Palmetto is a "person" within the meaning of Fla. Stat. §501.203(6) and as envisioned in Fla. Stat. §501.211 (1).

335. The Manufacturing Defendants and Wholesaler Defendants engaged in "[t]rade or commerce" within the meaning of Fla. Stat. §501.203(8).

336. During the relevant period and as detailed further herein, the Manufacturing Defendants have each engaged in unfair and deceptive acts or practices in commerce in violation of the FDUTPA by actively promoting and marketing the use of opioids for indications not federally approved; circulating false and misleading information concerning opioids' safety and efficacy; and/or downplaying or omitting the risk of addiction arising from their use.

337. Each of the Manufacturing Defendants and Wholesaler Defendants has engaged in unfair and/or deceptive trade practices by omitting the material fact of its failure to design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders, as required of "registrants" by the federal CSA, 21 C.F.R. § 1301.74(b), which is incorporated into Florida law by Fla. Stat. § 499.0121(10) and (15)(b). The CSA defines "registrant" as any person who is registered pursuant to 21 U.S.C. § 823. 21 C.F. R. § 1300.02(b). Section 823(a)-(b) requires manufacturers and distributors of controlled substances on Schedule II to register.

338. The Manufacturing Defendants' and Wholesaler Defendants' unfair or deceptive acts or practices in violation of the FDUTPA offend Florida's public policy, are immoral, unethical, oppressive and unscrupulous, as well as malicious, wanton and manifesting of ill will, and they caused substantial injury to Palmetto. Palmetto risks irreparable injury as

a result of the Manufacturing Defendants' and Wholesaler Defendants' acts, misrepresentations and omissions in violation of the FDUTPA, and these violations present a continuing risk to Palmetto, as well as to the general public.

339. As a direct and proximate result of Manufacturing Defendants' and Wholesaler Defendants' violations of the FDUTPA, Palmetto has suffered injury-in-fact and actual damages.

340. Palmetto is entitled to recover actual damages under Fla. Stat. §501.211(2) and attorneys' fees under Fla. Stat. §501.2105(1).

341. Palmetto also seeks an order under Fla. Stat. §501.211(1) enjoining the Manufacturing Defendants' and Wholesaler Defendants' unfair, unlawful and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## COUNT II – PUBLIC NUISANCE
### (Against all Defendants)

342. Plaintiff City of Palmetto realleges paragraphs 1 through 331 above as if fully set forth herein.

343. The Manufacturing Defendants and Wholesaler Defendants, individually and acting through their employees and agents, have violated a right common to the general public of Palmetto, including by subverting the public order, decency, and morals, and causing inconvenience and damage to the public generally.

344. Each of the Manufacturing Defendants subverted the public order, decency, and morals of, and caused inconvenience and damage to, Palmetto and its residents by, among other things, promoting and marketing the use of opioids for indications not federally approved; circulating false and misleading information concerning their safety and efficacy; and/or

downplaying or omitting the risk of addiction arising from their use in violation of the FDUTPA. In so doing, the Manufacturing Defendants acted unreasonably and with actual malice.

345. Each of the Manufacturing Defendants and Wholesaler Defendants subverted the public order, decency, and morals of, and caused inconvenience and damage to, Palmetto by failing to design and operate a system that would disclose the existence of suspicious orders of controlled substances or by failing to report suspicious orders of opioids as required by the federal CSA, 21 C.F.R. §1301.74(b), and by the State of Florida, Fla. Stat. §499.0121(10) and (15)(b). In so doing, the Manufacturing Defendants and Wholesaler Defendants acted unreasonably and with actual malice.

346. As detailed herein, defendants' conduct has violated and continues to violate rights common to the general public of Palmetto and has caused Palmetto to sustain damages, special and particular in kind, including without limitation: increased law enforcement and public works expenditures, increased expenditures for overtime, the hiring of additional City employees, mental health treatment and workers' compensation for its employees, increased emergency and treatment services, damage to emergency equipment and vehicles, and lost productivity, economic opportunity, and tax revenue.

347. Palmetto, acting on its own behalf and on behalf of its residents, seeks monetary and injunctive relief to halt the threat of future harm.

## COUNT III – NEGLIGENCE
### (Against all Defendants)

348. Plaintiff City of Palmetto realleges paragraphs 1 through 331 above as if fully set forth herein.

349. Negligence *per se* is established where the defendant violates a statutory duty and where

the statute is intended to protect against the result of the violation, the plaintiff is within the class intended to be protected by the statute, and the statutory violation is a proximate cause of the plaintiff's injury. Negligence is established where the defendant owes the plaintiff a duty of care, breaches that duty and the plaintiff sustain an injury or loss proximately caused by the defendant's breach.

350. Each of the Manufacturing Defendants owed Palmetto, acting on its own behalf and on behalf of its residents, statutory and common-law duties, including the duty to comply with the FDUTPA's prohibition of "[u]nfair methods of competition, or unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce"; the duty to promote and market opioids truthfully and pursuant to their federally approved indications; and the duty to disclose the true risk of addiction associated with the use of opioids. Each of the Manufacturing Defendants breached those duties by, among other things, promoting and marketing the use of opioids for indications not federally approved; circulating false and misleading information concerning their safety and efficacy; and/or downplaying or omitting the risk of addiction arising from their use. In so doing, the Manufacturing Defendants acted with actual malice.

351. Each of the Manufacturing Defendants and Wholesaler Defendants owed Palmetto, acting on its own behalf and on behalf of its residents, the statutory duty to report suspicious sales; the duty not to fill suspicious orders; the duty to abide by any government agreements entered regarding the same; and the duty to comply with the federal CSA, 21 C.F.R. §1301.74(b), as incorporated by Fla. Stat. §499.0121(10) and (15)(b), which requires the design and operation of a system to detect and disclose suspicious orders of controlled substances. Each of the Manufacturing Defendants and Wholesaler Defendants breached these duties by

failing to design and operate a system that would disclose the existence of suspicious orders

of controlled substances or by failing to report such suspicious orders to the appropriate

regulators as required by state and federal law. In so doing, the Manufacturing Defendants

and Wholesaler Defendants acted with actual malice.

352. Palmetto, acting on its own behalf and on behalf of its residents, suffered both injuries and

pecuniary losses proximately caused by the Manufacturing Defendants' and Wholesaler

Defendants' breaches. Among other things, and upon information and belief, Plametto has

experienced an unprecedented opioid addiction and overdose epidemic costing millions of

dollars in increased law enforcement and public works expenditures, increased expenditures

for overtime, the hiring of additional City employees, mental health treatment and workers'

compensation for its employees, increased emergency and treatment services, damage to

emergency equipment and vehicles, and lost productivity, economic opportunity, and tax

revenue.

353. Defendants' breaches of the statutory and common-law duties they each owed to Palmetto

and its residents are the proximate cause of this crisis and its resultant harm to Palmetto.

## COUNT IV – UNJUST ENRICHMENT
### (Against all Defendants)

354. Plaintiff City of Palmetto realleges paragraphs 1 through 331 above as if fully set forth

herein.

355. Under the doctrine of unjust enrichment, a party who receives a benefit must return the

benefit if retention would be inequitable. Unjust enrichment is established where: (a) the

plaintiff conferred a benefit upon the defendant; (b) the defendant had knowledge of the

benefit; (c) the defendant accepted or retained the benefit conferred; and (d) the

circumstances are such that it would be inequitable for the defendant to retain the benefit

without paying the plaintiff for its fair value.

356. Palmetto, acting on its own behalf and on behalf of its residents, conferred on each Manufacturing Defendant a benefit. By paying for law enforcement, treatment and emergency services, Palmetto has assumed the financial burden of paying for externalities that allow defendants to continue their scheme, including treatment and emergency services, which benefit was known to and accepted by each Manufacturing Defendant, which inured to the profits of each Manufacturing Defendant, and for which retention of such benefit is inequitable based on the Manufacturing Defendants' false and misleading marketing and omissions of and failure to state material facts in connection with marketing opioids, as set forth herein. The Manufacturing Defendants have thus been unjustly enriched by deceptive marketing, contributing to Palmetto's current opioid epidemic.

357. Palmetto, acting on its own behalf and on behalf of its residents, conferred on each Wholesaler Defendant a benefit, including paying for externalities that allow defendants to continue their scheme without incurring the resultant costs of that scheme, which benefit was known to and accepted by each Wholesaler Defendant, which inured to the profits of each Wholesaler Defendant, and for which retention of such benefit is inequitable based on the Wholesaler Defendants' failure to report suspicious sales as required by law. The Wholesaler Defendants have thus been unjustly enriched by neglecting their duty to distribute drugs only for proper medical purposes, contributing to Palmetto's current opioid epidemic.

358. Palmetto's unprecedented opioid addiction and overdose epidemic has, upon information and belief, cost it millions of dollars in increased law enforcement and public works expenditures, increased expenditures for overtime, mental health treatment and workers'

compensation for its employees, increased emergency and treatment services, damage to emergency equipment and vehicles, and lost productivity, economic opportunity, and tax revenue.

359. The unjust enrichment of the Manufacturing Defendants and Wholesaler Defendants is directly related to the damage, loss and detriment to Palmetto caused by defendants' false marketing and failure to report suspicious sales. It would be inequitable under these circumstances for the Manufacturing Defendants and Wholesaler Defendants to retain this benefit without compensating Palmetto for its value. Palmetto seeks recovery of the amounts by which the Manufacturing Defendants and Wholesaler Defendants were enriched as a result of their inequitable conduct.

## COUNT V – VIOLATION OF THE RICO ACT, 18 U.S.C. § 1962(C)-(D)
### (Against all Defendants)

360. Plaintiff City of Palmetto realleges paragraphs 1 through 331 above as if fully set forth herein.

361. At all relevant times, defendants have been "persons" under 18 U.S.C. §1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

362. The Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

363. RICO, among other provisions, makes it unlawful for "any person to conspire to violate" the provisions of 18 U.S.C. §1962(c). 18 U.S.C. §1962(d).

364. As alleged herein, at all relevant times, defendants moved aggressively to capture a large

portion of the opioid sales market. In so doing, the Manufacturing Defendants launched an aggressive nationwide campaign over-emphasizing the under-treatment of pain and deceptively marketing opioids as being: (i) rarely, if ever, addictive; (ii) safe and effective for the treatment of chronic long-term pain; (iii) abuse resistant or deterrent; or (iv) safe and effective for other types of pain for which the drugs were not approved. All defendants knowingly failed to report suspicious orders as required by state and federal law, thereby inundating the market with opioids. In particular, defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (the "Opioid Fraud Enterprise"), whose purpose was to deceive opioid prescribers, the public, and regulators into believing that opioids were safe and effective for the treatment of long-term chronic pain and presented minimal risk of addiction and/or that defendants were in compliance with their state and federal reporting obligations. In doing so, defendants sought to maximize revenues from the design, manufacture, sale and distribution of opioids which, in fact, were highly addictive and often ineffective and dangerous when used for long term, chronic and other types of pain. As a direct and proximate result of their fraudulent scheme and common course of conduct, defendants were able to extract billions of dollars of revenue. As explained in detail below, defendants' years-long misconduct violated 18 U.S.C. § 1962(c) and (d).

a) **The Opioid Fraud Enterprise**

365. At all relevant times, defendants, along with other individuals and entities, including unknown third parties involved in the marketing and sale of opioids, operated an "enterprise" within the meaning of 18 U.S.C. § 1961(4), because they are a group of individuals associated in fact, even though they are not a collective legal entity. The Opioid Fraud

Enterprise: (a) had an existence separate and distinct from each of its component entities; (b) was separate and distinct from the pattern of racketeering in which defendants engaged; and (c) was an ongoing organization consisting of legal entities, including, but not limited to, the Manufacturing Defendants, the Wholesaler Defendants, pharmacies, employees and agents of the FSMB, APF, AAPM, APS and APA, as well as other entities and individuals, including physicians.

366. Within the Opioid Fraud Enterprise, there was a common communication network by which members exchanged information on a regular basis through the use of wires and mail. The Opioid Fraud Enterprise used this common communication network for the purpose of deceptively marketing, selling and distributing opioids to the general public. When their products, sales, distributions and failure to report suspicious sales were contested by other parties, the enterprise members took action to hide the scheme to continue its existence.

367. The participants in the Opioid Fraud Enterprise were systematically linked to each other through corporate ties, contractual relationships, financial ties and the continuing coordination of activities. Through the enterprise, defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses. Each member of the Opioid Fraud Enterprise shared in the bounty generated by the enterprise by sharing the benefit derived from increased sales of opioids and other revenue generated by the scheme to defraud prescribers and consumers and fail to report suspicious sales in Palmetto.

368. The Opioid Fraud Enterprise engaged in and continues to engage in the deceptive marketing of opioids as non-addictive, as safe and effective for chronic long-term pain and for uses which have not been FDA-approved, and the failure to report suspicious sales. The

Opioid Fraud Enterprise has engaged in such activity for the purpose of maximizing the sale and profits of opioids. To fulfill this purpose, the enterprise has advocated for and caused the over-prescription and over-distribution of opioids by marketing, promoting, advertising and selling opioids throughout the country and across state boundaries and by failing to report suspicious sales. Their receipt of monies from such activities consequentially affected interstate and foreign commerce. The enterprise's past and ongoing practices thus constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

369. The Opioid Fraud Enterprise functioned by marketing, selling and distributing opioids to states, counties, other municipalities, doctors, healthcare organizations, pharmacies and the consuming public, while failing to report suspicious sales. However, defendants as co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for defendants and the other entities and individuals associated-in-fact with the enterprise's activities through the deceptive marketing and sale of opioids and the failure to report suspicious sales.

370. Defendants participated in the operation and management of the Opioid Fraud Enterprise by directing its affairs, as described herein. While defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements and financial statements.

371. Each of the members of the Opioid Fraud Enterprise furthered the ends of the enterprise, through the acts and omissions pleaded above and herein.

372. Each of the Manufacturing Defendants relentlessly promoted opioids as having little to no risk of addiction, as being safe and effective for the treatment of long-term chronic pain

and/or other uses for which the drugs were not approved. The Manufacturing Defendants' success in maximizing sales was due to the tight collaboration among the Manufacturing Defendants through and in collaboration with the pain foundations – a formidable partnership that marketed to hundreds of thousands of prescribers across the country, including prescribers in Palmetto. The relationship was strengthened, in part, by individuals, including physicians, that held different leadership roles at different times across the various entities participating in the enterprise over the years.

373. On numerous occasions, the Manufacturing Defendants funded the pain foundations' marketing efforts. The Manufacturing Defendants specifically chose to partner with the pain foundations and individual physicians to publish and otherwise disseminate misleading pro-opioid material, knowing the public and prescribers would be more receptive to statements made by what they perceived to be scholarly, neutral, third party sources.

374. Further, all defendants knowingly failed to design and operate a system to disclose suspicious orders of controlled substances and failed to notify the appropriate DEA field division offices in their areas of suspicious orders, including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

375. The members of the Opioid Fraud Enterprise worked together to further the enterprise by and among the following manner and means:

    a. jointly planning to deceptively market and manufacture opioids that were purportedly non-addictive, safe and effective for the treatment of chronic, long-term pain;

    b. concealing the addictive qualities of the opioids from prescribers and the public;

    c.   misleading the public about the addictive quality and safety and efficacy of opioids;

    d.   otherwise misrepresenting or concealing the highly dangerous nature of opioids from prescribers and the public;

    e.   illegally marketing, selling, and/or distributing opioids;

    f.   collecting revenues and profits from the sale of such products for uses for which they are unapproved, unsafe, or ineffective; and/or

    g.   failing to report suspicious sales as required by the CSA.

376. To achieve their common goals, defendants hid from the general public the full extent of the unsafe and ineffective nature of opioids for chronic pain as described herein. Defendants suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities about the addictive, unsafe and often ineffective nature of opioids.

377. The foregoing allegations support that defendants were part of an association of entities that shared a common purpose, had relationships across the various members of the enterprise and collaborated to further the goals of the enterprise for a continuous period of time. Manufacturing Defendants knowingly and intentionally engaged in deceptive marketing practices, and incentivized pain foundations, marketing firms and physicians to do so as well. Defendants knowingly and intentionally failed to report suspicious orders as required by state and federal law and inundated the market with opioids.

    **b) Mail and Wire Fraud**

378. To carry out and attempt to carry out the scheme to defraud, defendants, each of whom is a person associated in fact with the enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and

which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

379. Specifically, defendants have committed, conspired to commit and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past four years. The multiple acts of racketeering activity which defendants committed, or aided and abetted in the commission of, were related to each other and also posed a threat of continued racketeering activity. They therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by defendants' regular use of the facilities, services, distribution channels and employees of the enterprise. Defendants participated in the scheme to defraud by using the mail, telephone and Internet to transmit mailings and wires in interstate or foreign commerce.

380. In devising and executing the illegal scheme, defendants devised and knowingly carried out a material scheme and/or artifice to defraud regulators, prescribers and the public to obtain money from Palmetto by means of materially false or fraudulent pretenses, representations, promises or omissions of material facts. For the purpose of executing the illegal scheme, defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

381. Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include, but are not limited to:

    a. Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market,

135

sell and distribute the opioids by means of false pretenses, misrepresentations, promises and omissions; and

b. Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises and omissions.

382. Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery and shipment of deceptive marketing materials; the filling of suspicious orders; and the misleading of regulators and the public as to defendants' compliance with their state and federal reporting obligations. These materials would not have been delivered, orders would not have been filled, and regulators would have not been misled but for defendants' illegal scheme, including, but not limited to:

a. the FSMB's publication of opioid prescribing guidelines entitled "Responsible Opioid Prescribing: A Physician's Guide," by Fishman;

b. the FSMB's publication of "Responsible Opioid Prescribing: A Clinician's Guide (Second Edition, Revised and Expanded)," by Fishman;

c. the APF's publication of Exit Wounds;

d. the AAPM's "consensus statement" and educational programs featuring Fine;

e. the APA's publication and dissemination of "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse";

f. false or misleading communications to the public and to regulators;

g. failing to report suspicious orders as required by state and federal law;

h. sales and marketing materials, including slide decks, presentation materials,

purported guidelines, advertising, web sites, product packaging, brochures, labeling and other writings which misrepresented, falsely promoted and concealed the true nature of opioids;

i.  documents intended to facilitate the manufacture and sale of opioids, including bills of lading, invoices, shipping records, reports and correspondence;

j.  documents to process and receive payment for opioids, including invoices and receipts;

k.  payments to the foundations and physicians that deceptively marketed the Manufacturing Defendants' opioids;

l.  deposits of proceeds; and

m.  other documents and things, including electronic communications.

383.  Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. For example, the Manufacturing Defendants made misrepresentations about opioids on their websites, YouTube and through online ads, all of which were intended to mislead prescribers and the public about the safety, efficacy and non- addictiveness of opioids.

384.  Defendants also communicated by U.S. mail, by interstate facsimile and by interstate electronic mail with various affiliates, regional offices, divisions, distributors, regulators and other third-party entities in furtherance of the scheme. The mail and wire transmissions described herein were made in furtherance of defendants' scheme and common course of conduct to deceive prescribers, consumers and regulators, oversupply the market, and fail to report suspicious sales.

385.  Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities

are concealed from Palmetto and cannot be alleged without access to defendants' books and records. However, Palmetto has described the types of predicate acts of mail and/or wire fraud that occurred. The secretive nature of the enterprise's activities made the unlawful tactics discussed herein even more deceptive and harmful.

386. The foregoing allegations support that: the Manufacturing Defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceptively market their products through the use of both print and electronic outlets; and all defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceive regulators and oversupply the market while failing to report suspicious sales.

c) **Conspiracy Allegations**

387. Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the defendants conspired to violate 18 U.S.C. § 1962(c), as described herein.

388. Defendants conspired to incentivize and encourage various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this complaint, to carry out offenses and other acts in furtherance of the conspiracy. Defendants conspired to increase or maintain revenues, increase market share and/or minimize losses for the defendants and their other collaborators throughout the illegal scheme and common course of conduct. In order to achieve this goal, the defendants engaged in the aforementioned predicate acts on numerous occasions. Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in defectively marketing and/or selling opioids through the use of mail and wire fraud.

389. Indeed, for the conspiracy to succeed, each of the defendants had to agree to deceptively market, sell and/or distribute opioids while failing to report suspicious sales. The unanimity of the Manufacturing Defendants' marketing tactics and all defendants' failure to report suspicious sales gave credence to their misleading statements and omissions to prescribers, consumers and regulators and directly caused opioids to inundate the market in Palmetto.

390. Defendants knew and intended that government regulators, prescribers, consumers, and others, including Palmetto, would rely on the collective material misrepresentations and omissions made by them and the other enterprise members about opioids and suspicious sales. Defendants knew and recklessly disregarded the cost that would be suffered by the public, including Palmetto.

391. The Manufacturing Defendants knew that by partnering with the pain foundations and individual physicians who carried a more neutral public image, they would be able to attribute more scientific credibility to their products, thereby increasing their sales and profits.

392. Defendants also knew that by filling and failing to report suspicious sales, they would significantly increase their sales and profits.

393. The foregoing illustrates defendants' liability under 18 U.S.C. § 1962(d), by engaging in their pattern of racketeering and conspiring to achieve their common goal of maximizing opioid sales.

   **d) Effect on Palmetto**

394. As described herein, defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from

consumers, based on their misrepresentations and omissions. The predicate acts also had the same or similar results, participants, victims and methods of commission. The predicate acts were related and not isolated events. The predicate acts all had the purpose of generating significant revenue and profits for defendants, at the expense of Palmetto. The predicate acts were committed or caused to be committed by defendants through their participation in the enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Palmetto's funds.

395. As more fully alleged herein, Palmetto, together with scores of other counties and municipalities, relied upon representations and omissions that were made or caused by defendants.

396. Palmetto's injuries were proximately caused by defendants' racketeering activity. But for defendants' misstatements and omissions and the scheme employed by the Opioid Fraud Enterprise, Palmetto would not be bearing the costs of its current opioid epidemic.

397. By reason of, and as a result of the conduct of each of the defendants, and in particular, their pattern of racketeering activity, Palmetto have been injured in their business and property in multiple ways, including, but not limited to, suffering increased law enforcement and public works expenditures, increased expenditures for overtime, mental health treatment and workers' compensation for its employees, increased emergency and treatment services, damage to emergency equipment and vehicles, and lost productivity, economic opportunity, and tax revenue.

398. Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Palmetto, and Palmetto is entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs and reasonable attorneys' fees

pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

WHEREFORE, The City of Palmetto, acting on behalf of itself and on behalf of its residents, prays that the Court grant the following relief:

A. Enjoin the Manufacturing Defendants from violating Fla. Stat. § 501.021 *et seq.*, by making any further false or misleading statements or omissions related to opioids;

B. Enjoin the Manufacturing Defendants and the Wholesaler Defendants from failing to report suspicious orders as required by the federal CSA, as incorporated by Fla. Stat. § 499.0121(10) and 15(b);

C. Order Defendants to pay cots, losses, and damages for injuries sustained by Palmetto, acting on its own behalf and on behalf of its residents, as a proximate result of the Manufacturing Defendants'' and the Wholesaler Defendants' unlawful conduct as set forth herein, including restitution, disgorgement of unjust enrichment, actual damages, exemplary damages, punitive damages, and attorneys' fees and costs; and

D. Grant any such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff City of Palmetto demands a trial by jury.

Dated this 16 day of August, 2018.

Respectfully Submitted,

/s/ Steven W. Teppler

**Steven W. Teppler**
FBN: 14787
**Brittany R. Ford**
FBN: 0117718
**ABBOTT LAW GROUP, P.A.**
2929 Plummer Cove Road

Jacksonville, FL 32223
Telephone: (904) 292-1111
Facsimile:  (904) 292-1220
steppler@abbottlawpa.com
bford@abbottlawpa.com
soneill@abbottlawpa.com

**William F. Robertson, Jr.**
FBN: 436607
**Kirk-Pinkerton, PA**
240 So. Pineapple Avenue
6th Floor
Sarasota, FL 34236
Telephone: (941) 364-2400
Facsimile:  (941) 364-2490
wrobertson@kirkpinkerton.com

*Counsel for Plaintiff*